## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

**JOSEPH AND KAREN SOMERVILLE, III**
15507 Sir Edwards Drive
Upper Marlboro, MD 20772

**DAVID AND JAMIE MCCRANIE**
8553 Wide Road
Tallahassee, FL 32305

**RANDOLPH WHITLEY**
2433 Mace Street
Orlando, FL 32839

**DALE AND DEBORAH WESSELL**
2 Cinderella Lane, NW, Unit B
Fort Walton Beach, FL 32547

**GILMAN AND KATHLEEN HOFFMAN**
1418 Hardley Court
Bel Air, MD 21014

and

**MARK AND SUSAN KLINE**
23521 Log House Road
Gaithersburg, MD 20882

*Plaintiffs*,

v.

**WEST TOWN BANK & TRUST, A/K/A**
**WEST TOWN SAVINGS BANK**
4852 West 30th Street
Cicero, IL 60804
    <u>Serve on:</u> Roderick Swan, Resident Agent
    9822 Notting Hill Drive
    Frederick, MD 21704

*Defendant*.

Civil Action No.:

---

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Joseph and Karen Somerville, III, David and Jamie McCranie, Randolph Whitley, Dale and Deborah Wessell, Gilman and Kathleen Hoffman, and Mark and Susan Kline, on behalf of themselves and on behalf of the entire class of persons similarly situated, by and through their attorneys, Michael Paul Smith, Melissa L. English and Sarah A. Zadrozny of Smith, Gildea & Schmidt, LLC and Timothy F. Maloney, Veronica B. Nannis and Megan Benevento of Joseph, Greenwald and Laake, P.A., file this Class Action Complaint, sue the Defendant for cause, claim damages, and state as follows:

## **INTRODUCTION**

1.  Plaintiffs Joseph and Karen Somerville, III ("Somerville Plaintiffs"), David and Jamie McCranie ("McCranie Plaintiffs"), Randolph Whitley, Dale and Deborah Wessell ("Wessell Plaintiffs"), Gilman and Kathleen Hoffman ("Hoffman Plaintiffs"), and Mark and Susan Kline ("Kline Plaintiffs") (collectively, "Plaintiffs") and alleged Class Members are borrowers who currently have or had a residential mortgage loan originated and/or brokered by West Town Bank & Trust a/k/a West Town Savings Bank ("West Town"), which was or is secured by  residential real property.

2.  Plaintiffs and alleged Class Members are victims of an illegal kickback and price fixing scheme between West Town and All Star Title, Inc. ("All Star"), a Maryland-based title and settlement services company.

3.  Under the scheme, West Town, by and through its branch managers, loan officers, agents, and/or other employees, received and accepted illegal kickbacks in exchange for the assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services in violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601, *et seq.*  West Town and All Star

laundered the kickbacks through third party marketing companies to conceal the illegal kickbacks and the kickback agreement.

4.      As an essential component of the scheme, All Star conspired to and formed a cartel with various residential mortgage lenders ("All Star Lender Cartel"). West Town participated in the All Star Lender Cartel and, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq*., entered into naked price fixing, minimum pricing and refusal to deal agreements (collectively, the "Cartel Agreements") with All Star related to the residential mortgage loans generated by All Star's illegal kickback payments to West Town.

5.      West Town benefitted, and continues to benefit from the Cartel Agreements, because the supracompetitive prices for title and settlement services charged to West Town borrowers under the Cartel Agreements were financed into the borrower's loans, and West Town charges and earns interest from these supracompetitive prices.

6.      West Town and All Star continuously and regularly used the U.S. Mail and interstate wires in furtherance of the kickback and price fixing scheme, and to identify and defraud borrowers into the All Star Scheme, willfully and intentionally engaging in a pattern of racketeering activity over a period of at least five years.

7.      The kickback and Cartel Agreements, and the resulting supracompetitive prices, were fraudulently concealed by West Town and All Star from Plaintiffs and alleged Class Members by: laundering kickbacks through third party marketing companies, creating sham invoice and payment records, fraudulent representations in marketing materials, false allocation of title and settlement fees and manipulation of the APR associated with West Town loans, and false and fraudulent representations and omissions in West Town borrowers' loan documents, and prevented borrowers, regulators and auditors from

discovering the scheme or kickback and Cartel Agreements and the injuries to West Town borrowers therefrom, thereby allowing the kickbacks and supracompetitive fees to continue.

## PARTIES

8.      Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 as a class action on their own behalf and on behalf of the entire class of people similarly situated.

9.      Plaintiffs Joseph and Karen Somerville, III are residents of Prince George's County, Maryland.

10.     Plaintiffs David and Jamie McCranie are residents of Leon County, Florida.

11.     Plaintiff Randolph Whitley is a resident or Orange County, Florida.

12.     Plaintiffs Dale and Deborah Wessell are residents of Okaloosa County, Florida.

13.     Plaintiffs Gilman and Kathleen Hoffman are residents of Harford County, Maryland.

14.     Plaintiffs Mark and Susan Kline are residents of Montgomery County, Maryland.

15.     Defendant West Town Bank & Trust, also known as West Town Savings Bank, is a commercial bank formed and headquartered in the State of Illinois.  It is engaged in the business of consumer mortgage brokering and/or origination and/or lending and/or otherwise transacted business in the State of Maryland and in other states and is registered to conduct business in the State of Maryland.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), Section 4 of the Sherman Act, 15 U.S.C. § 4, and 18 U.S.C. § 1964(c).

17.     This Court has personal jurisdiction over the parties.  Personal jurisdiction over West Town is appropriate because during the time period alleged herein West Town

continuously transacted business within this District during the applicable time period and engaged in an illegal price fixing agreement to fix the prices charged by All Star for settlement services that was directed at, and had the intended effect of causing injury to, persons residing in or located in this District. In addition, West Town currently transacts business within this District.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a) because West Town is subject to personal jurisdiction in this District and a substantial part of the conduct, events, and omissions giving rise to Plaintiffs' and Class Members' claims occurred within this District, and a substantial portion of the affected interstate trade and commerce has been carried out in this District.

## FACTUAL ALLEGATIONS FOR INDIVIDUAL AND CLASS RELIEF

19. At all relevant times, All Star Title, Inc. ("All Star") is a Maryland corporation and a title and settlement service provider licensed in Maryland and regulated by the Maryland Insurance Administration.  All Star is a licensed title and settlement service provider in more than 30 states, and provides title and settlement services on residential mortgage loans, refinances and reverse mortgages secured by real property in 47 states.

### I.     The All Star Scheme

20. Beginning by at least 2008, All Star designs and executes a scheme ("All Star Scheme") with lenders and their mortgage brokers, loan officers and other employees (collectively, "Participating Lender") to charge borrowers higher prices for title and settlement services and defraud borrowers of their money through the use of U.S. Mail and wires.

21. Under the All Star Scheme, All Star pays kickbacks to Participating Lenders in exchange for the Participating Lender's assignment and referral of residential mortgage loans,

refinances and reverse mortgages to All Star for title and settlement services ("Kickback Agreement").

22.     The amount of the kickback All Star paid is based on the number of loans the Participating Lender assigns and refers to All Star under the Kickback Agreement and the amount of profit All Star realizes on those loans.

   A.     **All Star and Participating Lenders Choose to Use Several Payment Forms and Channels to Conceal the Kickbacks**

23.     All Star pays, and Participating Lenders receive and accept, kickbacks in different forms and by and through different channels, which conceal the kickbacks from Plaintiffs and alleged Class Members, regulators, and auditors.

24.     In some instances, All Star pays kickbacks by purchasing and delivering to a Participating Lender marketing materials for the Participating Lender to use in soliciting borrowers, most commonly postage to be used by a Participating Lender to send direct mail solicitations.

25.     In other instances, All Star pays cash kickbacks by checks written directly to a Participating Lender and/or their branch managers, mortgage brokers, loan officers, or other employees.  Often, a Participating Lender or its employee receives and accepts a kickback check by and through a sham entity set up for the express purpose of receiving and accepting kickbacks and concealing the same.

26.     In most instances, to further conceal the kickbacks, the Participating Lenders and All Star agree to have All Star not issue a check directly to the Participating Lender but instead launders the kickback payment through a third party marketing company.

27.     Participating Lenders frequently use third party marketing companies to produce marketing services aimed at soliciting borrowers to obtain residential mortgage loans,

refinances and reverse mortgages, which increase the volume of loans the Participating

Lender brokers or originates, thereby increasing its net profit and commissions earned.

28.   All Star and Participating Lenders use a variety of third party marketing companies to

launder the kickbacks. Some of these marketing companies specialize in direct mail,

while others specialize in producing data and leads lists of potential borrowers for direct

mail or telemarketing solicitations.  Still other third party marketing companies provide

Participating Lenders "live transfer" leads in which a borrower who contacts a centralized

telemarketing company is transferred "live" to the Participating Lender.

29.   Under the Kickback Agreement, the Participating Lender identifies a third party

marketing company that the Participating Lender uses for marketing services.  The third

party marketing company then produces an invoice for marketing services it produces for

the Participating Lender that was subject to a kickback, All Star makes the kickback

payment to the third party marketing company, and the Participating Lender receives and

accepts the kickback payment when the third party marketing company applies the

payment to the invoice for marketing services for the benefit of the Participating Lender.

30.   To even further conceal the kickbacks and the Kickback Agreement, All Star and the

Participating Lenders request and cause the third party marketing companies to issue

sham invoices that falsely identify All Star as the company purchasing and receiving the

marketing services.  These sham invoices create the false impression that All Star

purchases and receives marketing services when in fact the payment is a kickback

received and accepted by the Participating Lender in exchange for the assignment and

referral of loans to All Star under the Kickback Agreement.

31. The sham invoices conceal the fact that any thing of value is exchanged between All Star and the Participating Lender related to the loans the Participating Lender assigns and refers to All Star under the Kickback Agreement.

32. In some instances, All Star and Participating Lenders request and cause the third party marketing company to issue sham split invoices in which the All Star is issued one invoice and the Participating Lender is issued a second invoice.

33. All Star and the Participating Lenders' choice to use these sham split invoices create the false impression that All Star is purchasing marketing services when in fact that payment is a kickback the Participating Lender is receiving and accepting in exchange for the assignment and referral of loans to All Star under the Kickback Agreement. The sham split invoices also hide All Star and the Participating Lender's coordinated business relationship because there is no Participating Lender listed on the sham split invoice received and paid by All Star.

34. In other instances, All Star and the Participating Lenders choose to conceal the kickback payment entirely by creating sham payment records. To do this, a Participating Lender directs All Star to launder a kickback through the third party marketing company without the use or issuance of any invoice to either All Star or the Participating Lender. Other times, the Participating Lender forwards to All Star an invoice addressed to the Participating Lender and All Star launder a kickback through a third party marketing company by simply referencing the Participating Lender's invoice number.

35. The choice to use sham payment records to conceal the fact that All Star made a payment to the third party marketing company at all and create the false record that the payment provided to the third party marketing company came from the Participating Lender was

an integral part of the Kickback Scheme and Agreement and designed to hide the fact that the payment originates with All Star and also to conceal the fact that All Star and the Participating Lender exchanged any thing of value related to the loans the Participating Lender assigned and referred to All Star under the Kickback Agreement.

### B. All Star and Participating Lenders Form a Cartel to Fix and Charge Borrowers Higher Prices for Title and Settlement Services

36.    One of the purposes of the All Star Scheme is to allow All Star to charge borrowers higher prices for title and settlement service than is possible in a competitive market and to exclude other title and settlement services from the market for title and settlement services on residential mortgage loans, refinances and reverse mortgages.

37.    To achieve these purposes, All Star and Participating Lenders conspire to and form a cartel ("All Star Lender Cartel"), enter agreements and act in restraint of trade.

38.    All Star and Participating Lenders conspire and agree to fix the prices All Star charges the Participating Lender's borrowers for title and settlement services on loans that are assigned and referred to All Star under the Kickback Agreement ("Price Fixing Agreement").

39.    In addition, All Star and the Participating Lenders conspire and agree to minimum prices that borrowers are charged for title and settlement services on loans that are assigned and referred to All Star under the Kickback Agreement ("Minimum Fee Agreements").

40.    The Price Fixing and Minimum Fee Agreements are enforced by an agreement that the Participating Lender refuse to deal with any other title and settlement services company on those loans generated by the kickbacks ("Refusal to Deal Agreement") (collectively, with the Price Fixing and Minimum Fee Agreements, the "Cartel Agreements"), such that

all loans generated by the Kickback Agreement are referred to All Star and are subject to the Price Fixing and Minimum Fee Agreements.

41.     The prices fixed by All Star and the Lenders under the Price Fixing and Minimum Fee Agreements are supracompetitive and higher than the prices that borrowers would otherwise be charged for title and settlement services in a competitive market and without the Cartel Agreements.

42.     An additional purpose of the All Star Lender Cartel formed by All Star and Participating Lenders under the Kickback and Cartel Agreements is to exclude All Star's competitors from the market for title and settlement services on residential mortgage loans, refinances and reverse mortgages, and to deprive borrowers of their choice of title and settlement service provider on loans generated by the All Star funded kickbacks.

43.     Participating Lenders benefit from the Cartel Agreements because: (i) the supracompetitive pricing funds the illegal kickbacks used by Participating Lenders to solicit borrowers, generate residential mortgage loans, and earn substantial interest and commissions, and (ii) the costs for title and settlement service fees were financed into the loan and paid for by borrowers from loan proceeds such that the Participating Lender earns interest and other fees on the supracompetitive pricing.

C.      **All Star and the Participating Lenders Use the U.S. Mail and Interstate Wires to Identify and Lure Borrowers into the All Star Scheme**

44.     All Star and Participating Lenders intend the All Star Scheme to defraud borrowers into paying supracompetitive prices for title and settlement services and to thereby fund and continue the kickbacks All Star is paying Participating Lenders.

45.     In service of this intention, Participating Lenders and All Star use the kickback payments to lure borrowers into the All Star Scheme, and in turn use the interstate mails and wires to identify, solicit and lure borrowers into the All Star Scheme.

46.     Potential borrowers are identified by the third party marketing companies through which All Star and Participating Lenders are laundering the kickbacks.  Many of these third party marketing companies specialize in identifying and soliciting potential borrowers, and compiling and selling borrower data and marketing "leads lists."

47.     Participating Lenders use these lists to solicit borrowers often through printed direct mail pieces such as postcards, letters, "SNAP packs", and other printed material, that encourage borrowers to contact the Participating Lender and apply for a residential mortgage loan, refinance or reverse mortgage.

48.     All Star requires, and Participating Lenders agree, to include false representations in the Participating Lender's direct mail borrower solicitations, stating that a potential borrower would save "30-40% on title fees" by using All Star.  The purpose of these false representations is to: (i) prevent a borrower from trying to use a different title and settlement services company for the loan, (ii) conceal the fixed, supracompetitive pricing resulting from the All Star Scheme, and (iii) create the false representation that the prices charged the borrower for title and settlement services would be lower than the prices charged by All Star competitors.

49.     Participating Lenders and All Star, by and through third party marketing companies, cause borrower data and leads list to be merged onto these direct mail solicitations, and Participating Lenders, by and through the third party marketing companies, cause these fraudulent solicitations to be sent through the interstate U.S. mail.

50.    All Star and Participating Lenders also obtain from third party marketing companies borrower data and leads list to solicit borrowers over the telephone, and Participating Lenders use interstate wires to make these telemarketing calls to potential borrowers. Plaintiffs believe, and therefore aver, that All Star requires, and Participating Lenders agree, to make false representations to borrowers in these telephone solicitations similar to the false representations that All Star and Participating Lenders agree to include in direct mail solicitations.

51.    Participating Lenders also receive "live transfer" leads wherein a borrower calls a centralized call center, and then is transferred by the call center "live" to the Participating Lender.  The third marketing company delivering the live transfer leads transmits the "live transfer" over interstate wires, and the Participating Lender receives the live transfer calls over interstate wires.

52.    All Star's records document that these borrower solicitation techniques lured thousands of borrowers into the All Star Scheme.

**II.    West Town's Participation in the All Star Scheme Beginning by 2010.**

53.    By at least March 2010, West Town, by and through its branch managers, loan officers and other employees, agree to accept and receive kickbacks paid by All Star in exchange for the assignment and referral of West Town loans to All Star for title and settlement services.

54.    All Star pays, and West Town receives and accepts, kickbacks directly from All Star, as well as kickbacks that were laundered through third party marketing companies used by West Town for marketing services.

55.    At all relevant times, West Town's branch managers and loan officers who received and accepted kickbacks are licensed mortgage brokers and/or authorized loan officers, and at all relevant times are acting within scope of the business relationship and duties of their employment on behalf of West Town, specifically seeking borrowers and originating and securing loans for residential mortgages through West Town and/or brokering such loans through West Town to other lenders with whom West Town authorizes, referring West Town borrowers to title companies, and working with title companies to close these loans.   All activities, including interaction with All Star, are for the benefit of West Town.

**A.    West Town's participation in the All Star Scheme by and through the West Town Bel Air South Branch.**

56.    Beginning in early 2010, Christopher Casazza and Brent Erickson are licensed mortgage originators and branch managers employed by West Town in a West Town branch at 1 Bel Air South Parkway in Bel Air, Maryland ("West Town Bel Air South Branch").

57.    On or about March 19, 2010, All Star pays a $3,484 kickback to West Town by and through Titan List and Mailing Services ("Titan"), a Florida based marketing services company.   The sham invoice and payment records appear as Exhibit 1.

58.    The sham invoice states that Titan designs, produces and mails West Town solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these West Town solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the West Town solicitation is placed in the mail in one state and delivered to the potential borrower in another state.

59.    In addition, All Star makes the kickback payment by transmission over interstate wires in the form of a credit card authorization form, with All Star transmitting the kickback

13

payment from Maryland and West Town receiving the payment, by and through Titan, in Florida.

60.    Just a few months later, on or about May 24, 2010, All Star pays a $968 kickback to West Town in the form of 2,200 stamps. Ex. 2, 5/24/10; Ex. 3, 5/26/10 Email.

61.    Plaintiffs believe, and therefore aver, that West Town uses the stamps on borrower solicitations produced internally at West Town. West Town sends these solicitations by U.S. Mail with most, if not all, delivered interstate; that is, West Town places the solicitation in the mail in one state and it is delivered to the potential borrower in another state.

62.    Just a few days later, All Star and West Town reiterate the Kickback and Refusal to Deal Agreements, planning that "All Star should get 8 new orders from this drop." Ex.  4, 5/28/10 Email.

63.    The next month, June, 2010, All Star confronts West Town for a breach of the Refusal to Deal Agreement stating, "We paid for marketing twice and now I'm not getting all the loans from you guys?? Not happy about this….". West Town reassured All Star that it was conforming to the Kickback and Cartel Agreements, stating "U are getting every deal from this last drop and more". Ex. 5, 6/28/10 Email.

64.    The next month, All Star and West Town conspire and agree to fix prices for title and settlement service associated with West Town loans assigned and referred from the West Town Bel Air South Branch at approximately $2,500 for licensed states, and "$1500 PLUS title insurance" for "unlicensed" states; that is, those states in which All Star is not a licensed title and settlement services company and must work with a cooperating title company.  Ex. 6, 7/28/10 Email.

65.     Just a few weeks later, All Star pays a kickback to West Town in the form of stamps used for postage on a borrower solicitation produced internally at West Town. Ex. 7, 8/9/10 Email.

66.     Plaintiffs believe, and therefore aver, that the stamps All Star paid West Town were used on borrower solicitations that All Star and West Town sent by U.S. Mail and most, if not all, were delivered interstate; that is, the West Town solicitation was placed in the mail in one state and delivered to the potential borrower in another state.

67.     The following week. All Star pays a $1,320 kickback to West Town in the form of 3,000 stamps. Ex. 8, 8/13/10 Email.

68.     Plaintiffs believe, and therefore aver, that West Town uses the stamps on borrower solicitations West Town sends by U.S. Mail with most, if not all, delivered interstate; that is, West Town places the solicitation in the mail in one state and it is delivered to the potential borrower in another state.

69.     The next month, on or around September 16, 2010, All Star pays a $7,718 kickback to West Town by and through Titan. The sham invoice and payment records associated with this kickback appear as Exhibit 9.

70.     The sham invoice states that Titan designs, prints and mails West Town solicitations to potential borrowers in Alabama, Illinois and Pennsylvania. Based on the postage charges on the sham invoice, these West Town solicitations are sent by U.S. Mail and are delivered interstate; that is, West Town solicitation is placed in the mail in one state, Florida, and delivered to the potential borrower in another state.

71.     In addition, All Star makes the kickback payment by transmission over interstate wires in the form of a credit card authorization form, with All Star transmitting the kickback

payment from Maryland and West Town receiving the payment, by and through Titan, in Florida.

72.    By the next month, All Star and West Town conspire and agree to fix prices in relation to loans assigned and referred to All Star by West Town Bel Air South Branch.  West Town and All Star agree and fix prices at "$1250 including insurance for FHA Streamlines" and "$2000 including insurance for VA Streamlines" for those loans assigned and referred by George Denikos and Tom Barker, two loan officers West Town employs in the West Town Bel Air South Branch.  West Town and All Star also agree and fix prices at "$1850 including insurance" for loans assigned and referred by Andrew Tsottles, another loan officer West Town employs in the West Town Bel Air South Branch.  Ex. 10, Title Fee Structure Effective 10/1/2010. These prices are $400-$1000 higher than the prices All Star is charging other Participating Lenders, which amount represents the minimum amount of actual damages incurred by West Town borrowers assigned and referred to All Star by the West Town Bel Air South Branch pursuant to the Cartel Agreements.

73.    Less than two weeks later, All Star pays a $1,882.50 kickback to West Town by and through Titan.  The sham invoice and payment records associated with this kickback appear as Exhibit 11.

74.     The sham invoice states that Titan designs, produces and mails West Town solicitations to potential borrowers. Based on the postage charges on the sham invoice, Plaintiffs believe, and therefore aver, that these West Town solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the West Town solicitation is placed in the mail in one state and delivered to the potential borrower in another state.

75.    In addition, All Star makes the kickback payment by transmission over interstate wires in the form of a credit card authorization form, with All Star transmitting the kickback payment from Maryland and West Town receiving the payment, by and through Titan, in Florida.

76.    The same day the kickback is paid, All Star and West Town reiterate the Kickback and Cartel Agreements, with West Town providing All Star with a report of "all deals that are or will be sent to All Star". Ex. 12, 10/6/10 Email.

77.    Two weeks later West Town and All Star agree to increase the number of stamps that All Star is paying as a kickback to West Town "to 1700 per week from 1500." Ex. 13, 10/27/10 Email.

78.    Plaintiffs believe, and therefore aver, that West Town uses the stamps on borrower solicitations that West Town sends by U.S. Mail with most, if not all, delivered interstate; that is, West Town places the solicitation in the mail in one state and it is delivered to the potential borrower in another state.

79.    Within a few days, All Star expands its price fixing agreement to include new brokers at the West Town Bel Air South Branch.  All Star and West Town conspire and agree to fix prices for title and settlements services on those loans assigned and referred to All Star by Chung Tran, a loan officer employed by West Town in the West Town Bel Air South Branch, at "$1350 plus title" for both licensed and unlicensed states. Ex. 14, Fee Sheet. These prices are $200-$550 higher than the prices All Star is charging other Participating Lenders, which amount represents the minimum amount of actual damages incurred by West Town borrowers assigned and referred to All Star by the West Town Bel Air South Branch pursuant to the Cartel Agreements.

80.     The next month, All Star pays a kickback to West Town again in the form of stamps. Ex. 15, 12/10/10 Email. Plaintiffs believe, and therefore aver, that West Town uses the stamps on borrower solicitations that West Town sends by U.S. Mail with most, if not all, delivered interstate; that is, the West Town solicitation is placed in the mail in one state and it is delivered to the potential borrower in another state.

81.     A few days after receiving the stamps, West Town reiterates the Kickback and Cartel Agreements, claiming, "Obviously, all of inbound calls go exclusively to All Star without question." Ex.16, 12/16/ Email.

82.     At the beginning of 2011, All Star and West Town agree that All Star will pay West Town's stamp kickbacks on a monthly basis. Ex. 17, 1/5/11 Email.

83.     Just a few days later, All Star pays West Town a kickback in the form of stamps for the benefit of a new senior mortgage banker West Town employees in the West Town Bel Air South Branch, Derek Adkins.

84.     Plaintiffs believe, and therefore aver, that West Town uses the stamps on borrower solicitations that West Town sends by U.S. Mail with most, if not all, delivered interstate; that is, West Town places the solicitation in the mail in one state and it is delivered to the potential borrower in another state.

85.     The next week, in the last week of January, 2011, All Star pays a $3,300 kickback to West Town in the form of 7,500 stamps.  All Star invites West Town to "[l]et me know when you're running low and I'll order some more." Ex. 18, 1/27/11 Email.

86.     Plaintiffs believe, and therefore aver, that West Town uses the stamps on borrower solicitations that West Town sends by U.S. Mail with most, if not all, delivered interstate;

that is, West Town places the solicitation in the mail in one state and it is delivered to the potential borrower in another state.

87.    Two weeks later, All Star pays West Town a kickback in the form of additional stamps. Ex. 19, 2/15/11.  Plaintiffs believe, and therefore aver, that West Town uses the stamps on borrower solicitations that West Town sends by U.S. Mail with most, if not all, delivered interstate; that Wiest Town places the solicitation in the mail in one state and it is delivered to the potential borrower in another state.

88.    The next month, All Star pays a $1,320 kickback to West Town in the form of 3,000 stamps.  Ex. 20, 3/11/11 Email.  In the same email confirming that West Town receives the kickback, All Star and West Town agree to "go over the loan officers we should add some $ to" in relation to the Price Fixing and Minimum Fee Agreements.

89.    Plaintiffs believe, and therefore aver, that West Town uses the stamps on borrower solicitations that West Town sends by U.S. Mail with most, if not all, delivered interstate; that is, West Town places the solicitation in the mail in one state and it is delivered to the potential borrower in another state.

90.    A few weeks later, at the end of March, 2011, All Star pays a kickback to West Town laundered by and through AMG Lead Source, a New York based data and leads lists provider. Concurrently, All Star pays a $1,320 kickback to West Town in the form of 3,000 stamps. Ex. 21, 3/23/11 Email.

91.    Plaintiffs believe and therefore aver that West Town causes the data from AMG Lead Source to be merged onto borrower solicitations that are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the West Town solicitation is placed in the mail in one state and delivered to the potential borrower in another state.

92.    Plaintiffs believe, and therefore aver, that All Star makes the kickback payment by transmission over interstate wires of a credit card authorization form, with All Star transmitting the kickback payment from Maryland and West Town receiving the payment, by and through AMG Lead Source, in New York.

93.    As a result of this kickback, All Star and West Town agree to raise the title and settlement charges on those loans assigned and referred by Jessica Ewing, a new loan officer employed by West Town in the West Town Bel Air South Branch, by $500. Ex. 22, 4/5/11 Email. This $500 Kickback Surcharge is the minimum amount of actual damages sustained by West Town borrowers assigned and referred by West Town broker Jessica Ewing in performance of the Cartel Agreements.

94.    The next week, on or about March 31, 2011, All Star pays West Town another kickback in the form of stamps. Ex. 23, 3/30/11 Email. Plaintiffs believe, and therefore aver, that West Town uses the stamps on borrower solicitations that West Town sends by U.S. Mail with most, if not all, delivered interstate; that is, the West Town solicitation is placed in the mail in one state and it is delivered to the potential borrower in another state.

95.    Two weeks later, on April 14, 2011, All Star pays West Town another kickback in the form of stamps. Ex. 24, 4/14/11 Email. Plaintiffs believe, and therefore aver, that West Town uses the stamps on borrower solicitations that West Town sends by U.S. Mail with most, if not all, delivered interstate; that is, West Town places the solicitation in the mail in one state and it is delivered to the potential borrower in another state.

96.    Two weeks later, on April 26, 2011, All Star pays West Town another kickback in the form of stamps. Ex. 25, 4/26/11 Email. The next week, on or about March 31, 2011, Plaintiffs believe, and therefore aver, that West Town uses the stamps on borrower

20

solicitations that West Town sends by U.S. Mail with most, if not all, delivered interstate; that is, West Town places the solicitation in the mail in one state and it is delivered to the potential borrower in another state.

97.    Two weeks later, on May 12, 2011, All Star pays West Town another kickback in the form of stamps.  Ex. 26, 5/12/11 Email. Plaintiffs believe, and therefore aver, that West Town uses the stamps on borrower solicitations that West Town sends by U.S. Mail with most, if not all, delivered interstate; that is, West Town places the solicitation in the mail in one state and it is delivered to the potential borrower in another state.

98.    The same day, as a result of the mounting cost of the kickbacks, West Town and All Star conspire and agree to raise prices on all loans assigned and referred to All Star from the West Town Bel Air South Branch by $50. Ex. 26.  This $50 Kickback Surcharge is the minimum amount of actual damages sustained by West Town borrowers assigned and referred to All Star by the West Town Bel Air South Branch in performance of the Cartel Agreements.

99.    A few weeks later, on or about May 23, 2011, All Star pays a kickback to West Town laundered by and through AMG Lead Source, and pays West Town an additional $220 kickback in the form of 500 stamps.  Ex. 27, 5/23/11 Email.

100.    Plaintiffs believe and therefore aver that West Town causes the data from AMG Lead Source to be merged onto borrower solicitations that West Town sends by U.S. Mail with most, if not all, delivered interstate; that is, West Town places the solicitation in the mail in one state and it is delivered to the potential borrower in another state.

101.    Plaintiffs believe, and therefore aver, that All Star makes the kickback payment by transmission over interstate wires in the form of a credit card authorization form, with All

21

Star transmitting the kickback payment from Maryland and West Town receiving the payment, laundered by and through AMG Lead Source, in New York.

102.  Just a few days later, All Star pays another kickback to West Town, again in the form of stamps. Ex. 28, 5/25/11 Email. Plaintiffs believe, and therefore aver, that West Town uses the stamps on borrower solicitations that West Town sends by U.S. Mail with most, if not all, delivered interstate; that is, West Town places the solicitation in the mail in one state and it is delivered to the potential borrower in another state.

103.  Two weeks later, All Star pays another kickback to West Town, again in the form of stamps. Ex. 29, 6/10/11 Email. Plaintiffs believe, and therefore aver, that West Town uses the stamps on borrower solicitations that West Town sends by U.S. Mail with most, if not all, delivered interstate; that is, West Town places the solicitation in the mail in one state and it is delivered to the potential borrower in another state.

104.  Just a few days later, All Star pays a $650 kickback to West Town laundered by and through AMG Lead Source. The sham invoices and payment records appear as Exhibit 30.

105.  According to the sham invoice, West Town is receiving borrower data and lead lists with "phones only". Plaintiffs believe, and therefore aver, that West Town uses these lists to telemarket to potential borrowers. In addition, Plaintiffs believe and therefore aver, that West Town uses the interstate wires for these telemarketing calls, placing the call in one state, Maryland, and the borrower receiving the call in a different state.

106.  A little more than a week later, on June 22, 2011, All Star pays West Town another $1,760 kickback in the form of 4,000 stamps. Plaintiffs believe, and therefore aver, that West Town uses the stamps on borrower solicitations that West Town sends by U.S. Mail

with most, if not all, delivered interstate; that is, West Town places the solicitation in the mail in one state and it is delivered to the potential borrower in another state.

107.    A month later, All Star pays West Town another $880 kickback in the form of 2,000 stamps. Ex. 31, 7/28/11.  Plaintiffs believe, and therefore aver, that West Town uses the stamps on borrower solicitations that West Town sends by U.S. Mail with most, if not all, delivered interstate; that is, West Town places the solicitation in the mail in one state and it is delivered to the potential borrower in another state.

108.    The next month, in August, 2011, All Star and West Town agree to increase the amount of the stamp kickback by 1,000, from 2,000 to 3,000 stamps per week. Ex. 38, 8/16/11 Email.

109.    To pay for the increased kickback, All Star and West Town conspire and agree to raise the prices charged for title and settlement services on loans assigned and referred to All Star from the West Town Bel Air South Branch by $250. Ex. 38.  This $250 Kickback Surcharge, along with the other surcharges and amounts pled herein, constitute the minimum amount of actual damages sustained by West Town borrowers assigned and referred to All Star by the West Town Bel Air South Branch pursuant to the Cartel Agreements.

110.    A few weeks later, All Star pays West Town another $2,640 kickback in the form of 6,000 stamps. Ex. 39, 9/6/11 Email.  Plaintiffs believe, and therefore aver, that West Town uses the stamps on borrower solicitations that West Town sends by U.S. Mail with most, if not all, delivered interstate; that is, West Town places the solicitation in the mail in one state and it is delivered to the potential borrower in another state.

111.   At the end of September, 2011, All Star and West Town reaffirm the Cartel Agreements
and West Town ensures All Star, "I have spoken to the staff and reviewed the fee
structure change accordingly.  All understood and confirmed that they will comply." Ex.
40, 9/21/11.

112.   By November, 2011, All Star is paying kickbacks to West Town in an amount "a little
over 5k in stamps" every month. Ex. 32, 11/1/2011 Email. All Star continues to pay
stamp kickbacks to West Town through February, 2012.  Plaintiffs believe, and therefore
aver, that West Town uses all of these stamps on borrower solicitations that West Town
sends by U.S. Mail with most, if not all, delivered interstate; that is, West Town places
the solicitation in the mail in one state and it is delivered to the potential borrower in
another state.

113.   At the end of April, 2012, All Star "bumps up" the kickback it pays West Town to $1,540
per week in the form of 3,500 stamps per week. Ex. 33, 4/30/12 Email. Plaintiffs believe,
and therefore aver, that West Town uses all of these stamps on borrower solicitations that
West Town sends by U.S. Mail with most, if not all, delivered interstate; that is, West
Town places the solicitation in the mail in one state and it is delivered to the potential
borrower in another state.

114.   In June, 2012, All Star purchases and begins to use software called Titlehound to
generate "pre-HUDS" and other loan documents provided by All Star and West Town to
borrowers and which All Star and West Town intend borrowers to rely. All Star causes its
Price Fixing and Minimum Fee Agreements to be programmed into the software so that
the Cartel Agreements are automatically performed when the software used by All Star
and West Town.

115.    In doing so,  All Star reveals that All Star and West Town have conspire and agreed to fix prices for title and settlement services on those loans assigned and referred by the West Town Bel Air South Branch at  $1650 for "FHA Streamlines", $1650 to $2450 for "VA Streamlines, depending on the loan amount, and $2500 for reverse mortgages.  Ex. 41, 6/14/12 Email. Based on All Star and West Town's continuing pattern of practice, Plaintiffs believe, and therefore aver, that these fixed and minimum prices are in effect at all times that All Star is paying, and West Town is receiving and accepting, kickbacks in any form.

116.     These fixed prices are $450 more than All Star is charging other Participating Lenders, which amount represents the actual damages sustained by West Town borrowers assigned and referred to All Star by the West Town Bel Air South branch pursuant to the Cartel Agreements.

117.    A few months later, in late August, 2012, All Star and West Town agree to "up the stamps to 4k per week".  Ex. 34, 8/29/12 Email.  Plaintiffs believe, and therefore aver, that West Town uses the stamps on borrower solicitations that West Town send by U.S. Mail with most, if not all, delivered interstate; that is, West Town places the solicitation in the mail in one state and it is delivered to the potential borrower in another state.

118.    In April, 2013, All Star and West Town conspire and agree to continue performance of the Cartel Agreements, continuing to charge fixed and minimum prices for title and settlement services on West Town loans assigned and referred to All Star under the Kickback and Cartel Agreements.  Ex. 35, 4/18/13 Jason's Fee Sheet.

119.    A few months later, in September, 2013, All Star and West Town add $250 to the fixed and minimum fees charged for title and settlement services on West Town loans assigned

and referred to All Star under the Kickback and Cartel Agreements. Ex. 36, 9/9/13 Titlehound Client Profile.

120.    West Town and All Star agree to and perform the Kickback and Cartel Agreements through at least 2015, and, on information and belief, longer.   Ex. 37, 2/5/15 Email.

121.    The West Town Bel Air South Branch assigned and referred more than 1,800 loans to All Star involving residential mortgage loans, refinances or reverse mortgages secured by property in more than 44 states.

**B.    West Town's participation in the All Star Scheme by and through the West Town Abingdon Branch.**

122.    By 2011, Justin Hartman is a licensed mortgage originator and loan officer employed by West Town in a West Town branch at 2012 Tollgate Road in Bel Air, Maryland  ("West Town Abington Branch").

123.    In February, 2011, All Star pays a $652 kickback to West Town in the form of stamps. The receipts for All Star's purchase of the stamps appears as Exhibit 42.

124.    Plaintiffs believe, and therefore aver, that West Town uses the stamps on borrower solicitations that West Town sends by U.S. Mail with most, if not all, delivered interstate; that is, West Town places the solicitation in the mail in one state and it is delivered to the potential borrower in another state.

125.    A few weeks later, All Star and West Town conspire and agree to fix prices for title and settlement services for loans assigned and referred to All Star by Hartman in performance of the Kickback and Cartel Agreements.  All Star and West Town agree and fix these prices at "$2000 plus Title Insurance." Ex. 43, Title Fee Structure Effective 3/10/2011. These prices are $150 - $925 higher than the prices All Star is charging other Participating Lenders, which amount represents the minimum amount of actual damages

incurred by West Town borrowers assigned and referred to All Star by Hartman pursuant to the Cartel Agreements.

126.    A few weeks later, in April, 2011, All Star pays West Town a kickback in the form of stamps. Ex. 44, 4/15/11 Email. To further conceal the kickback payment, All Star and West Town agree to funnel the kickback through personal broker PayPal accounts. Plaintiffs believe, and therefore aver, that West Town uses the stamps on borrower solicitations that West Town sends by U.S. Mail with most, if not all, delivered interstate; that is, West Town places the solicitation in the mail in one state and it is delivered to the potential borrower in another state.

127.    The following month, All Star pays a kickback to West Town laundered by and through AMG Lead Source, along with an additional kickback payment in stamps. Ex. 45, 5/19/11 Email. Based on All Star and West Town's continuing pattern of practice with AMG Lead Source, Plaintiffs believe that West Town caused data it received from AMG Lead Source to be merged onto borrower solicitations and placed in the interstate U.S. Mail.

128.    Plaintiffs believe, and therefore aver, that West Town uses the stamps on borrower solicitations that West Town sends by U.S. Mail with most, if not all, delivered interstate; that is, West Town places the solicitation in the mail in one state and it is delivered to the potential borrower in another state.

129.    The next month, in June, 2011, All Star pays a $2000 kickback to West Town laundered by and through Live Calls Now, a Maryland based marketing services company. Email correspondence and a wire transfer record for this kickback appear as Exhibit 46.

130.  According to the email correspondence, West Town is receiving "live transfer" or other telemarketing calls to borrowers. Plaintiffs believe, and therefore aver, that these telemarketing calls are transmitted over interstate wires with the telemarketing call originating in one state and received by a potential borrower in another state.

131.  A few weeks later, All Star reiterates its Kickback and Cartel Agreements with West Town expanding it to new brokers in the West Town Abington Branch, with All Star communicating that "I would honestly expect at a minimum that all of your deals and anything like this would go directly to me without exception." Ex. 47, 7/28/11 Email.

132.  On August 1, 2011 All Star pays an approximately $2200 kickback to West Town. Roughly $400 of the kickback is laundered through Dataman Group, Inc., a Florida based marketing services company.  All Star pays the remaining amount of the kickback in the form of postage.  Email correspondence and a credit card payment receipt associated with the kickbacks appear as Exhibit 48.

133.  According to the email correspondence, Plaintiffs believe, and therefore aver, that West Town merges the data onto borrower solicitations. In addition, Plaintiffs believe and therefore aver that West Town uses the stamps to send the borrower solicitations by U.S. Mail with most, if not all, delivered interstate; that is, West Town places the solicitation in the mail in one state and it is delivered to the potential borrower in another state.

134.  In addition, All Star uses the interstate wires to facilitate this kickback transmitting payment for the kickback over interstate wires in the form of a credit card authorization form sent by All Star in Maryland and received and accepted by West Town by and through Dataman in a different state, Florida.

135.    Based on the continuing pattern of practice between All Star and West Town, Plaintiffs believe, and therefore aver, that All Star and West Town continued to perform the Kickback and Cartel Agreements in relation to the West Town loans assigned and referred by the West Town Abington Branch at least through December, 2011 and, on information and belief, through later times.

136.    The West Town Abington Branch assigned and referred more than 57 loans to All Star for title and settlement services in performance of the Kickback and Cartel Agreements, affecting loan transactions secured by real property in more than 23 states.

**C.    West Town's participation in the All Star Scheme by and through the West Town  Columbus Branch.**

137.    By at least January, 2011, Gordon Yocom is a licensed mortgage originator and loan officer employed by West Town in a West Town branch at 5003 Horizons Drive in Columbus, Ohio   ("West Town Columbus Branch").

138.    On January 3, 2011, All Star pays a $1345.50 kickback to West Town laundered by and through Influence Direct, a Tennessee based marketing services and data and leads list provider.  The sham invoices and payment records associated with this kickback appear as Exhibit 49.

139.    In addition, on the same day, All Star pays a $650 kickback to West Town laundered by and through Davis Data, a Florida based borrower data and leads list provider. The sham invoice and payment records associated with this kickback appear as Exhibit 50.

140.    The sham invoices associated with these kickbacks indicate that West Town causes the data from Davis Data to merged on and into borrower direct mail solicitations Influence Direct designs, produces and places in the U. S. mail.  Plaintiffs believe, and therefore aver, that most, if not all, of the borrower solicitations that All Star and West Town sent

by U.S. Mail are delivered interstate; that is, the West Town solicitation is placed in the mail in one state, Tennessee, and delivered to the potential borrower in another state.

141.    In addition, All Star uses the interstate wires to facilitate this kickback transmitting payment for the kickback over interstate wires in the form of a credit card authorization form sent by All Star in Maryland and received and accepted by West Town by and through Influence Direct in a different state, Tennessee.

142.    All Star requires, and West Town agrees, to include in the West Town borrower solicitations that claim that a potential West Town borrower can "Save an additional 30-40% of your title fees with All Star." Ex. 51, 1/6/11 Email. This representation is false because, under the Kickback and Cartel Agreements, West Town borrowers are not saving any percentage of the price of title and settlement service fees, and these borrowers will pay more, not less, in title and settlement service fees under the Fixed and Minimum Price Agreements.

143.    The following week, All Star and West Town conspire and agree to fix prices in relation to loans assigned and referred to All Star by the West Town Columbus Branch in performance of the Kickback and Cartel Agreements. Ex. 5, Title Fee Structure Effective 1/17/2011. The fixed and minimum prices are $50 - $1,250 higher than the prices All Star is charging other Participating Lenders, which amount represents the minimum amount of actual damages incurred by West Town borrowers assigned and referred to All Star by the West Town Columbus Branch pursuant to the Cartel Agreements.

144.    One week later, All Star pays at $300 kickback to West Town laundered by and through Live Calls Now.  The sham invoice associated with this kickback appears as Exhibit 53.

145.    The invoice indicates West Town is receiving "live transfer" calls.  Plaintiffs believe, and therefore aver, that these "live transfer calls" are received by West Town over interstate wires with the borrower placing the call in one state, and being transferred to West Town's brokers in a different state, Maryland.

146.    The next day, All Star pays another $1,984 kickback to West Town laundered by and through Best Rate Referrals, a Nevada based marketing services company. The sham invoice associated with this kickback appears as Exhibit 54.

147.    Correspondence associated with this kickback indicates that West Town is sending a borrower solicitation through the U.S. Mail. Ex. 55, 1/26/11 Email. Plaintiffs believe, and therefore aver, that most, if not all, of the borrower solicitations that All Star and West Town send by U.S. Mail are delivered interstate; that is, the West Town solicitation is placed in the mail in one state, Nevada, and delivered to the potential borrower in another state.

148.    In July, 2011, All Star pays another $1,200 kickback to All Star laundered by and through Ohio Capital LLC, an Ohio based borrower data and leads list company. The sham invoice and email correspondence associated with this kickback appears as Exhibit 56.

149.    Based on the continuing pattern of practice between All Star and West Town, Plaintiffs believe, and therefore aver, that All Star and West Town continued to perform the Kickback and Cartel Agreements in relation to loans assigned and referred to All Star by the West Town Columbus Branch at least through December, 2011 and, on information and belief, through later times.

150.    The West Town Columbus Branch assigned and referred more than 30 loans to All Star for title and settlement services in performance of the Kickback and Cartel Agreements, affecting loan transactions secured by real property in more than 15 states.

**D.    West Town's participation in the All Star Scheme by and through the West Town South Frederick Branch.**

151.    By January, 2014, Paul Deibler is a licensed mortgage originator and loan officer employed by West Town in the West Town South Frederick branch located at 5340 Spectrum Drive in Frederick, Maryland.

152.    By January 16, 2014, All Star and West Town conspire and agree to fix prices in relation to loans assigned and referred to All Star by the West Town South Frederick Branch in performance of the Kickback and Cartel Agreements. Ex. 57, 1/16/2014. The fixed and minimum prices are $145 - $495 higher than the prices All Star is charging other Participating Lenders, which amount represents the minimum amount of actual damages West Town borrowers assigned and referred to All Star by the West Town South Frederick Branch incur as actual damages.

153.    Correspondence associated with this kickback indicates that All Star causes these fixed and minimum prices to be programmed into its Titlehound software so that the Cartel Agreements will be automatically performed when West Town brokers obtain "pre-HUDs" and other preliminary loan documents All Star and West Town provide borrowers and intend borrowers to rely on.

154.    A few months later, in March, 2014, All Star pays a $925 kickback to West Town laundered by and through Camber Marketing Group, Inc., a Georgia based marketing services company. The sham invoices associated with this kickback appear as Exhibit 58.

155.   According to the sham invoice, West Town causes Camber to merge data onto borrower solicitations and causes those borrower solicitations to be placed in the U. S. Mail. Plaintiffs believe, and therefore aver, that most, if not all, of the borrower solicitations that All Star and West Town sent by U.S. Mail were delivered interstate; that is, the West Town solicitation was placed in the mail in one state, Georgia, and delivered to a potential borrower in different state.

156.   A few months later, in July, 2014, All Star pays a $269 kickback to West Town laundered by and through Zillow, a internet based real estate listing and leads provider. The All Star employee expense sheet documenting this kickback appears as Exhibit 59.

157.   A few months later, in September, 2014, All Star pays another $269 kickback to West Town laundered by and through Zillow. The All Star employee expense sheet documenting this kickback appears as Exhibit 60.

158.   Based on the continuing pattern of practice between All Star and West Town, Plaintiffs believe, and therefore aver, that All Star and West Town continued to perform the Kickback and Cartel Agreements in relation to loans assigned and referred to All Star by the West Town South Frederick Branch at least through March, 2016, and, on information and belief, through later times.

159.   The West Town South Frederick Branch assigned and referred more than 13 loans to All Star for title and settlement services in performance of the Kickback and Cartel Agreements, affecting loan transactions secured by real property in more than 9 states.

**E.    West Town's participation in the All Star Scheme by and through the West Town Indianapolis Branch.**

160.    By October, 2013, Jason Shell is a licensed mortgage originator and loan officer employed by West Town in a West Town branch located at 338 S. Arlington Avenue in Indianapolis, Indiana ("West Town Indianapolis Branch").

161.    By November, 2013, All Star and West Town conspire and agree to fix prices in relation to loans assigned and referred to All Star by the West Town Indianapolis Branch in performance of the Kickback and Cartel Agreements at $2200 for loans in all states in which an attorney is not required to close the transaction, $1,750 for FHA streamlines, and $795 on all "conventional" deals plus title insurance. Ex. 61,  11/20/13 Email. The fixed and minimum prices are $100 - $1,050 higher than the prices All Star is charging other Participating Lenders, which amount represents the minimum amount of actual damages incurred by West Town borrowers assigned and referred to All Star by the West Town Indianapolis Branch.

162.    Correspondence associated with this kickback indicates that All Star causes these fixed and minimum prices to be programmed into its Titlehound software so that the Cartel Agreements will be automatically performed when West Town brokers obtain "pre-HUDs" and other preliminary loan documents West Town and All Star provide borrowers and intend borrowers to rely on. Ex. 61.

163.    A few months later, in March, 2014, All Star pays a $2500 kickback to West Town laundered by and through an unidentified marketing services company. The All Star employee expense report identifying this kickback appears as Exhibit 62.

164.    The next month, in April, 2014, All Star pays a $2,500 kickback to West Town laundered by and through an unidentified marketing services company.  The All Star employee expense report identifying this kickback appears as Exhibit 63.

165.    The expense report identifies West Town as receiving "trigger leads".  Plaintiffs believe, and therefore aver, that these "trigger leads" are live transfer calls transmitted over interstate wires with the borrower call originating in one state and then being transmitted to a call center in a different state and in turn transmitted to West Town in a third state, Maryland.

166.    A couple of months later, in June, 2014, All Star pays a $2500 kickback to West Town laundered by and through an unidentified marketing services and borrower data and leads list provider. The All Star employee expense report identifying this kickback appears as Exhibit 64.

167.    The expense report identifies West Town as receiving "live transfer data".  Plaintiffs believe, and therefore aver, that the "live transfer data" is live transfer calls transmitted over interstate wires with the borrower call originating in one state and then being transmitted to a call center in a different state, and in turn transmitted to West Town in a third state, Maryland.

168.    A couple of months later, in August, 2014, All Star pays a $2,500 kickback to West Town laundered by and through an unidentified marketing services and borrower data and leads list provider.  The All Star employee expense report identifying this kickback appears as Exhibit 65.

169.    The expense report identifies West Town as receiving "Shell Date".  Plaintiffs believe, and therefore aver, that the "Shell Date" is intended to read "Shell Data."  Plaintiffs also believe, based on All Star and West Town's continuing pattern of practice, that the Shell Data is live transfer calls transmitted over interstate wires with the borrower call

originating in one state and then being transmitted to a call center in a different state, and in turn transmitted to West Town in a third state, Maryland.

170. Just a few days after this kickback, All Star and West Town reiterate the Cartel Agreements in relation to the loans assigned and referred to All Star by the West Town Indianapolis Branch. All Star and West Town conspire and agree to fix prices on these loans at "$1,995 including title". Ex. 66, 9/3/14 Fee Sheet. These fixed prices are $145-$1,200 higher than All Star is charging other Participating Lenders, which amount represents the minimum amount of actual damages incurred by West Town borrowers assigned and referred to All Star by the West Town Indianapolis Branch pursuant to the Cartel Agreements.

171. The next month, All Star pays another $2,500 kickback to West Town laundered by and through an unidentified marketing services company. The All Star employee expense report identifying this kickback appears as Exhibit 67.

172. The next month, in November, 2014, All Star pays a $1,500 kickback to West Town laundered through an unidentified marketing services provider. The All Star employee expense report identifying this kickback appears as Exhibit 68.

173. The expense report identifies West Town as receiving "Data". Based on All Star and West Town's continuing pattern of practice, Plaintiffs believe, and therefore aver, that the "data" is live transfer calls transmitted over interstate wires with the borrower call originating in one state and then being transmitted to a call center in a different state, and in turn transmitted to West Town in a third state, Maryland.

174. Based on the continuing pattern of practice between All Star and West Town, Plaintiffs believe, and therefore aver, that All Star and West Town continued to perform the

Kickback and Cartel Agreements in relation to loans assigned and referred to All Star by the West Town Indianapolis Branch at least through December, 2014, and, on information and belief, through later times.

175. The West Town Indianapolis Branch assigned and referred more than 18 loans to All Star for title and settlement services in performance of the Kickback and Cartel Agreements, affecting loan transactions secured by real property in more than 13 states.

   **F.    West Town's participation in the All Star Scheme by and through other various West Town Branches.**

176. By 2011, All Star and West Town conspire and agree to fix prices on loans assigned and referred by West Town to All Star for title and settlement services from additional various West Town branches in several states.  Ex. 69, 2011 Fee Sheet.  These Price Fixing and Minimum Fee Agreements cover West Town Branches in "Ohio", "Crofton", "Westminster", "Pittsburgh", "NC- Lori Snell" and "Frederick – Jason Fox". Collectively, these various branches assigned and referred more than 260 loans to All Star for title and settlement services in performance of the Kickback and Cartel Agreements, affecting loan transactions secured by real property in more than 39 states.

177. By March, 2011, Dan McCabe is a licensed loan originator and loan officer in the West Town "Crofton" Branch.

178. On or about March 1, 2011, All Star pays a $3,409 kickback to West Town laundered by and through Best Rate Referral.  The sham invoices and correspondence related to this kickback appear as Exhibit 70.

179. The sham invoice indicates that West Town is receiving and conducting a direct mail campaign.  Plaintiffs believe, and therefore aver, that most, if not all, of the borrower solicitations that All Star and West Town send by U.S. Mail are delivered interstate; that

is, the West Town solicitation is placed in the mail in one state, Nevada, and delivered to a potential borrower in different state.

180.  In addition, All Star facilitates the payment of the kickback using interstate wires, with payment originating with its bank in Maryland and being transmitted by interstate wires to West Town, by and through Best Rate Referral, in a different state, Nevada.

181.  In correspondence associated with the kickback, All Star indicates that it is "working directly with Lenny and Rod", two corporate managers of West Town.  Plaintiffs believe, and therefore aver, that the "Rod" All Star is referring to is Rod Swan, West Town's Executive Vice President and Chief Banking Officer.

182.  The following week, All Star pays a $559 kickback to West Town again laundered by and through Best Rate Referral. The sham invoice and correspondence associated with this kickback appears as Exhibit 71.

183.  The sham invoice associated with this kickback indicates West Town is receiving borrower data and leads lists. Plaintiffs believe, and therefore aver, that West Town causes this data to be merged on to borrower solicitations that are then placed in the U.S. mail and delivered interstate; that is, the solicitation being placed in the mail in one state and being delivered to the potential borrower in a different state.

184.  Based on the continuing pattern of practice between All Star and West Town, Plaintiffs believe, and therefore aver, that All Star pays kickbacks to West Town by and through other third party marketing companies in addition to those identified herein.

185.  Based on the continuing pattern of practice between All Star and West Town, Plaintiffs believe, and therefore aver, that additional West Town branches and loan officers participate in the All Star Scheme.  Based on the continuing pattern of practice between

All Star and West Town, Plaintiffs believe and therefore aver that every loan West Town assigned and referred to All Star from the period of January 1, 2010 through December 31, 2017 was subject to kickbacks and the Cartel Agreements, including the price fixing and minimum fee agreements.

186. Based on the continuing pattern of practice between All Star and West Town, Plaintiffs believe, and therefore aver, that All Star and West Town have Cartel Agreements with additional known and unknown West Town branches and loan officers in furtherance and performance of the All Star Lender Cartel.

187. As a result of the Kickback and Cartel Agreements, and West Town's participation in the All Star Lender Cartel and wider All Star Scheme, West Town borrowers, including Plaintiffs and alleged Class Members, are harmed because they are charged and pay supracompetitive prices for title and settlement services and prices higher than they would have been charged and paid without the Kickback and Cartel Agreements, and are denied their choice of settlement service provider, and other consumer benefits of a competitive marketplace.

188. No title services were provided by West Town, or any West Town employee and/or agent, associated with the receipt and acceptance of the kickbacks. The payment by All Star and the receipt and acceptance by West Town of the kickbacks are made solely for the assignment and referral of West Town borrowers to All Star.

## FACTUAL ALLEGATIONS RELATED TO THE INDIVIDUAL CLASS REPRESENTATIVES

### A. Joseph and Karen Somerville, III

189. On or about November 2011, Plaintiffs Joseph and Karen Somerville obtain a residential mortgage loan from West Town through Jason McCotter, a loan officer West Town

employs at the West Town Bel Air South Branch, in relation to the refinance of their residential real property located at 15507 Sir Edwards Drive, Upper Marlboro, MD 20772.  The Somerville Plaintiffs' West Town loan closes on or about November 4, 2011.

190.    The Somerville Plaintiffs believe, and therefore aver, that McCotter assigned and referred the Somerville Plaintiffs' loan to All Star in performance of the Refusal to Deal Agreement and as quid pro quo for the kickback All Star paid to West Town by and through the stamps kickbacks described in paragraphs ¶¶ 107-110, thereby performing the Kickback and Cartel Agreements, depriving the Somerville Plaintiffs of their choice of title and settlement service provider, and denying the Somerville Plaintiffs kickback-free title and settlement services.

191.    Plaintiffs believe, and therefore aver, that All Star charges the Somerville Plaintiffs approximately $2,450.00 in title and settlement service fees related to their West Town loan, thereby performing the Price Fixing and Minimum Fee Agreements.  The Somerville Plaintiffs are not in possession of their HUD-1 Settlement Statement, and believe that document is in the sole possession of West Town.

192.    The Somerville Plaintiffs believe, and therefore aver, that the price for title and settlement service fees All Star charges to the Somerville Plaintiffs are supracompetitive and higher than the same charges would have been without the Kickback and Cartel Agreements.

193.    The Somerville Plaintiffs believe, and therefore aver, that these title and settlement service fees included the $250 Kickback Surcharge described in ¶ 109, which is the

minimum amount of the Somerville Plaintiffs' actual damages resulting from the All Star Scheme and Cartel Agreements.

194.    The Somerville Plaintiffs believe, and therefore aver, that All Star disburses proceeds from the Somerville Plaintiffs' West Town loan in payment of these title and settlement service charges.

195.    West Town benefits, and continues to benefit, from the supracompetitive title and settlement service charges related to the Somerville Plaintiffs' loan because they pay for these fees from loan proceeds such that West Town loan earns interest on the title and settlement service fees over the term of their West Town loan.

196.    As a direct and proximate result of the Kickback and Cartel Agreements, and West Town's performance of these agreements, the Somerville Plaintiffs were harmed because they were: (i) charged and paid more for settlement services than they would have paid without the illegal Kickback and Cartel Agreements; (ii) were defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of their choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

197.    As a direct and proximate result of the Kickback and Cartel Agreements, the Somerville Plaintiffs were charged and paid more for the title and settlement services than they would have paid without the Kickback and Cartel Agreements, and suffered actual damages in the amount of at least $250 and, on information and belief, additional amounts.

**B. David and Jamie McCranie**

198.   On or about July 2010, Plaintiffs David and Jamie McCranie obtain a residential mortgage loan from West Town through Jessica Ewing, a loan officer West Town employs at the West Town Bel Air South Branch, in relation to the refinance of their residential real property located at 8553 Wide Road, Tallahassee, FL 32305.   The McCranie Plaintiffs' West Town loan closes on or about July 27, 2010.

199.   The McCranie Plaintiffs believe, and therefore aver, that Ewing assigned and referred the McCranie Plaintiffs' loan to All Star in performance of the Refusal to Deal Agreement and as quid pro quo for the kickback All Star paid to West Town by and through the stamps kickbacks alleged in paragraphs ¶¶ 60-61, thereby performing the Kickback and Cartel Agreements, depriving the McCranie Plaintiffs of their choice of title and settlement service provider, and denying the McCranie Plaintiffs kickback-free title and settlement services.

200.   The McCranie Plaintiffs believe, and therefore aver, that All Star charges the McCranie Plaintiffs approximately $2,500.00 in title and settlement service fees based on and in performance of the Price Fixing and Minimum Fee Agreements alleged in paragraph ¶ 64 and 72 for licensed states, as Florida was a state in which All Star was licensed to provide title and settlement services.   The McCranie Plaintiffs are not in possession of their HUD-1 Settlement Statement, and believe that document is in the sole possession of West Town.

201.   The McCranie Plaintiffs believe, and therefore aver, the price for title and settlement service fees All Star charges to the McCranie Plaintiffs are supracompetitive and higher than the same charges would have been without the Kickback and Cartel Agreements.

202.    The McCranie Plaintiffs believe, and therefore aver, that these title and settlement service fees are approximate $400-$1000 higher than the prices All Star is charging other Participating Lenders as alleged in ¶ 72, which is the minimum amount of the McCranie Plaintiffs' actual damages resulting from the All Star Scheme and Cartel Agreements.

203.    The McCranie Plaintiffs believe, and therefore aver, that All Star disburses proceeds from the McCranie Plaintiffs' West Town loan in payment of these title and settlement service charges.

204.    West Town benefits, and continues to benefit, from the supracompetitive title and settlement service charges related to the McCranie Plaintiffs' loan because they pay for these fees from loan proceeds such that West Town loan earns interest on the title and settlement service fees over the term of their West Town loan.

205.    As a direct and proximate result of the Kickback and Cartel Agreements, and West Town's performance of these agreements, the McCranie Plaintiffs were harmed because they were: (i) charged and paid more for settlement services than they would have paid without the illegal Kickback and Cartel Agreements; (ii) were defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of their choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

206.    As a direct and proximate result of the Kickback and Cartel Agreements, the McCranie Plaintiffs were charged and paid more for the title and settlement services than they would have paid without the Kickback and Cartel Agreements, and suffered actual

damages in the amount of at least $400 and, on information and belief, additional amounts.

### C. Randolph Whitley

207. On or about April 2014, Plaintiff Randolph Whitley obtain a residential mortgage loan from West Town through Jessica Ewing, a loan officer West Town employs at the West Town Bel Air South Branch, in relation to the refinance of his residential real property located at 2433 Mace Street, Orlando, FL 32839.  The Plaintiff Whitley's West Town loan closes on or about April 24, 2014.

208. Plaintiff Whitley believes, and therefore avers, that Ewing assigned and referred Plaintiff Whitley's loan to All Star in performance of the Refusal to Deal Agreement and as quid pro quo for the kickback All Star paid to West Town by and through the stamps kickbacks alleged in ¶ 119, thereby performing the Kickback and Cartel Agreements, depriving Plaintiff Whitley of his choice of title and settlement service provider, and denying Plaintiff Whitley kickback-free title and settlement services.

209. All Star charges Plaintiff Whitley for title and settlement service fees thereby performing the Price Fixing and Minimum Fee Agreements.  Plaintiff Whitley is not in possession of his HUD-1 Settlement Statement, and believes that document is in the sole possession of West Town.

210. Plaintiff Whitley believes, and therefore avers, the price for title and settlement service fees All Star charges to Plaintiff Whitley are supracompetitive and higher than the same charges would have been without the Kickback and Cartel Agreements.

211. Plaintiff Whitley believes, and therefore avers, that these title and settlement service fees included the $500 Kickback Surcharge described in ¶ 93 which is the minimum amount

of Plaintiff Whitley's actual damages resulting from the All Star Scheme and Cartel Agreements.

212.  Plaintiff Whitley believes, and therefore avers, that All Star disburses proceeds from Plaintiff Whitley's West Town loan in payment of these title and settlement service charges.

213.  West Town benefits, and continues to benefit, from the supracompetitive title and settlement service charges related to Plaintiff Whitley's loan because he pays for these fees from loan proceeds such that West Town loan earns interest on the title and settlement service fees over the term of his West Town loan.

214.  As a direct and proximate result of the Kickback and Cartel Agreements, and West Town's performance of these agreements, Plaintiff Whitley was harmed because he was: (i) charged and paid more for settlement services than he would have paid without the illegal Kickback and Cartel Agreements; (ii) was defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of his choice of title and settlement service provider and his mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

215.  As a direct and proximate result of the Kickback and Cartel Agreements, Plaintiff Whitley was charged and paid more for the title and settlement services than he would have paid without the Kickback and Cartel Agreements, and suffered actual damages in the amount of at least $500 and, on information and belief, additional amounts.

**D. Dale and Deborah Wessell**

216.    On or about August 2011, Plaintiffs Dale and Deborah Wessell obtain a residential mortgage loan from West Town through Jessica Ewing, a loan officer West Town employs at the West Town Bel Air South Branch, in relation to the refinance of their residential real property located at 2 Cinderella Lane, NW, Unit B, Fort Walton Beach, FL 32547.  The Wessell Plaintiffs' West Town loan closes on or about August 4, 2011.

217.    The Wessell Plaintiffs believe, and therefore aver, that Ewing assigned and referred the Wessell Plaintiffs' loan to All Star in performance of the Refusal to Deal Agreement and as quid pro quo for the kickback All Star paid to West Town by and through the weekly stamps kickbacks alleged in ¶¶ 102-107 and/or through the $650 kickback laundered by and through AMG Lead Source alleged in ¶¶ 104-105, thereby performing the Kickback and Cartel Agreements, depriving the Wessell Plaintiffs of their choice of title and settlement service provider, and denying the Wessell Plaintiffs kickback-free title and settlement services.

218.    All Star charges the Wessell Plaintiffs for title and settlement service fees thereby performing the Price Fixing and Minimum Fee Agreements.  The Wessell Plaintiffs are not in possession of their HUD-1 Settlement Statement, and believe that document is in the sole possession of West Town.

219.    The Wessell Plaintiffs believe, and therefore aver, the price for title and settlement service fees All Star charges to the Wessell Plaintiffs are supracompetitive and higher than the same charges would have been without the Kickback and Cartel Agreements.

220.    The Wessell Plaintiffs believe, and therefore aver, that these title and settlement service fees included the $500 Kickback Surcharge described in ¶ 93 which is the minimum

amount of the Wessell Plaintiffs' actual damages resulting from the All Star Scheme and Cartel Agreements.

221.   The Wessell Plaintiffs believe, and therefore aver, that All Star disburses proceeds from the Wessell Plaintiffs' West Town loan in payment of these title and settlement service charges.

222.   West Town benefits, and continues to benefit, from the supracompetitive title and settlement service charges related to the Wessell Plaintiffs' loan because they pay for these fees from loan proceeds such that West Town loan earns interest on the title and settlement service fees over the term of their West Town loan.

223.   As a direct and proximate result of the Kickback and Cartel Agreements, and West Town's performance of these agreements, the Wessell Plaintiffs were harmed because they were: (i) charged and paid more for settlement services than they would have paid without the illegal Kickback and Cartel Agreements; (ii) were defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of their choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

224.   As a direct and proximate result of the Kickback and Cartel Agreements, the Wessell Plaintiffs were charged and paid more for the title and settlement services than they would have paid without the Kickback and Cartel Agreements, and suffered actual damages in the amount of at least $500 and, on information and belief, additional amounts.

### E. Gilman and Kathleen Hoffman

225. On or about September 2010, Plaintiffs Gilman and Kathleen Hoffman obtain a residential mortgage loan from West Town through Brian Portner, a loan officer West Town employs at the West Town Bel Air South Branch, in relation to the refinance of their residential real property located at 1418 Hardley Court, Bel Air, MD 21014. The Hoffman Plaintiffs' West Town loan closes on or about September 14, 2010.

226. The Hoffman Plaintiffs believe, and therefore aver, that Portner assigned and referred the Hoffman Plaintiffs' loan to All Star in performance of the Refusal to Deal Agreement and as quid pro quo for the kickback All Star paid to West Town by and through the stamps kickbacks alleged in paragraphs ¶¶ 60-61 and/or 65-67, thereby performing the Kickback and Cartel Agreements, depriving the Hoffman Plaintiffs of their choice of title and settlement service provider, and denying the Hoffman Plaintiffs kickback-free title and settlement services.

227. All Star charges the Hoffman Plaintiffs approximately $2,500.00 in title and settlement service fees based on and in performance of the Price Fixing and Minimum Fee Agreements alleged in paragraph ¶ 64 and 72 for licensed states, as Maryland was a state in which All Star was licensed to provide title and settlement services. The Hoffman Plaintiffs are not in possession of their HUD-1 Settlement Statement, and believe that document is in the sole possession of West Town.

228. The Hoffman Plaintiffs believe, and therefore aver, the price for title and settlement service fees All Star charges to the Hoffman Plaintiffs are supracompetitive and higher than the same charges would have been without the Kickback and Cartel Agreements.

229.    The Hoffman Plaintiffs believe, and therefore aver, that these title and settlement service fees are approximately $400-$1000 higher than the prices All Star is charging other Participating Lenders as alleged in ¶ 72, which is the minimum amount of the Hoffman Plaintiffs' actual damages resulting from the All Star Scheme and Cartel Agreements.

230.    The Hoffman Plaintiffs believe, and therefore aver, that All Star disburses proceeds from the Hoffman Plaintiffs' West Town loan in payment of these title and settlement service charges.

231.    West Town benefits, and continues to benefit, from the supracompetitive title and settlement service charges related to the Hoffman Plaintiffs' loan because they pay for these fees from loan proceeds such that West Town loan earns interest on the title and settlement service fees over the term of their West Town loan.

232.    As a direct and proximate result of the Kickback and Cartel Agreements, and West Town's performance of these agreements, the Hoffman Plaintiffs were harmed because they were: (i) charged and paid more for settlement services than they would have paid without the illegal Kickback and Cartel Agreements; (ii) were defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of their choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

233.    As a direct and proximate result of the Kickback and Cartel Agreements, the Hoffman Plaintiffs were charged and paid more for the title and settlement services than they would have paid without the Kickback and Cartel Agreements, and suffered actual

damages in the amount of at least $400 and, on information and belief, additional amounts.

**F.  Mark and Susan Kline**

234.   On or about February 2015, Plaintiffs Mark and Susan Kline obtain a residential mortgage loan from West Town through Alan Sanders, a loan officer West Town employs at the West Town Bel Air South Branch, in relation to the refinance of their residential real property located at 23521 Log House Road, Gaithersburg, MD 20882. The Kline Plaintiffs' West Town loan closes on or about February 17, 2015.  Ex. 72, Kline Plaintiffs' HUD-1.

235.   The Kline Plaintiffs believe, and therefore aver, that Sanders assigned and referred the Kline Plaintiffs' loan to All Star in continued performance of the Refusal to Deal Agreement and as quid pro quo for the kickback All Star paid to West Town in accordance with ¶ 119, thereby performing the Kickback and Cartel Agreements, depriving the Kline Plaintiffs of their choice of title and settlement service provider, and denying the Kline Plaintiffs kickback-free title and settlement services.

236.   All Star charges the Kline Plaintiffs $2,391.11 in total title and settlement service fees thereby performing the Price Fixing and Minimum Fee Agreements.  The price for title and settlement service fees All Star charges to the Kline Plaintiffs are supracompetitive and higher than the same charges would have been without the Kickback and Cartel Agreements.

237.   These title and settlement service fees included the $250 Kickback Surcharge described in ¶¶ 118-119 which is the minimum amount of the Kline Plaintiffs' actual damages resulting from the All Star Scheme and Cartel Agreements. See Ex. 36, 9/9/13.

238.  All Star disburses proceeds from the Kline Plaintiffs' West Town loan in payment of these title and settlement service charges as reflected on the Kline Plaintiffs' HUD-1. See Ex. 72.

239.  West Town benefits, and continues to benefit, from the supracompetitive title and settlement service charges related to the Kline Plaintiffs' loan because they pay for these fees from loan proceeds such that West Town loan earns interest on the title and settlement service fees over the term of their West Town loan.

240.  As a direct and proximate result of the Kickback and Cartel Agreements, and West Town's performance of these agreements, the Kline Plaintiffs were harmed because they were: (i) charged and paid more for settlement services than they would have paid without the illegal Kickback and Cartel Agreements; (ii) were defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of their choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

241.  As a direct and proximate result of the Kickback and Cartel Agreements, the Kline Plaintiffs were charged and paid more for the title and settlement services than they would have paid without the Kickback and Cartel Agreements, and suffered actual damages in the amount of at least $250 and, on information and belief, additional amounts.

242.  Plaintiffs' transactions and the course of events thereafter exemplify the working of the Kickback and Cartel Agreements and are typical of all alleged Class Members' transactions.

## FACTUAL ALLEGATIONS RELATED TO LIMITATIONS

243.  Essential to the All Star Scheme, West Town, as well as other members of the All Star Lender Cartel, and All Star undertake affirmative acts that fraudulently conceal the Kickback and Cartel Agreements, the resulting kickbacks and fixed prices, and the actual injury and damages to borrowers, including Plaintiffs and alleged Class Members.

    **I.**    **All Star and West Town Launder Kickbacks through Third Party Marketing Companies and Use Sham Invoice and Payment Records.**

244.  As described in ¶ 26 above, West Town and All Star concealed the fact and payment of kickbacks by laundering kickbacks through third party marketing companies.

245.  As described in ¶¶ 30-34, West Town and All Star further concealed the illegal kickbacks and Kickback Agreement through the creation of sham invoices and payment records.

246.  These sham invoices and payment records created an ongoing false record concealing and preventing discovery of the fact that any thing of value was exchanged between West Town and All Star related to the assignment and referral of West Town loans, including Plaintiffs' loans, the actual payment and receipt and acceptance of illegal kickbacks, and West Town's coordinated business relationship with All Star.

    **II.**    **West Town and All Star's Fraudulent Marketing Representations**

247.  To conceal the Price Fixing, Minimum Fee Agreements and Kickback Agreement and the resulting supracompetitive prices charged to West Town borrowers for title and settlement services, West Town and All Star made false representations to borrowers in marketing materials.

248.    In direct mail solicitations of borrowers, West Town represented that borrowers could save "30-40% on title fees with All Star", All Star had "competitive pricing", was a part of West Town's "experienced team of real estate professionals", and was "Our Preferred Title Company." *See, e.g.*, West Town mailer, attached as Exhibit 73.

249.    These representations are false because: (i) West Town did not recognize the designation of a "preferred" title company; (ii)  West Town did not have an employment or ownership relationship with All Star; (iii)  a borrower could not save any percentage of title fees with All Star, but instead would be charged higher and supracompetitive fees under the Price Fixing and Minimum Fee Agreements; (iv) the reason the West Town broker wanted a borrower to use All Star w**a**s for the West Town broker to obtain kickbacks and to perform its obligations under the Cartel Agreements, not because the borrower would receive lower prices; and (v) any borrower responding to the direct mail solicitation would not "choose" All Star, but would be assigned by West Town to All Star and thereby required to use All Star.

250.    Plaintiffs believe, and therefore aver, that West Town made similar false representations by other means, e.g. as in telemarketing phone calls with borrowers.

### III.    West Town and All Star's  False Allocation of Fees and APR Manipulation

251.    The Truth in Lending Act ("TILA") mandates that lenders report to borrowers the Annual Percentage Rate, or "APR", associated with a loan, refinance, or reverse mortgage. While the interest rate of a loan is the cost to borrow the principal loan amount, the APR includes both the interest rate of the loan plus the cost to the borrower of certain fees associated with the loan. The APR is intended as a tool for borrowers to compare, among other things, closing and settlement costs across loans with similar interest rates and to

easily identify when one loan has substantially higher fees than another loan at the same interest rate. Lenders must report to borrowers a calculation of the APR on various loan documents, including the TILA disclosure.

252. Not all title and settlement service fees are included in the APR calculation. TILA identifies the title and settlement service fees that are excluded from the APR calculation. 12 C.F.R. §1026.4(c). Because some fees are excluded from the APR (and others are not) title and settlement service companies and lenders can manipulate – and falsely minimize – the APR by falsely allocating amounts charged for title and settlement services to those categories of fees that TILA excludes from the APR calculation.

253. As a regular and continuing business practice, West Town and All Star choose to falsely allocate the charges for title and settlement services associated with a borrower's loan to only those categories of title services TILA excludes from the APR calculation, thereby falsely minimizing the APR reported on West Town borrowers' loan documents and required federal disclosures.

254. For example, "fees for title examination" and "abstract of title" are excluded from the APR calculation – see, 12 C.F.R. §1026.4(c)(7)(i) – while a settlement or closing fee, or an application signing fee, is a settlement service cost required to be included in the APR calculation. See 12 C.F.R. §1026.4(a)(1)(i). By allocating the charges associated with conducting a settlement or closing with a borrower, or those charges associated with conducting an application signing with a borrower, to the category of "title exam" or "abstract" the result is a false, and falsely minimized, APR.

255. All Star claims the false allocation of fees and manipulation of the APR as a regular business practice as early as 2011 and at least through October, 2015, allocating all

charges for title and settlement service to "Title Exam" or "Abstract" because those fees are excluded from, and do not raise, the Participating Lender's APR.  Ex. 74, 6/6/11 CBC Email; Ex. 75, 9/24/15 CBC Email; Ex. 76, 10/6/15 CBC Email.

256.    West Town ratifies this false allocation of fees on West Town loans assigned and referred to All Star under the Kickback and Cartel Agreements.  See, e.g., Ex. 72, Kline HUD-1. Based on All Star's continuing pattern of practice and West Town's participation in the All Star Scheme, Plaintiffs believe, and therefore aver, that All Star and West Town engage in the false allocation and manipulation of the APR throughout the time period West Town is participating in the All Star Scheme.

257.    West Town's and All Star's choice to falsely allocate fees results in the fraudulent reporting of false APR's and the false, and falsely minimized, representation of the cost of the loan to West Town borrowers.

258.    As a regular business practice, All Star uses various software programs, including "Titlehound", to produce borrower loan documents, including documents reporting the APR associated with a loan. All Star chooses to program this software, including Titlehound, to automatically execute these false allocations of title and settlement service fees and the resulting false APR calculations, and to produce West Town loan documents to present to borrowers and on which West Town and All Star intend borrowers rely. *See e.g.*, Ex. 41.

259.    West Town and All Star's choice to falsely allocate fees and manipulate and falsely report APRs fraudulently conceals from borrowers the coordinated business relationship between West Town and All Star under the Kickback and Cartel Agreements, the supracompetitive and higher prices for title and settlement services resulting from the

Kickback and Cartel Agreements, and affirmatively prevents West Town borrowers from discovering their injuries resulting therefrom.

### IV.    False Representations in West Town Borrowers' Loan Documents

260.    West Town and All Star choose to make other false representations on borrowers' loan documents.

261.    At all relevant times, federal law requires West Town, as a lender, to provide a "Good Faith" Estimate to a borrower within three days of taking a loan application. 12 C.F.R. § 1024.7(a)-(b).

262.    Block 4 of the "Good Faith" Estimate is to state only the charges for "title services and lender's title insurance".

263.    As a regular pattern of practice, West Town falsely includes in Block 4 charges that are not title services and lender's title insurance including, but not limited to, the Kickback Surcharge (see ¶¶ 93, 98, 109) and other overcharges associated with the Price Fixing and Minimum Fee Agreements.

264.    West Town's choice to falsely include these charges in Block 4 of the "Good Faith" Estimate conceals from borrowers: (i) the charges and amounts associated with the surcharges and flat fixed fees, (ii)  the fixed and supracompetitive nature of the charges, (iii)  the illegal kickbacks, and (iv) the coordinated business relationship between West Town and All Star under the Kickback and Cartel Agreements.

265.    In addition to the GFE, federal law, at all relevant times, required each borrower to receive a HUD- Settlement Statement at the closing or settlement of a loan.   The settlement agent produces the HUD-1, but federal regulations require the lender to provide to the settlement agent all information appearing in the HUD-1 statement.

266.    Section 1100 of the HUD-1 reports to the borrower the title and settlement services provided on the loan, along with the associated charges to the borrowers for those services.

267.    As a continuing pattern and regular business practice, West Town and All Star choose and cause the false allocation of fees described in ¶¶ 251-258 to repeat and appear on West Town borrowers' HUD-1 statements in Section 1100.

268.    As a continuing pattern and regular business practice, West Town omits and fails to describe anywhere on a borrower's HUD-1 statement the amount of the kickback received by West Town related to the borrower's loan or the fact that All Star has paid a kickback to West Town for the assignment and referral of the borrower's loan.  West Town is required to report the kickback on Line 801 or Line 808 of the HUD-1.

269.    As a continuing pattern of practice, West Town omits and fails to describe anywhere on a borrower's HUD-1 statement that the borrower is being charged or the amount of any Kickback Surcharge or other flat fee associated with the fixed prices under the Cartel Agreements.  West Town is required to report these amounts in Section 1100 or Section 1300 of the HUD-1.

270.    These false representations and omissions, presented to West Town borrowers by All Star as West Town's agent at closing, fraudulently conceals: (i) the charges and amounts associated with the surcharges and flat fixed fees, (ii) the fixed and supracompetitive nature of the charges, (iii) the illegal kickbacks, and (iv) the coordinated business relationship between West Town and All Star under the Kickback and Cartel Agreements.

271.    Individually and collectively, West Town and All Star's affirmative acts of concealment – the laundering of kickbacks through third party marketing companies, the related creation of shame invoice and payment records, false marketing statements, false allocation of fees and manipulation of the reported APR, and misrepresentations and omissions on borrowers "Good Faith" Estimates, HUD-1s, and other loan documents – are outside the control of West Town borrowers, including Plaintiffs and Class Members, and are in the sole control of, and the result of choices by, West Town and All Star.

## V.    Plaintiffs' Reasonable Diligence

### A.    The Somerville Plaintiffs' Reasonable Diligence

272.    As a result of the fraudulent concealments by West Town and All Star, the Somerville Plaintiffs have no actual notice before, at or after the closing of their West Town loan of the illegal kickbacks, the exchange of any thing of value between West Town and All Star, the Price Fixing and Minimum Fee Agreements, the resulting fixed and supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of West Town or All Star under the Kickback and Cartel Agreements.

273.    The Somerville Plaintiffs exercise reasonable diligence before, during and after the closing of their refinance.

274.    The Somerville Plaintiffs receive loan documents prepared by West Town in advance of their closing and review those loan documents.

275.    The Somerville Plaintiffs believe, and therefore aver, that their pre-closing loan documents include a "Good Faith" Estimate prepared by West Town. The Somerville

Plaintiffs are not in possession of the "Good Faith" Estimate issued regarding their West Town refinance and believe that document is in the sole possession of West Town.

276. The Somerville Plaintiffs believe, and therefore aver, that West Town and All Star choose to omit from their "Good Faith" Estimate any description or statement of the coordinated business relationship between West Town and All Star and to include the fraudulent representations *a*nd omissions described in ¶¶ 261-264. The Somerville Plaintiffs believe and therefore aver that their "Good Faith" Estimate does not identify All Star as the provider of any title settlement service related to their refinance.

277. The Somerville Plaintiffs believe, and therefore aver, that West Town and All Star include in their pre-closing documents West Town and All Star's false allocation of fees and a false APR as described in ¶¶ 251-258.

278. West Town and All Star make the false statements and omissions in the Somerville Plaintiffs' pre-closing loan documents for the purposes of concealing, and did so conceal from the Somerville Plaintiffs, the coordinated business relationship between West Town and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to the Somerville Plaintiffs' loan, and the fixed and supracompetitive nature of prices charged the Somerville Plaintiffs for title and settlement services.

279. As is reasonable under the circumstances, the Somerville Plaintiffs believe these pre-closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Somerville Plaintiffs did not believe, that: (i) a coordinated business relationship exists between West Town and All Star; (ii) there has been any payment or exchange of a thing of value between West Town and All Star

related to the assignment and referral of the Somerville Plaintiffs' West Town loan for title and settlement services, or (iii) the prices they will be charged for title and settlement services are fixed and supracompetitive or the result of Kickback and Cartel Agreements between West Town and All Star.

280. The Somerville Plaintiffs act diligently during the closing or settlement of their loan. As a condition of funding their loan, West Town requires the Somerville Plaintiffs to participate in a closing, and they attend and fully participates in the required closing.

281. At the closing of their loan, the Somerville Plaintiffs receive from All Star, or its agent, several documents, including a HUD-1 Settlement Statement. The Somerville Plaintiffs are not in possession of the documents All Star presents at the closing, including the HUD-1 Settlement Statement, and believe that document is in the sole possession of West Town.

282. The Somerville Plaintiffs believe, and therefore aver, that West Town and All Star choose to omit from the documents the Somerville Plaintiffs receive at closing, including the Somerville Plaintiffs' HUD-1, any description or statement of the coordinated business relationship between West Town and All Star under any of the Kickback or Cartel Agreements.

283. The Somerville Plaintiffs believe, and therefore aver, that West Town and All Star choose to omit from the documents the Somerville Plaintiffs receive at closing, including their HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to West Town related to the Somerville Plaintiffs' loan.

284. The Somerville Plaintiffs believe, and therefore aver, that West Town and All Star choose to include in the documents the Somerville Plaintiffs receive at closing, including

their HUD-1, the false allocation of fees as described in ¶¶ 251-258 and the resulting fraudulent representations and omissions as described in ¶¶ 265-269.

285.    West Town and All Star make the fraudulent omissions and representations and false certifications in the Somerville Plaintiffs' loan closing documents for the purposes of concealing, and did so conceal from the Somerville Plaintiffs, the coordinated business relationship between West Town and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to the Somerville Plaintiffs' loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and the Somerville Plaintiffs' injuries and actual damages therefrom.

286.    As is reasonable under the circumstances, the Somerville Plaintiffs believe these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Somerville Plaintiffs do not believe, that: (i) a coordinated business relationship exists between West Town and All Star; (ii) there has been any payment or exchange of a thing of value between West Town and All Star related to the assignment and referral of the Somerville Plaintiffs' loan for title and settlement services; (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between West Town and All Star.

287.    The Somerville Plaintiffs act diligently after their closing.  On or about November 6, 2018, the Somerville Plaintiffs receive a letter from undersigned counsel describing an investigation of All Star and West Town.  This is the Somerville Plaintiffs' first indication of any potential wrongful, illegal, and/or actionable conduct by anyone.

288.    Within days, the Somerville Plaintiffs contact and retain counsel.  The Somerville Plaintiffs file this Complaint within months of becoming aware of facts giving rise to their causes of action.

**B.    The McCranie Plaintiffs' Reasonable Diligence**

289.    As a result of the fraudulent concealments by West Town and All Star,  the McCranie Plaintiffs have no actual notice before, at or after the closing of their West Town loan of the illegal kickbacks, the exchange of any thing of value between West Town and All Star, the Price Fixing and Minimum Fee Agreements, the resulting fixed and supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of West Town or All Star under the Kickback and Cartel Agreements.

290.    The McCranie Plaintiffs exercise reasonable diligence before, during and after the closing of their refinance.

291.    The McCranie Plaintiffs receive loan documents prepared by West Town in advance of their closing and review those loan documents.

292.    The McCranie Plaintiffs believe, and therefore aver, that their pre-closing loan documents include a "Good Faith" Estimate prepared by West Town.  The McCranie Plaintiffs are not in possession of the "Good Faith" Estimate issued regarding their West Town refinance and believe that document is in the sole possession of West Town.

293.    The McCranie Plaintiffs believe, and therefore aver, that West Town and All Star choose to omit from their "Good Faith" Estimate any description or statement of the coordinated business relationship between West Town and All Star and to include  the fraudulent representations *a*nd omissions described in ¶¶ 261-264. The McCranie Plaintiffs believe

and therefore aver that their "Good Faith" Estimate does not identify All Star as the provider of any title settlement service related to their refinance.

294.    The McCranie Plaintiffs believe, and therefore aver, that West Town and All Star include in their pre-closing documents  West Town and All Star's false allocation of fees and a false APR as described in ¶¶ 251-258.

295.    West Town and All Star make the false statements and omissions in the McCranie Plaintiffs' pre-closing loan documents for the purposes of concealing, and did so conceal from the McCranie Plaintiffs, the coordinated business relationship between West Town and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to the McCranie Plaintiffs' loan, and the fixed and supracompetitive nature of prices charged the McCranie Plaintiffs for title and settlement services.

296.    As is reasonable under the circumstances, the McCranie Plaintiffs believe these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and the McCranie Plaintiffs did not believe, that: (i) a coordinated business relationship exists between West Town and All Star; (ii) there has been any payment or exchange of a thing of value between West Town and All Star related to the assignment and referral of the McCranie Plaintiffs' West Town loan for title and settlement services, or (iii) the prices they will be charged for title and settlement services are fixed and supracompetitive or the result of Kickback and Cartel Agreements between West Town and All Star.

297.   The McCranie Plaintiffs act diligently during the closing or settlement of their loan.  As a condition of funding their loan, West Town requires the McCranie Plaintiffs to participate in a closing, and they attend and fully participates in the required closing.

298.   At the closing of their loan, the McCranie Plaintiffs receive from All Star, or its agent, several documents, including a HUD-1 Settlement Statement.  The McCranie Plaintiffs are not in possession of the documents All Star presents at the closing, including the HUD-1 Settlement Statement, and believe that document is in the sole possession of West Town.

299.   The McCranie Plaintiffs believe, and therefore aver, that West Town and All Star choose to omit from the documents the McCranie Plaintiffs receive at closing, including the McCranie Plaintiffs' HUD-1, any description or statement of the coordinated business relationship between West Town and All Star under any of the Kickback or Cartel Agreements.

300.   The McCranie Plaintiffs believe, and therefore aver, that West Town and All Star choose to omit from the documents the McCranie Plaintiffs receive at closing, including their HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to West Town related to the McCranie Plaintiffs' loan.

301.   The McCranie Plaintiffs believe, and therefore aver, that West Town and All Star choose to include in the documents the McCranie Plaintiffs receive at closing, including their HUD-1, the false allocation of fees as described in ¶¶ 251-258 and the resulting fraudulent representations and omissions as described in ¶¶ 265-269.

302.   West Town and All Star make the fraudulent omissions and representations and false certifications in the McCranie Plaintiffs' loan closing documents for the purposes of

concealing, and did so conceal from the McCranie Plaintiffs, the coordinated business relationship between West Town and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to the McCranie Plaintiffs' loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and the McCranie Plaintiffs' injuries and actual damages therefrom.

303.    As is reasonable under the circumstances, the McCranie Plaintiffs believe these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the McCranie Plaintiffs do not believe, that: (i) a coordinated business relationship exists between West Town and All Star; (ii) there has been any payment or exchange of a thing of value between West Town and All Star related to the assignment and referral of the McCranie Plaintiffs' loan for title and settlement services; (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between West Town and All Star.

304.    The McCranie Plaintiffs act diligently after their closing.  On or about May 1, 2018, the McCranie Plaintiffs receive a letter from undersigned counsel describing an investigation of All Star and West Town.  This is the McCranie Plaintiffs' first indication of any potential wrongful, illegal, and/or actionable conduct by anyone.

305.    Within days, the McCranie Plaintiffs contact and retain counsel.  The McCranie Plaintiffs file this Complaint within months of becoming aware of facts giving rise to their causes of action.

### C.    Plaintiff Whitley's Reasonable Diligence

306.    As a result of the fraudulent concealments by West Town and All Star, Plaintiff Whitley has no actual notice before, at or after the closing of his West Town loan of the illegal

kickbacks, the exchange of any thing of value between West Town and All Star, the Price Fixing and Minimum Fee Agreements, the resulting fixed and supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of West Town or All Star under the Kickback and Cartel Agreements.

307. Plaintiff Whitley exercises reasonable diligence before, during and after the closing of his refinance.

308. Plaintiff Whitley receives loan documents prepared by West Town in advance of his closing and reviews those loan documents.

309. Plaintiff Whitley believes, and therefore avers, that their pre-closing loan documents include a "Good Faith" Estimate prepared by West Town.  Plaintiff Whitley is not in possession of the "Good Faith" Estimate issued regarding his West Town refinance and believes that document is in the sole possession of West Town.

310. Plaintiff Whitley believes, and therefore avers, that West Town and All Star choose to omit from their "Good Faith" Estimate any description or statement of the coordinated business relationship between West Town and All Star and to include the fraudulent representations and omissions described in ¶¶ 261-264. Plaintiff Whitley believes and therefore avers that his "Good Faith" Estimate does not identify All Star as the provider of any title settlement service related to his refinance.

311. Plaintiff Whitley believes, and therefore aver, that West Town and All Star include in his pre-closing documents West Town and All Star's false allocation of fees and a false APR as described in ¶¶ 251-258.

312. West Town and All Star make the false statements and omissions in Plaintiff Whitley's pre-closing loan documents for the purposes of concealing, and did so conceal from

Plaintiff Whitley, the coordinated business relationship between West Town and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to Plaintiff Whitley's loan, and the fixed and supracompetitive nature of prices charged Plaintiff Whitley for title and settlement services.

313.    As is reasonable under the circumstances, Plaintiff Whitley believes these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and Plaintiff Whitley did not believe, that: (i) a coordinated business relationship exists between West Town and All Star; (ii) there has been any payment or exchange of a thing of value between West Town and All Star related to the assignment and referral of Plaintiff Whitley's West Town loan for title and settlement services, or (iii) the prices he will be charged for title and settlement services are fixed and supracompetitive or the result of Kickback and Cartel Agreements between West Town and All Star.

314.    Plaintiff Whitley acts diligently during the closing or settlement of his loan.  As a condition of funding his loan, West Town requires Plaintiff Whitley to participate in a closing, and he attends and fully participates in the required closing.

315.    At the closing of their loan, Plaintiff Whitley receives from All Star, or its agent, several documents, including a HUD-1 Settlement Statement.  Plaintiff Whitley is not in possession of the documents All Star presents at the closing, including the HUD-1 Settlement Statement, and believe that document is in the sole possession of West Town.

316.    Plaintiff Whitley believes, and therefore avers, that West Town and All Star choose to omit from the documents Plaintiff Whitley receives at closing, including Plaintiff

Whitley's HUD-1, any description or statement of the coordinated business relationship between West Town and All Star under any of the Kickback or Cartel Agreements.

317. Plaintiff Whitley believes, and therefore avers, that West Town and All Star choose to omit from the documents Plaintiff Whitley receives at closing, including his HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to West Town related to Plaintiff Whitley's loan.

318. Plaintiff Whitley believes, and therefore avers, that West Town and All Star choose to include in the documents Plaintiff Whitley receives at closing, including his HUD-1, the false allocation of fees as described in ¶¶ 251-258 and the resulting fraudulent representations and omissions as described in ¶¶ 265-269.

319. West Town and All Star make the fraudulent omissions and representations and false certifications in Plaintiff Whitley's loan closing documents for the purposes of concealing, and did so conceal from Plaintiff Whitley, the coordinated business relationship between West Town and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to Plaintiff Whitley's loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and Plaintiff Whitley's injuries and actual damages therefrom.

320. As is reasonable under the circumstances, Plaintiff Whitley believes these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Plaintiff Whitley does not believe, that: (i) a coordinated business relationship exists between West Town and All Star; (ii) there has been any payment or exchange of a thing of value between West Town and All Star related to the assignment and referral of Plaintiff Whitley's loan for title and settlement services; (iii) the prices

charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between West Town and All Star.

321.    Plaintiff Whitley acts diligently after his closing.  On or about May 1, 2018, Plaintiff Whitley receives a letter from undersigned counsel describing an investigation of All Star and West Town.  This is Plaintiff Whitley's first indication of any potential wrongful, illegal, and/or actionable conduct by anyone.

322.    Within days, Plaintiff Whitley contacts and retains counsel.  Plaintiff Whitley files this Complaint within months of becoming aware of facts giving rise to his causes of action.

**D.    The Wessell Plaintiffs' Reasonable Diligence**

323.    As a result of the fraudulent concealments by West Town and All Star,  the Wessell Plaintiffs have no actual notice before, at or after the closing of their West Town loan of the illegal kickbacks, the exchange of any thing of value between West Town and All Star, the Price Fixing and Minimum Fee Agreements, the resulting fixed and supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of West Town or All Star under the Kickback and Cartel Agreements.

324.    The Wessell Plaintiffs exercise reasonable diligence before, during and after the closing of their refinance.

325.    The Wessell Plaintiffs receive loan documents prepared by West Town in advance of their closing and review those loan documents.

326.    The Wessell Plaintiffs believe, and therefore aver, that their pre-closing loan documents include a "Good Faith" Estimate prepared by West Town.  The Wessell Plaintiffs are not

in possession of the "Good Faith" Estimate issued regarding their West Town refinance and believe that document is in the sole possession of West Town.

327. The Wessell Plaintiffs believe, and therefore aver, that West Town and All Star choose to omit from their "Good Faith" Estimate any description or statement of the coordinated business relationship between West Town and All Star and to include  the fraudulent representations *a*nd omissions described in ¶¶ 261-264. The Wessell Plaintiffs believe and therefore aver that their "Good Faith" Estimate does not identify All Star as the provider of any title settlement service related to their refinance.

328. The Wessell Plaintiffs believe, and therefore aver, that West Town and All Star include in their pre-closing documents  West Town and All Star's false allocation of fees and a false APR as described in ¶¶ 251-258.

329. West Town and All Star make the false statements and omissions in the Wessell Plaintiffs' pre-closing loan documents for the purposes of concealing, and did so conceal from the Wessell Plaintiffs, the coordinated business relationship between West Town and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to the Wessell Plaintiffs' loan, and the fixed and supracompetitive nature of prices charged the Wessell Plaintiffs for title and settlement services.

330. As is reasonable under the circumstances, the Wessell Plaintiffs believe these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and the Wessell Plaintiffs did not believe, that: (i) a coordinated business relationship exists between West Town and All Star; (ii) there has been any payment or exchange of a thing of value between West Town and All Star related to the

assignment and referral of the Wessell Plaintiffs' West Town loan for title and settlement services, or (iii) the prices they will be charged for title and settlement services are fixed and supracompetitive or the result of Kickback and Cartel Agreements between West Town and All Star.

331.  The Wessell Plaintiffs act diligently during the closing or settlement of their loan. As a condition of funding their loan, West Town requires the Wessell Plaintiffs to participate in a closing, and they attend and fully participates in the required closing.

332.  At the closing of their loan, the Wessell Plaintiffs receive from All Star, or its agent, several documents, including a HUD-1 Settlement Statement. The Wessell Plaintiffs are not in possession of the documents All Star presents at the closing, including the HUD-1 Settlement Statement, and believe that document is in the sole possession of West Town.

333.  The Wessell Plaintiffs believe, and therefore aver, that West Town and All Star choose to omit from the documents the Wessell Plaintiffs receive at closing, including the Wessell Plaintiffs' HUD-1, any description or statement of the coordinated business relationship between West Town and All Star under any of the Kickback or Cartel Agreements.

334.  The Wessell Plaintiffs believe, and therefore aver, that West Town and All Star choose to omit from the documents the Wessell Plaintiffs receive at closing, including their HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to West Town related to the Wessell Plaintiffs' loan.

335.  The Wessell Plaintiffs believe, and therefore aver, that West Town and All Star choose to include in the documents the Wessell Plaintiffs receive at closing, including their HUD-1, the false allocation of fees as described in ¶¶ 251-258 and the resulting fraudulent representations and omissions as described in ¶¶ 265-269.

336.   West Town and All Star make the fraudulent omissions and representations and false certifications in the Wessell Plaintiffs' loan closing documents for the purposes of concealing, and did so conceal from the Wessell Plaintiffs, the coordinated business relationship between West Town and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to the Wessell Plaintiffs' loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and the Wessell Plaintiffs' injuries and actual damages therefrom.

337.   As is reasonable under the circumstances, the Wessell Plaintiffs believe these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Wessell Plaintiffs do not believe, that: (i) a coordinated business relationship exists between West Town and All Star; (ii) there has been any payment or exchange of a thing of value between West Town and All Star related to the assignment and referral of the Wessell Plaintiffs' loan for title and settlement services; (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between West Town and All Star.

338.   The Wessell Plaintiffs act diligently after their closing.  On or about May 1, 2018, the Wessell Plaintiffs receive a letter from undersigned counsel describing an investigation of All Star and West Town.  This is the Wessell Plaintiffs' first indication of any potential wrongful, illegal, and/or actionable conduct by anyone.

339.   Within days, the Wessell Plaintiffs contact and retain counsel.  The Wessell Plaintiffs file this Complaint within months of becoming aware of facts giving rise to their causes of action.

   **E.**   **The Hoffman Plaintiffs' Reasonable Diligence**

340.    As a result of the fraudulent concealments by West Town and All Star,  the Hoffman Plaintiffs have no actual notice before, at or after the closing of their West Town loan of the illegal kickbacks, the exchange of any thing of value between West Town and All Star, the Price Fixing and Minimum Fee Agreements, the resulting fixed and supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of West Town or All Star under the Kickback and Cartel Agreements.

341.    The Hoffman Plaintiffs exercise reasonable diligence before, during and after the closing of their refinance.

342.    The Hoffman Plaintiffs receive loan documents prepared by West Town in advance of their closing and review those loan documents.

343.    The Hoffman Plaintiffs believe, and therefore aver, that their pre-closing loan documents include a "Good Faith" Estimate prepared by West Town.  The Hoffman Plaintiffs are not in possession of the "Good Faith" Estimate issued regarding their West Town refinance and believe that document is in the sole possession of West Town.

344.    The Hoffman Plaintiffs believe, and therefore aver, that West Town and All Star choose to omit from their "Good Faith" Estimate any description or statement of the coordinated business relationship between West Town and All Star and to include  the fraudulent representations *a*nd omissions described in ¶¶ 261-264. The Hoffman Plaintiffs believe and therefore aver that their "Good Faith" Estimate does not identify All Star as the provider of any title settlement service related to their refinance.

345.    The Hoffman Plaintiffs believe, and therefore aver, that West Town and All Star include in their pre-closing documents  West Town and All Star's false allocation of fees and a false APR as described in ¶¶ 251-258.

346.    West Town and All Star make the false statements and omissions in the Hoffman Plaintiffs' pre-closing loan documents for the purposes of concealing, and did so conceal from the Hoffman Plaintiffs, the coordinated business relationship between West Town and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to the Hoffman Plaintiffs' loan, and the fixed and supracompetitive nature of prices charged the Hoffman Plaintiffs for title and settlement services.

347.    As is reasonable under the circumstances, the Hoffman Plaintiffs believe these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and the Hoffman Plaintiffs did not believe, that: (i) a coordinated business relationship exists between West Town and All Star; (ii) there has been any payment or exchange of a thing of value between West Town and All Star related to the assignment and referral of the Hoffman Plaintiffs' West Town loan for title and settlement services, or (iii) the prices they will be charged for title and settlement services are fixed and supracompetitive or the result of Kickback and Cartel Agreements between West Town and All Star.

348.    The Hoffman Plaintiffs act diligently during the closing or settlement of their loan.  As a condition of funding their loan, West Town requires the Hoffman Plaintiffs to participate in a closing, and they attend and fully participates in the required closing.

349.   At the closing of their loan, the Hoffman Plaintiffs receive from All Star, or its agent, several documents, including a HUD-1 Settlement Statement.  The Hoffman Plaintiffs are not in possession of the documents All Star presents at the closing, including the HUD-1 Settlement Statement, and believe that document is in the sole possession of West Town.

350.   The Hoffman Plaintiffs believe, and therefore aver, that West Town and All Star choose to omit from the documents the Hoffman Plaintiffs receive at closing, including the Hoffman Plaintiffs' HUD-1, any description or statement of the coordinated business relationship between West Town and All Star under any of the Kickback or Cartel Agreements.

351.   The Hoffman Plaintiffs believe, and therefore aver, that West Town and All Star choose to omit from the documents the Hoffman Plaintiffs receive at closing, including their HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to West Town related to the Hoffman Plaintiffs' loan.

352.   The Hoffman Plaintiffs believe, and therefore aver, that West Town and All Star choose to include in the documents the Hoffman Plaintiffs receive at closing, including their HUD-1, the false allocation of fees as described in ¶¶ 251-258 and the resulting fraudulent representations and omissions as described in ¶¶ 265-269.

353.   West Town and All Star make the fraudulent omissions and representations and false certifications in the Hoffman Plaintiffs' loan closing documents for the purposes of concealing, and did so conceal from the Hoffman Plaintiffs, the coordinated business relationship between West Town and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to the Hoffman Plaintiffs' loan,

the fixed and supracompetitive nature of the prices charged for title and settlement services, and the Hoffman Plaintiffs' injuries and actual damages therefrom.

354.    As is reasonable under the circumstances, the Hoffman Plaintiffs believe these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Hoffman Plaintiffs do not believe, that: (i) a coordinated business relationship exists between West Town and All Star; (ii) there has been any payment or exchange of a thing of value between West Town and All Star related to the assignment and referral of the Hoffman Plaintiffs' loan for title and settlement services; (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between West Town and All Star.

355.    The Hoffman Plaintiffs act diligently after their closing.  On or about November 6, 2018, the Hoffman Plaintiffs receive a letter from undersigned counsel describing an investigation of All Star and West Town.  This is the Hoffman Plaintiffs' first indication of any potential wrongful, illegal, and/or actionable conduct by anyone.

356.    Within days, the Hoffman Plaintiffs contact and retain counsel.  The Hoffman Plaintiffs file this Complaint within months of becoming aware of facts giving rise to their causes of action.

###     F.    The Kline Plaintiffs' Reasonable Diligence

357.    As a result of the fraudulent concealments by West Town and All Star,  the Kline Plaintiffs have no actual notice before, at or after the closing of their West Town loan of the illegal kickbacks, the exchange of any thing of value between West Town and All Star, the Price Fixing and Minimum Fee Agreements, the resulting fixed and supracompetitive nature of the prices charged for title and settlement services, or the

coordinated business relationship of West Town or All Star under the Kickback and Cartel Agreements.

358.    The Kline Plaintiffs exercise reasonable diligence before, during and after the closing of their refinance.

359.    The Kline Plaintiffs receive loan documents prepared by West Town in advance of their closing and review those loan documents.

360.    The Kline Plaintiffs believe, and therefore aver, that their pre-closing loan documents include a "Good Faith" Estimate prepared by West Town.  The Kline Plaintiffs are not in possession of the "Good Faith" Estimate issued regarding their West Town refinance and believe that document is in the sole possession of West Town.

361.    The Kline Plaintiffs believe, and therefore aver, that West Town and All Star choose to omit from their "Good Faith" Estimate any description or statement of the coordinated business relationship between West Town and All Star and to include  the fraudulent representations *a*nd omissions described in ¶¶ 261-264. The Kline Plaintiffs believe and therefore aver that their "Good Faith" Estimate does not identify All Star as the provider of any title settlement service related to their refinance.

362.    The Kline Plaintiffs believe, and therefore aver, that West Town and All Star include in their pre-closing documents  West Town and All Star's false allocation of fees and a false APR as described in ¶¶ 251-258.

363.    West Town and All Star make the false statements and omissions in the Kline Plaintiffs' pre-closing loan documents for the purposes of concealing, and did so conceal from the Kline Plaintiffs, the coordinated business relationship between West Town and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks

related to the Kline Plaintiffs' loan, and the fixed and supracompetitive nature of prices charged the Kline Plaintiffs for title and settlement services.

364.    As is reasonable under the circumstances, the Kline Plaintiffs believe these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and the Kline Plaintiffs did not believe, that: (i) a coordinated business relationship exists between West Town and All Star; (ii) there has been any payment or exchange of a thing of value between West Town and All Star related to the assignment and referral of the Kline Plaintiffs' West Town loan for title and settlement services, or (iii) the prices they will be charged for title and settlement services are fixed and supracompetitive or the result of Kickback and Cartel Agreements between West Town and All Star.

365.    The Kline Plaintiffs act diligently during the closing or settlement of their loan.  As a condition of funding their loan, West Town requires the Kline Plaintiffs to participate in a closing, and they attend and fully participates in the required closing.

366.    At the closing of their loan, the Kline Plaintiffs receive from All Star, or its agent, several documents, including a HUD-1 Settlement Statement.  The Kline Plaintiffs review and sign all of the documents All Star presents at the closing, including the HUD-1 Settlement Statement.

367.    West Town and All Star choose to omit from the documents the Kline Plaintiffs receive at their closing, including the Kline Plaintiffs' HUD-1, any description or statement of the coordinated business relationship between West Town and All Star under any of the Kickback or Cartel Agreements.  *See* Ex. 72, Kline Plaintiffs' HUD-1.

368. West Town and All Star choose to omit from the documents the Kline Plaintiffs receive at closing, including their HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to West Town related to the Kline Plaintiffs' loan.

369. West Town and All Star choose to include in the documents the Kline Plaintiffs receive at closing, including their HUD-1, the false allocation of fees as described in ¶¶ 251-258 and the resulting fraudulent representations and omissions as described in ¶¶ 265-269.

370. West Town and All Star make the fraudulent omissions and representations and false certifications in the Kline Plaintiffs' loan closing documents for the purposes of concealing, and did so conceal from the Kline Plaintiffs, the coordinated business relationship between West Town and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to the Kline Plaintiffs' loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and the Kline Plaintiffs' injuries and actual damages therefrom.

371. As is reasonable under the circumstances, the Kline Plaintiffs believe these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Kline Plaintiffs do not believe, that: (i) a coordinated business relationship exists between West Town and All Star; (ii) there has been any payment or exchange of a thing of value between West Town and All Star related to the assignment and referral of the Kline Plaintiffs' loan for title and settlement services; (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between West Town and All Star.

372.   The Kline Plaintiffs act diligently after their closing.  On or about December 28, 2018, the Kline Plaintiffs receive a letter from undersigned counsel describing an investigation of All Star and West Town.  This is the Kline Plaintiffs' first indication of any potential wrongful, illegal, and/or actionable conduct by anyone.

373.   Within days, the Kline Plaintiffs contact and retain counsel.  The Kline Plaintiffs file this Complaint within months of becoming aware of facts giving rise to their causes of action.

### VI.    Accrual and Tolling of Limitations

374.   The Kline Plaintiffs' claims pursuant to pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964 accrued at the earliest, for the purpose of the limitations period provided in 15 U.SC. § 15(b), on the date of their injury, that is on or about February 23, 2015, the date loan proceeds were disbursed and the Kline Plaintiffs incurred and paid the fixed and supracompetitive prices resulting from the Kickback and Cartel Agreements.  The Kline Plaintiffs' claims are brought within four years of that date, and are not subject to any limitations defense.

375.   In addition, and in the alternative, the limitations period provided in 15 U.SC. § 15(b), applicable to claims pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964, is subject to the discovery of injury rule.  *Detrick v. Panalpina,* 108 F.3d 529 (4th Cir. 1997) *cert. denied* 1997 U.S. Dist. LEXIS 4626.  West Town's affirmative acts precluded West Town borrowers, including all Plaintiffs and Class Members, from discovering the fixed and supracompetitive nature of the prices charged for title and settlement services, and affirmatively prevented West Town borrowers, including Plaintiffs and Class Members, from discovering the fact of their injuries resulting therefrom.

376.    As a result, Plaintiffs', and Class Members', claims pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964 did not accrue, for the purpose of the limitations period provided in 15 U.S.C. § 15(b), until such time as Plaintiffs, and Class Members, knew, or should have known, of their injury: for the McCranie Plaintiffs, Whitley, and the Wessell Plaintiffs, on or about May 1, 2018, for the Somerville Plaintiffs and Hoffman Plaintiffs, on or about November 6, 2018, and for the Kline Plaintiffs and, on or about December 28, 2018.

377.    In addition and in the alternative, as a result of West Town's and All Star's fraudulent concealments and Plaintiffs' reasonable diligence before, during and after the closing of Plaintiffs' loans, the statute of limitations as to all causes of action pled herein are and should be tolled beginning on the date of each Plaintiffs' loan closing and continuing until the learning of facts giving rise to the causes of action pled herein: for the McCranie Plaintiffs, Whitley, and the Wessell Plaintiffs, on or about May 1, 2018, for the Somerville Plaintiffs and Hoffman Plaintiffs, on or about November 6, 2018, and for the Kline Plaintiffs and, on or about December 28, 2018.

378.    Plaintiffs believe, and therefore aver, that the fraudulent concealments described herein were an integral component of the Kickback and Cartel Agreements and the All Star Scheme, and typical of all alleged Class Members' transactions such that all Class Members are entitled to the equitable tolling of applicable limitations period.

**COUNT I**
**Violation of the Real Estate Settlement Procedures Act (RESPA),**
**12 U.S.C. § 2607(a)**

379.    Plaintiffs incorporate the above stated paragraphs as if restated herein.

380. All transactions at issue in the instant complaint are incident to or part of real estate settlement services involving federally related mortgage loans and thereby are subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

381. West Town by and through its branch managers, mortgage brokers, loan officers, employees and/or agents received and accepted things of value paid by All Star in exchange for the assignment and referral of business to All Star in violation of RESPA, 12 U.S.C. § 2607(a).

382. All loans referred to All Star under the Kickback Scheme were secured by first or subordinate liens on residential real property and were made in whole or in part by West Town and/or its affiliates whose deposits or accounts are insured by the Federal Government and/or who are regulated by an agency of the Federal Government.

383. The payment and/or arranging of payment of kickbacks to West Town by All Star and West Town's receipt thereof constitute a violation of § 8(a) of RESPA, which prohibits the payment of referral fees or kickbacks pursuant to an agreement in connection with the origination or brokering of federally related mortgage loans.

384. Plaintiffs allege claims for violations of 12 U.S.C. §2607(a) on their own behalf and pursuant to Fed. R. Civ. P. 23 with the class defined as follows:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated or brokered by West Town Bank & Trust a/k/a West Town Savings Bank for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2010, and December 31, 2015. Exempted from this class is any person who, during the period of January 1, 2010 through December 31, 2015, was an employee, officer, member and/or agent of West Town Bank & Trust a/k/a West Town Savings Bank or All Star Title, Inc.

82

(the "RESPA Class").

385.   There are questions of law and fact common to the claims of each and all members of the
       RESPA Class.  These common questions include, but are not limited to:

   a.   Whether there existed a referral agreement between West Town and All Star
        whereby West Town agreed to assign and refer West Town loans, refinances and
        reverse mortgages to All Star in return for kickbacks;

   b.   Whether West Town and its employees and/or agents received illegal kickbacks
        from All Star for the assignment and referral of business to All Star;

   c.   Whether the illegal kickbacks to West Town and its employees and/or agents
        violated RESPA;

   d.   Whether West Town and All Star used third party marketing companies to launder
        kickbacks related to West Town loans;

   e.   Whether Plaintiffs and RESPA Class Members were forced to pay more for said
        settlement services;

   f.   Whether West Town used sham invoices and payment records to actively and
        fraudulently conceal the payment, receipt and acceptance of illegal kickbacks;

   g.   Whether West Town disclosed or described to any borrower its coordinated business
        relationship with All Star or the fact that a thing of value had been exchanged
        between West Town and All Star related to any borrower's loan;

   h.   Whether West Town disclosed or described on any borrowers "Good Faith"
        Estimate, HUD-1 or other loan document West Town's coordinated business
        relationship with All Star or the fact that a thing of value had been exchanged
        between West Town and All Star related to any borrower's loan;

i.  Whether despite exercising reasonable due diligence, Plaintiffs and RESPA Class Members did not and could not have learned of the illegal kickbacks until contacted by counsel;

j.  Whether Plaintiffs and RESPA Class Members are entitled to treble damages under RESPA; and

k.  Whether Plaintiffs and RESPA Class Members are entitled to attorneys' fees and expenses under RESPA.

386.  These common issues of law and fact predominate over any question affecting only individual RESPA Class Members.

387.  Plaintiffs' transactions and claims are typical of the claims or defenses of the respective RESPA Class Members, and are subject to the same statutory measure of damages set forth in 12 U.S.C. § 2607(d)(2).

388.  Plaintiffs will fairly and adequately protect the interests of the RESPA Class. The interests Plaintiffs and all other members of the RESPA Class are identical.

389.  Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class and settlement class counsel in multiple U.S. District Courts in similar litigation, and will adequately represent the RESPA Class's interests.

390.  The RESPA Class consists of borrowers on more than 750 loans, and thus are so numerous that joinder of all members is impracticable.

391.  Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for West Town.

392. This action entails questions of law and fact common to RESPA Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

393. Most members of the RESPA Class are unaware of their rights to prosecute a claim against West Town.

394. No member of the RESPA Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

**COUNT II**
**Violation of the Sherman Act,**
**15 U.S.C. § 1**

395. Plaintiffs incorporate the above stated paragraphs as if restated herein.

396. All Star and West Town conspired to and executed an agreement to fix the price of title and settlement services charged to borrowers on refinances, reverse mortgages, and other mortgage loans, in violation of the Sherman Act, 15 U.S.C. § 1.

397. As a direct and proximate result of the Cartel Agreements between West Town and All Star, Plaintiffs and Class Members were charged and paid supracompetitive prices for title and settlement services and were charged and paid more for title and settlement services than they otherwise would have without the Cartel Agreements.

398. As a direct and proximate result of the Cartel Agreements between West Town and All Star, Plaintiffs and Class Members were injured and suffered actual damages in the amount of at least $250.

399.    Plaintiffs allege claims pursuant to Fed. R. Civ. P. 23 for violations of 15 U.S.C. §1

("Antitrust Class"), with the alleged Antitrust Class defined as:

> All individuals in the United States who were borrowers on a
> refinance, reverse mortgage, or other mortgage loan originated or
> brokered by West Town Bank & Trust a/k/a West Town Savings
> Bank for which All Star Title, Inc. provided a settlement service,
> as identified in Section 1100 on the borrower's HUD-1, between
> January 1, 2010, and December 31, 2017. Exempted from this
> class is any person who, during the period of January 1, 2010
> through December 31, 2017, was an employee, officer, member
> and/or agent of West Town Bank & Trust a/k/a West Town
> Savings Bank or All Star Title, Inc.

400.    The Antitrust Class consists of borrowers on more than 2,100 loans, and thus are so

numerous that joinder of all members is impracticable.

401.    There are questions of law and fact common to the claims of each and all members of the

Antitrust Class and the two Subclasses. These common questions include, but are not

limited to:

a.    Whether West Town and its employees and/or agents violated the Sherman Act

by conspiring to and fixing the title and settlement services fees charged to and

paid by Plaintiffs and Antitrust Class Members;

b.    Whether West Town and its employees and/or agents violated the Sherman Act

by conspiring to and agreeing to supporting the Price Fixing and Minimum Fee

Agreements through a concerted refusal to deal with non-cartel title and

settlement service companies on all West Town loans generated by the Kickback

Agreement;

c.    Whether the prices charged West Town borrowers pursuant to the Cartel

Agreements were supracompetitive, and higher than prices that would have been

charged without the Cartel Agreements;

d.  Whether West Town made false representations to borrowers to actively conceal the Cartel Agreements and supracompetitive prices resulting therefrom;

e.  Whether West Town and All Star falsely allocated fees and otherwise manipulated APR calculation on Class Members' loans to actively conceal the Cartel Agreements and the supracompetitive prices charged West Town borrowers in performance of those agreements;

f.  Whether West Town and All Star made false representations on West Town borrowers' Good Faith Estimates, HUD-1 and other loan documents to actively conceal the Cartel Agreements and the supracompetitive prices charged West Town borrowers in performance of those agreements;

g.  Whether despite exercising reasonable due diligence, Plaintiffs and Class Members did not and could not have learned of the Cartel Agreements, the supracompetitive prices charged for title and settlement services, and their injuries and actual damages therefrom, until contacted by counsel;

h.  Whether Plaintiffs and the Antitrust Class are entitled to treble damages under the Sherman Act; and

i.  Whether Plaintiffs and the Antitrust Class are entitled to attorneys' fees and expenses under the Sherman Act.

402. These common issues of law and fact predominate over any question affecting only individual Antitrust Class Members.

403. Plaintiffs' transactions and claims are typical of the claims or defenses of the respective Antitrust Class Members, and are subject to the same statutory measure of damages set forth in 15 U.S.C. § 15(a).

404. Plaintiffs will fairly and adequately protect the interests of the Antitrust Class. The interests of the named Plaintiffs and all other members of the Antitrust Class are identical.

405. Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class counsel in related litigation, and will adequately represent the Antitrust Class's interests.

406. Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for West Town.

407. This action entails questions of law and fact common to Antitrust Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

408. Most members of the Antitrust Class are unaware of their rights to prosecute a claim against West Town.

409. No member of the Antitrust Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

**COUNT III**
**Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO)**
**18 U.S.C. § 1962**

410. Plaintiffs incorporate the above stated paragraphs as if restated herein.

411. West Town is a person for the purposes of 18 U.S.C. § 1962(a).

412.    The All Star Scheme constitutes an enterprise for the purposes of 18 U.S.C. § 1962(a). The activities of the All Star Scheme Enterprise affect interstate commerce across more than 30 states.

413.    West Town and All Star perpetrated the All Star Scheme for the purpose of defrauding borrowers into paying fixed and supracompetitive prices for title and settlement services related to West Town residential mortgage, refinance and reverse mortgages, and to thereby deprive borrowers of their money and/or property.

414.    The use of the U.S. Mail and interstate wires by West Town and All Star in furtherance of the All Star Scheme, as pled herein, constitutes a pattern of racketeering activity.

415.    West Town received, and continues to receive, income derived from this pattern of racketeering activity in the form of the kickbacks paid by All Star to West Town, and through the interest, fees and other income earned on the West Town mortgages, refinances and reverse mortgages resulting from the pattern of racketeering activity.

416.    West Town improperly used and invested the income it received from the pattern of racketeering activity in furtherance of the All Star Scheme Enterprise and for the purpose of luring borrowers into the All Star Scheme Enterprise in violation of 18 U.S.C. § 1962.

417.    As a direct and proximate result of West Town's pattern of racketeering activity, Plaintiffs and Class Members were injured and suffered actual damages in the amount of at least $250.

418.    Plaintiffs allege claims pursuant to 18 U.S.C. § 1964(c) on their behalf and pursuant to Fed. R. Civ. P. 23 for violations of 18 U.S.C. § 1962(a) ("RICO Class"), with the alleged RICO Class defined as:

> All individuals in the United States who were borrowers on a refinance, reverse mortgage, or other mortgage loan originated or

brokered by West Town Bank & Trust a/k/a West Town Savings Bank for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2010, and December 31, 2017. Exempted from this class is any person who, during the period of January 1, 2010 through December 31, 2017, was an employee, officer, member and/or agent of West Town Bank & Trust a/k/a West Town Savings Bank or All Star Title, Inc.

419.  The RICO Class consists of borrowers on more than 2,100 loans, and thus are so numerous that joinder of all members is impracticable.

420.  There are questions of law and fact common to the claims of each and all members of the RICO Class. These common questions include, but are not limited to:

  a.  Whether West Town and All Star formed an enterprise;

  b.  Whether the activities of the All Star Scheme Enterprise affected interstate commerce;

  c.  Whether one purpose of the All Star Scheme was to deprive borrowers of money or property;

  d.  Whether West Town and All Star used the interstate U.S. Mail in furtherance of the All Star Scheme and All Star Scheme Enterprise;

  e.  Whether West Town and All Star used the interstate wires in furtherance of the All Star Scheme and the All Star Scheme Enterprise;

  f.  Whether West Town received income from a pattern of racketeering activity;

  g.  Whether West Town used income derived from a pattern of racketeering activity in support of, or in furtherance of, the All Star Scheme Enterprise;

  h.  Whether West Town actively conceal the All Star Scheme, the supracompetitive prices and

i.   Whether Plaintiffs' and RICO Class members knew or should have known of their injuries resulting from West Town's violation of 18 U.S.C. § 1962(a);

j.   Whether West Town and All Star's fraudulent concealments prevented Plaintiffs' and RICO class members from discovering their injuries proximately caused by the West Town's pattern of racketeering activity;

k.   Whether Plaintiffs and the RICO Class are entitled to treble damages pursuant to 18 U.S.C. § 1964(c); and

l.   Whether Plaintiffs and the RICO Class are entitled to attorneys' fees and expenses pursuant to 18 U.S.C. § 1964(c).

421.   These common issues of law and fact predominate over any question affecting only individual RICO Class Members.

422.   Plaintiffs' transactions and claims are typical of the claims or defenses of the respective RICO Class Members.

423.   Plaintiffs will fairly and adequately protect the interests of the RICO Class. The interests of the named Plaintiffs and all other members of the RICO Class are identical.

424.   Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class counsel in related litigation, and will adequately represent the RICO Class's interests.

425.   Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for West Town.

426.   This action entails questions of law and fact common to RICO Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class

action is superior to other available methods of fair and efficient adjudication of this litigation.

427.    Most members of the RICO Class are unaware of their rights to prosecute a claim against West Town.

428.    No member of the RICO Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

**WHEREFORE**, Plaintiffs respectfully demand:

a.    This Court to certify the RESPA, Antitrust, and RICO Classes pursuant to Federal Rule of Civil Procedure 23 and set this matter for trial;

b.    Judgment for Plaintiffs and RESPA Members against West Town Bank & Trust a/k/a West Town Savings Bank and award Plaintiffs and RESPA Class Members treble damages for title and settlement services charged by All Star, including, but not limited to, title insurance premiums, in an amount equal to three times the amount of any charge paid for such settlement services, pursuant to 12 U.S.C. § 2607(d)(2);

c.    Judgment for Plaintiffs and Antitrust Class Members against West Town Bank & Trust a/k/a West Town Savings Bank and award Plaintiffs and Antitrust Class Members damages in the amount equal to three times the actual damages caused by the Cartel Agreements pursuant to 15 U.S.C. § 15(a);

d.    Judgment for Plaintiffs and RICO Class Members against West Town Bank & Trust a/k/a West Town Savings Bank and award Plaintiffs and RICO Class Members damages in the amount equal to three times the actual damages caused by the All Star Scheme pursuant to 18 U.S.C. § 1964(c);

e.  Reasonable attorneys' fees, interest and costs pursuant to 12 U.S.C. § 2607(d)(5), 15 U.S.C. § 15(a), and 18 U.S.C. § 1964(c); and

f.  For such other and further relief as this Court deems proper.

Respectfully submitted,

| | |
|---|---|
| _____/s/_____ | _____/s/_____ |
| Timothy F. Maloney, Esq. #03381 | Michael Paul Smith, Esq. #23685 |
| Veronica B. Nannis, Esq. #15679 | Melissa L. English, Esq. #19864 |
| Megan A. Benevento, Esq. #19883 | Sarah A. Zadrozny, Esq. #13911 |
| Joseph, Greenwald & Laake, P.A. | Smith, Gildea & Schmidt, LLC |
| 6404 Ivy Lane, Suite 400 | 600 Washington Avenue, Suite 200 |
| Greenbelt, Maryland 20770 | Towson, Maryland 21204 |
| (301) 220-2200 / (301) 220-1214 (fax) | (410) 821-0070 / (410) 821-0071 (fax) |
| Email: tmaloney@jgllaw.com | Email: mpsmith@sgs-law.com |
| vnannis@jgllaw.com | menglish@sgs-law.com |
| mbenevento@jgllaw.com | szadrozny@sgs-law.com |
| *Co-Counsel for Plaintiffs and Class Members* | *Counsel for Plaintiffs and Class Members* |

**PRAYER FOR JURY TRIAL**

Plaintiffs and Class Members hereby request a trial by jury on the foregoing Class Action Complaint.

| | |
|---|---|
| _____/s/_____ | _____/s/_____ |
| Timothy F. Maloney, Esq. #03381 | Michael Paul Smith, Esq. #23685 |
| Veronica B. Nannis, Esq. #15679 | Melissa L. English, Esq. #19864 |
| Megan A. Benevento, Esq. #19883 | Sarah A. Zadrozny, Esq. #13911 |
| Joseph, Greenwald & Laake, P.A. | Smith, Gildea & Schmidt, LLC |
| 6404 Ivy Lane, Suite 400 | 600 Washington Avenue, Suite 200 |
| Greenbelt, Maryland 20770 | Towson, Maryland 21204 |
| (301) 220-2200 / (301) 220-1214 (fax) | (410) 821-0070 / (410) 821-0071 (fax) |
| Email: tmaloney@jgllaw.com | Email: mpsmith@sgs-law.com |
| vnannis@jgllaw.com | menglish@sgs-law.com |
| mbenevento@jgllaw.com | szadrozny@sgs-law.com |
| *Co-Counsel for Plaintiffs and Class Members* | *Counsel for Plaintiffs and Class Members* |