# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Southern Division

JOSEPH AND KAREN SOMERVLLE, *et al.*,       *

      Plaintiffs,                   *

v.                               *

                                    Civil Action No.: PJM-19-490

WEST TOWN BANK & TRUST,        *

      Defendant.              *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT WEST TOWN BANK & TRUST'S MOTION TO DISMISS

Brian L. Moffet (Fed Bar No. 13821)
Ranak K. Jasani (Fed. Bar No. 27383)
Michael B. Brown (Fed. Bar No. 19641)
MILES & STOCKBRIDGE, P.C.
100 Light Street
Baltimore, Maryland 21202
410-727-6464
bmoffet@milesstockbridge.com

*Attorneys for Defendant*
*West Town Bank & Trust*

## TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................2

II.  FACTUAL ALLEGATIONS ..........................................................................3

III. STANDARD OF REVIEW ON MOTION TO DISMISS ......................................6

IV. ARGUMENT...................................................................................................7

    A.  PLAINTIFFS' RESPA AND RICO CLAIMS ARE TIME-BARRED. ...........................7

        1.  Limitations Is Properly Decided On A Motion To Dismiss. .........................................7

        2.  Plaintiffs' RESPA Claims Are Time-Barred. .................................................................7

        3.  Plaintiffs' RICO Claims Are Time-Barred. ..................................................................9

        4.  Plaintiffs Fail To Sufficiently Allege Fraudulent Concealment To Toll The Limitations Period. ...........................................................................................12

    B.  PLAINTIFFS FAIL TO STATE A PLAUSIBLE SHERMAN ACT CLAIM. ..............28

        1.  To Avoid Dismissal, A Plaintiff Must Allege Every Element Of A Sherman Act Claim. ...........................................................................................................28

        2.  The Complaint Fails To State A Plausible Claim For Unlawful Price-Fixing. ..........28

        3.  Plaintiffs Fail to Allege An Unlawful Refusal To Deal Or Exclusive Dealing.........34

        4.  Plaintiffs Have Not Alleged an Antitrust Injury to Confer Antitrust Standing.........37

    C.  PLAINTIFFS FAIL TO STATE A PLAUSIBLE RICO CLAIM...................................38

        1.  RESPA Is Not A Predicate Act Of RICO. .................................................................38

        2.  Plaintiffs Fail To Allege A Fraudulent Scheme By West Town................................40

V.  CONCLUSION ...........................................................................................44

Defendant West Town Bank & Trust ("West Town"), through its undersigned counsel and pursuant to Rule 12(b)(6), respectfully submits this Memorandum of Law in Support of its Motion to Dismiss the Class Action Complaint and Demand for Jury Trial ("Complaint") filed by Plaintiffs Joseph and Karen Somerville, David and Jamie McCranie, Randolph Whitley, Dale and Deborah Wessell, Gilman and Kathleen Hoffman, and Mark and Susan Kline (collectively, "Plaintiffs").  As explained below, Plaintiffs' claims against West Town should be dismissed because they are either time-barred or otherwise fail to state a plausible claim for relief.

## I.   INTRODUCTION

This action arises from events that took place between four and eight years before the filing of the Complaint.  Between 2010 and 2014, Plaintiffs obtained mortgage loans from West Town and used All Star Title, Inc. ("All Star") for title and settlement services on their loans.  Now, in 2019, years after their loans closed, Plaintiffs accuse West Town of engaging in a co-marketing arrangement with All Star that allegedly violated Section 8(a) of the Real Estate Settlement Procedures Act ("RESPA").  Given that such claims are subject to a one-year limitations period, Plaintiffs' claims are time barred — no matter how artfully Plaintiffs attempt to avoid this fact.  The Complaint does not stop there, however.  Based on the same alleged co-marketing arrangement, Plaintiffs try to repackage their RESPA claim as violations of the Sherman Act and the Racketeer Influenced and Corrupt Organizations Act ("RICO").  These efforts are unavailing as the Sherman Act and RICO claims are also barred under the applicable statutes of limitations or otherwise simply fail to state a claim as a matter of law.  Accordingly, the Complaint should be dismissed.

## II.    FACTUAL ALLEGATIONS

Plaintiffs allege that they "are borrowers who currently have or had a federally related mortgage loan originated and/or brokered by West Town Bank & Trust." ECF No. 1, Compl. ¶ 1.   They allege that they were victims of a kickback scheme, which caused them to pay "supracompetitive" prices for title and settlement services provided by All Star in connection with their loan closings. *Id.* ¶¶ 196-97, 205-06, 214-15, 223-24, 232-33, 240-41.

As alleged on the face of the Complaint, each set of Plaintiffs closed on their loan ***more than four years prior to filing this action***. More than eight years ago, the McCranie and Hoffman Plaintiffs closed on their loans on July 27, 2010 and September 14, 2010, respectively. *Id.* ¶¶ 198, 225.   More than seven years ago, the Somerville and Wessell Plaintiffs closed on their loans on November 4, 2011 and August 4, 2011, respectively.  *Id.* ¶¶ 189, 216.  And, more than four years ago, the Whitley and Kline Plaintiffs closed on their loans on April 24, 2014 and February 17, 2015, respectively. *Id.* ¶¶ 205, 234.

Recognizing that their claims are facially time-barred, Plaintiffs attempt to justify their substantial delay by accusing West Town of fraudulent concealment and alleging that:

- West Town and All Star used "sham invoices and payment records [to create] an ongoing false record concealing and preventing discovery of the fact that any thing [*sic*] of value was exchanged . . . ." Compl. ¶ 246.

- West Town used "fraudulent marketing materials," which represented that: "borrowers could save '30-40% on title fees with All Star,' All Star had 'competitive pricing', was a part of West Town's 'experienced team of real estate professionals', and was 'Our Preferred Title Company.'" *Id.* ¶ 248.

- West Town and All Star chose to "falsely allocate the charges for title and settlement services associated with a borrower's loan . . . thereby falsely minimizing the APR reported on West Town borrowers' loan documents and required federal disclosures." *Id.* ¶ 253.

- West Town failed to describe anywhere on Plaintiffs' HUD-1s the amount of the kickback received by West Town related to Plaintiffs' loans. *Id.* ¶ 269.

3

As a result, Plaintiffs allege that the "first indication of any potential wrongful, illegal, and or actionable conduct" was in May or December 2018, when they received a solicitation letter from their now-counsel.  Compl. ¶¶ 287, 304, 321, 338, 355, 372.  Plaintiffs thus ask this Court to disregard their allegations elsewhere in the Complaint that they significantly overpaid for their title services and their tacit admission that for years after their loan closings, they did nothing to investigate these alleged overpayments. *Id.* ¶¶ 192, 201, 210, 219, 228, 236.

Notwithstanding Plaintiffs' purported ignorance, their Complaint does not come entirely out of the blue.  Rather, the claims alleged here have been percolating for nearly three years, since August 2016.  At that time, Counsel for Plaintiffs in this case began their pursuit of All Star by improperly using discovery in the unrelated class action *Fangman v. Genuine Title, LLC*, RDB-14-0081 (D. Md.),[1] to subpoena All Star's bank records from Washington First Bank.[2]  The issuance of the subpoena raised red flags, as neither All Star nor Washington First Bank was party to *Fangman*, and the class in that case was limited to borrowers whose loans were closed by Genuine Title.  However, because none of the parties in that case had standing to object to the subpoena, the issue was never brought to the Court's attention. *See In re Grand Jury Subpoena*, 584 F.3d 175, 184 & n. 14 (4th Cir. 2007) (recognizing that unless a party is claiming that subpoenaed documents are privileged, he lacks standing to object to a subpoena directed to a third party).

---

[1] *Fangman* was a class action involving an alleged kickback scheme perpetrated by an unrelated title company, Genuine Title, LLC.

[2] A copy of the subpoena, signed by Sara Zadrozny, Esq., is attached hereto as **Exhibit 1**.

4

Eighteen months later, on April 27, 2018, Plaintiffs' counsel filed a class action lawsuit against All Star predicated on the same conduct alleged in this case. *See* Complaint in *Godswill Uche v. All Star Title, Inc.*, Case No. 03-C-18-004296 (Cir. Ct. Balt. County).[3]  Rather than defend against the litigation, All Star joined Plaintiffs' counsel in a motion to appoint a receiver over the title company's books, records and computer files.  The motion was promptly granted on September 4, 2018.  It appears that Plaintiffs' Counsel then used the information obtained from the receiver to identify prospective clients, like some of the Plaintiffs here, and sent solicitation letters inviting them to sue their lenders.[4]  *See* Compl. ¶¶ 287 and 355 (Somervilles and Hoffmans received letters on Nov. 6), ¶ 371 (Klines received letter on Dec. 28).  *See also* Solicitation Letter dated Dec. 19, 2018, sent by Michael Paul Smith, Esq., attached as **Exhibit 4**. Having acquired a stable of new clients, Plaintiffs' counsel voluntarily dismissed the lawsuit against All Star on January 24, 2019 and, instead, filed four new putative class action complaints in this Court between February 19, 2019 and February 25, 2019.[5]

Because Plaintiffs waited so long to file suit, their RESPA and RICO claims are now time-barred as matter of law and should be dismissed.  Plaintiffs' Sherman Act claims are similarly stale and should be dismissed because Plaintiffs have failed to plausibly allege a claim for unlawful price-fixing, exclusive dealing, and/or refusal to deal.

---

[3] Copies of the *Uche* complaint and docket sheet are attached as **Exhibit 2** and **Exhibit 3**, respectively. According to the *Uche* complaint, the plaintiff filed suit against All Star exactly one year after receiving a solicitation letter from Plaintiffs' counsel in this case on April 27, 2017.  *See* **Ex. 2**, *Uche* Complaint, ¶¶ 71-72.

[4] Curiously, the plaintiff in *Uche* chose not to sue his lender, despite identifying the lender in the complaint and accusing it of the same conduct alleged in this case against West Town.  *See* **Ex. 2**.

[5] *See Remsnyder v. MBA Mortg. Servs., Inc.*, CCB-19-492 (Feb. 20, 2019); *Kadow v. First Fed. Bank*, PWG-19-566 (Feb. 22, 2019); and *Bailey v. Sierra Pac. Mortg. Co., Inc.*, GLR-19-595 (Feb. 25, 2019). Plaintiffs' counsel have since filed two more putative class action lawsuits: *Donaldson v. Primary Residential Mortg., Inc.*, ELH-19-1175 (Apr. 23, 2019); and *Williams, Sr. v. Maryland Mut. Mortg., LLC*, GLR-19-1464 (May 17, 2019).

### III.   STANDARD OF REVIEW ON MOTION TO DISMISS

Rule 12(b)(6) authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted.   "[A] plaintiff's obligations to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A plaintiff is required to plead facts in a complaint that show an entitlement to relief that is "plausible on its face." *Id.* at 570.   This 'plausibility' standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). *See A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011).   In reviewing a motion under Rule 12(b)(6), the Court "assum[es] as true the complaint's factual allegations and constru[es] 'all reasonable inferences' in favor of the plaintiff." *Semenova v. Maryland Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017).

Plaintiffs' RICO and fraudulent concealment allegations are subject to the heightened pleading requirements of Rule 9(b). *Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575, 586 (D. Md. 2014); *Minter v. Wells Fargo Bank, N.A.*, 675 F. Supp. 2d 591, 596 (D. Md. 2009). To satisfy this rule, the plaintiff must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).   Thus, the allegations of fraud must describe "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Phillips v. Brock & Scott, PLLC*, PX-16-3899, 2017 WL 3226866, at *2 (D. Md. July 28, 2017) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)). *See also Becker v. Noe*, ELH-18-00931, 2019 WL 1415483, at *16 (D. Md. Mar. 27, 2019).   In the context of fraudulent concealment, this Court has explained that "merely intoning the word 'fraudulently' in a complaint is not sufficient to

raise the defense of equitable tolling." *Minter*, 675 F. Supp. 2d at 596 (quoting *Weinberger v. Retail Credit Co.*, 498 F.2d 552, 555 (4th Cir. 1974)). "Rather, a plaintiff seeking to escape the statute in such a case shall make distinct averments as to the time when the fraud, mistake, concealment or misrepresentation was discovered, and what the discovery is, so that the court may clearly see, whether by the exercise of ordinary diligence, the discovery might not have been made." *Id.*

## IV.    ARGUMENT

### A. PLAINTIFFS' RESPA AND RICO CLAIMS ARE TIME-BARRED.

#### 1. Limitations Is Properly Decided On A Motion To Dismiss.

A statute of limitations defense is appropriately brought as a motion to dismiss for failure to state a claim under Rule 12(b)(6) where the allegations of the complaint reveal that an action is untimely. *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007); *Miller v. Pacific Shore Funding*, 224 F. Supp. 2d 977, 985 (D. Md. 2002), *aff'd*, 92 F. App'x 933 (4th Cir. 2004) ("When it appears on the face of the complaint that the limitation period has run, a defendant may properly assert a limitations defense through a Rule 12(b)(6) motion to dismiss.") (citation omitted). Further, where the untimeliness of the action is evident from the face of the complaint and cannot be cured, dismissal on limitations grounds should be with prejudice.

#### 2. Plaintiffs' RESPA Claims Are Time-Barred.

##### a. RESPA has a strict one-year statute of limitations.

Statutes of limitations are an essential component of a fair and efficient legal system. *See Order of R.R. Telegraphers v. Ry. Express Agency*, 321 U.S. 342, 348–49 (1944) ("Statutes of limitation…are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared."). When crafting RESPA, Congress established a short, one-year

7

statute of limitations for private actions under Section 8.  *See* 12 U.S.C. § 2614.  This finite end date for RESPA Section 8 claims serves Congress' objective of achieving fairness and finality in the real estate closing process, and it appropriately balances the interests of borrowers and lenders.  The fact that RESPA claims are not subject to the discovery rule further confirms Congress' intent to restrict the time for bringing claims under the statute.  *See Mbongo v. Specialized Loan Servicing, LLC*, PJM-15-2941, 2016 WL 8671841, at *4, n. 6 (D. Md. June 24, 2016) ("the discovery rule does not apply to RESPA claims because the language of 12 U.S.C. § 2614 expressly requires that a suit be brought within one or three years from the date of the occurrence of the violation") (citing *Mullinax v. Radian Guar. Inc.*, 199 F. Supp. 2d 311, 324 (M.D.N.C. 2002)); *Cunningham v. M&T Bank Corp.*, 814 F.3d 156, 162 (3d Cir. 2016) ("The discovery rule is not apt for RESPA claims because Congress specifically provided that the limitations period begins to run on 'the date of the occurrence of the violation.'") (citation omitted).

### b. Plaintiffs filed suit more than one year after the closing of their loans.

Claims under Section 8 of RESPA must be asserted within one year from the date of the occurrence of the violation.  *See* 12 U.S.C. § 2614.  The date of the occurrence of the violation "generally refers to the date of closing for loan origination violations." *Fangman v. Genuine Title, LLC,* RDB-14-0081, 2016 WL 6600509, at *4 (D. Md. Nov. 8, 2016) (citing *Grant v. Shapiro & Burson, LLP*, 871 F. Supp. 2d 462, 470 (D. Md. 2016)).  Thus, borrowers have one year from the date their loans close to bring a claim under Section 8.  After that point, lenders and other providers of settlement services are entitled to repose.

8

Here, each set of Plaintiffs failed to file their claims within the one-year limitations period. Plaintiffs' Section 8 RESPA claims accrued on the date of closing of their loans and they all waited, at least four, and, in some cases, more than eight years later to assert their claims:

| Plaintiff(s) | Date of Loan Closing | Time Between Claim Accrual and Complaint | Time Between Expiration of 1-year SOL and Complaint |
|---|---|---|---|
| McCrainie | July 27, 2010 | 8 years and 6 months | *7 years and 6 months* |
| Hoffman | September 14, 2010 | 8 years and 5 months | *7 years and 5 months* |
| Somerville | November 4, 2011 | 7 years and 3 months | *6 years and 3 months* |
| Wessell | August 4, 2011 | 7 years and 5 months | *6 years and 5 months* |
| Whitley | April 24, 2014 | 4 years and 7 months | *3 years and 7 months* |
| Kline | February 17, 2015 | 4 years and 2 days | *3 years* |

Compl. ¶¶ 189, 198, 207, 216, 225, 234. Accordingly, based on the allegations appearing on the face of the Complaint, all of Plaintiffs' RESPA claims are time-barred and should be dismissed.

### 3. Plaintiffs' RICO Claims Are Time-Barred.

Civil RICO claims are subject to a four-year statute of limitations. *Rotella v. Wood,* 528 U.S. 549, 556 (2000). "Under this rule, the statute of limitations will begin to run from the date when the plaintiff knew or should have known of the existence of a RICO injury" regardless of when the alleged pattern of racketeering activity is discovered. *Dickerson v. TLC The Laser Eye Ctr. Inst., Inc.*, 493 F. App'x 390, 393 (4th Cir. 2012).

Here, Plaintiffs anchor their RICO claims on the theory that West Town made false representations through direct mail solicitations and through the telephone in order to "(i) prevent a borrower from trying to use a different title and settlement services company for the loan, (ii) conceal the fixed, supracompetitive pricing resulting from the All Star scheme, and (iii) create the false representation that the prices charged the borrower for title and settlement services would be lower [30-40% less] than the prices charged by All Star competitors." Compl. ¶ 48. Plaintiffs allege that, as a result, they were harmed because they were:

(i) *charged* and paid more for settlement services than they would have paid without the illegal Kickback and Cartel Agreements; (ii) [] defrauded into being *charged* and paying supracompetitive prices for title and settlements service fees; (iii) *stripped of their choice of title and settlement service provider* and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) *deprived of kickback-free title and settlement services* and the consumer benefits of fair competition among independent title and settlement service providers.

*Id.*, ¶¶ 196. 205, 214, 223, 232, 240 (emphases added).

Each of these alleged injuries necessarily occurred either before or at the time of closing of Plaintiffs' loans.[6]  Given that the actual amount of title and settlement service fees was disclosed to Plaintiffs on their HUD-1s at the time of closing, the closing date also represents the time when Plaintiffs "knew or should have known" of their alleged RICO injuries. *Dickerson*, 493 F. App'x at 393.  At that time, Plaintiffs knew the actual amount that they were paying to All Star, as well as the "30-40%" discount which allegedly was advertised to them. *Id.* ¶ 248.  With this information, Plaintiffs undoubtedly could have determined whether the discounts advertised had proven to be true—or whether they had been the victims of fraud (*i.e.*, a bait and switch scheme).  Thus, because Plaintiffs *knew or should have known* of the existence of their RICO injuries as of the closing of their loans, the statute of limitations on their RICO claims began to

---

[6] Plaintiffs' allegations that they were "stripped of their choice of title and settlement service provider" and "deprived of the consumer benefits of fair competition among independent title and settlement service providers" do not, by themselves, constitute actionable injuries. Notably, Plaintiffs do not allege that they took any action to find their own settlement company or claim that they were prevented from doing so. Nor do Plaintiffs allege that they ever inquired or complained about All Star's services.  In similar circumstances, this Court has found that mere allegations of being "deprived of impartial and fair competition between settlement services" providers fail to establish an injury in fact. *Baehr v. Creig Northrop Team, P.C.*, RDB-13-0933, 2018 WL 6434502, at *9-10 (D. Md. Dec. 7, 2018).  Rather, the alleged injury arises from the price charged for the settlement services—a price which Plaintiffs knew at their loan closings.

run at that time.[7]  *See Detrick v. Panalpina, Inc.*, 108 F.3d 529, 539 (4th Cir. 1997) ("the statutory period 'begins to run when a plaintiff knows or should know of the *injury* that underlies his cause of action,'" *not* when the plaintiff discovers "the interrelationships amongst the defendants that formed the basis for the RICO claims.") (citing *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 220 (4th Cir. 1987)).

Indeed, in *Mbongo v. Specialized Loan Servicing, LLC*, this Court rejected the plaintiffs' purported reliance on the discovery rule where they had all of the information needed to determine their legal claims *at the time of closing of their loans*.  2016 WL 8671841, at *4.  As this Court explained:

> 'Under the discovery rule, a plaintiff's cause of action accrues' for purposes of calculating the expiration of the statute of limitations 'when the plaintiff knows or *reasonably should have known* of the wrong.' Assuming arguendo that the discovery rule applies to all of the claims raised by Plaintiffs, **the Court finds it utterly implausible that they had no reason to know about the allegedly unlawful terms of their Loan** (i.e., the fact that it was negatively amortized) prior to attempting to refinance in 2015. Plaintiffs entered into the Loan with First Residential Mortgage in 2006. **The fact that they may not have *understood* the consequences of their Loan's payment structure does not mean that they could not have made an investigation with respect to its terms with reasonable diligence.**

*Id.* at *4 (internal citations and footnote omitted) (italics in original) (bold added).  The same result follows here.  That is, at the time of the closing of their loans, Plaintiffs had all of the information needed to "ma[ke] an investigation with respect to  [the cost of settlement services]" so as to determine whether the prices charged by All Star were fraudulent as they now allege.  *Id.*

---

[7] The Kline Plaintiffs concede that the discovery rule has no application here and allege that their RICO claim "accrued at the earliest . . . on or about February 23, 2015," when the proceeds of their loan were disbursed. Compl. ¶ 374.  While the Klines try to shift the focus to the disbursement date of their loan to avoid the limitations bar, they wholly ignore the fact that they had knowledge of their alleged injury at the closing of their loan, six days earlier when they signed the HUD-1 form on February 17, 2015, charging them for the same "supracompetitive" title fees about which they now complain.  Because the Kline Plaintiffs waited to bring this action until four years and two days after their claims accrued, their RICO claim is time-barred.

The fact that Plaintiffs failed to take any action for years later "does not mean that they could not have made an investigation." *Id.* Thus, Plaintiffs cannot rely on the discovery rule to save their RICO claims.

Based on the time-of-closing accrual date, all six sets of Plaintiffs failed to file their RICO claims within the applicable four-year limitations period:

| Plaintiff(s) | Date of Loan Closing | Time Between Claim Accrual and Complaint | Time Between Expiration of RICO 4-year SOL and Complaint |
|---|---|---|---|
| McCrainie | July 27, 2010 | 8 years and 6 months | *4 years and 6 months* |
| Hoffman | September 14, 2010 | 8 years and 5 months | *4 years and 5 months* |
| Somerville | November 4, 2011 | 7 years and 3 months | *3 years and 3 months* |
| Wessell | August 4, 2011 | 7 years and 5 months | *3 years and 3 months* |
| Whitley | April 24, 2014 | 4 years and 7 months | *7 months* |
| Kline | February 17, 2015 | 4 years and 2 days | *2 days* |

Compl. ¶¶ 189, 198, 207, 216, 225, 234. Accordingly, Plaintiffs' RICO claims are time-barred.[8]

### 4. Plaintiffs Fail To Sufficiently Allege Fraudulent Concealment To Toll The Limitations Period.

As the foregoing makes clear, and as Plaintiffs concede on the face of their Complaint, their RESPA and RICO claims are time-barred. Nevertheless, Plaintiffs seek to resurrect their stale claims based on the doctrine of fraudulent concealment. In so doing, Plaintiffs ask this Court to toll the applicable limitations periods until the date they received solicitation letters from their now-attorneys in May (McCranie, Whitley and Wessell Plaintiffs), November (Somerville and Hoffman Plaintiffs) and December 2018 (Kline Plaintiffs). Compl. ¶ 377. Plaintiffs' proposed extensions of the Congressionally-mandated limitations periods pushes the doctrine of equitable tolling to an extreme and, therefore, must be viewed with circumspection. *See generally Pac. Shore Funding*, 224 F. Supp. 2d at 986 ("Statutes of limitations, moreover, are to be strictly construed; implied and equitable exceptions are frowned upon.").

---

[8] For these same reasons, Plaintiffs' Sherman Act claims are also time-barred. *See* 15 U.S.C. § 15b ("Any action to enforce any cause of action [for violation of anything forbidden in the antitrust laws] shall be forever barred unless commenced within four years after the cause of action accrued.").

### a. Fraudulent concealment must be pleaded with particularity.

Plaintiffs' allegations of fraudulent concealment must be pleaded with particularity under Rule 9(b). To satisfy Rule 9(b), a plaintiff must plead "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Edmonson v. Eagle Nat'l Bank*, No. 18-1216, ---F.3d---, 2019 WL 1873270, at *11 (4th Cir. Apr. 26, 2019) (quoting *Harrison*, 176 F.3d at 784). The Fourth Circuit has adopted a three-part test that Plaintiffs must satisfy to claim fraudulent concealment: (1) West Town affirmatively concealed (as opposed to simply choosing not to disclose) the facts that are the basis of their claims; and (2) Plaintiffs failed to discover those facts within the statutory period, despite (3) the exercise of due diligence. *Id.* *See Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995); *Pocahontas*, 828 F.2d at 218. As explained below, Plaintiffs are unable to satisfy the standards set forth in *Marlinton*.[9]

### b. Plaintiffs have not sufficiently alleged "affirmative acts of concealment".

To prove fraudulent concealment, Plaintiffs first must sufficiently allege that West Town actively misled them in a fashion that prevented them from recognizing the validity of their claims within the statutory period. *Marlinton*, 71 F.3d at 122. Under well-established Fourth Circuit precedent, however, a defendant's mere silence or "an alleged failure to own up to illegal conduct" does not constitute an affirmative act of concealment for purposes of equitable tolling. *Pocahontas*, 828 F.2d at 218-19; *see Minter v. Wells Fargo Bank, N.A.*, 924 F. Supp. 2d 627, 642 (D. Md. 2013) (because a RESPA violation is not a "self-concealing wrong," nondisclosure or

---

[9] This case stands in stark contrast to the decision in *Fangman*, where the Court permitted the plaintiffs' time-barred RESPA claim to proceed based on the doctrine of fraudulent concealment. *Fangman v. Genuine Title, LLC*, RDB-14-0081, 2015 WL 8315704, at *7 (D. Md. Dec. 9, 2015). Unlike the allegations in this case, the *Fangman* complaint contained no allegations that the plaintiffs were aware of the existence of some type of business relationship between their lender and Genuine Title.

mere silence is insufficient to warrant equitable tolling); *Mullinax,* 199 F. Supp. 2d at 329 ("even

if a kickback scheme is generally secretive, it need not be so, and therefore it does not qualify as

a self-concealing wrong"). As the *Pocahontas* court explained:

> To permit a claim of fraudulent concealment to rest on no more than an alleged
> failure to own up to illegal conduct upon this sort of timid inquiry would
> effectively nullify the statute of limitations in these cases. It can hardly be
> imagined that illegal activities would ever be so gratuitously revealed. 'Fraudulent
> concealment' implies conduct more affirmatively directed at deflecting litigation
> than that alleged here…

*Id.* at 218–19. The Fourth Circuit repeatedly has endorsed this principle. *See Marlinton,* 71 F.3d

at 123 ("failing to admit to illegal conduct upon general inquiry could not constitute 'a claim of

fraudulent concealment.'"); *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 179 (4th Cir.

2007) ("wrongdoing is not a straightforward matter of fact, and it is not fraud to deny it."). Thus,

in order to plead affirmative acts of concealment, Plaintiffs must allege conduct on the part of

West Town which is "affirmatively directed at deflecting litigation." *Pocahontas,* 828 F.2d at

219. *See also Sims v. BB&T Corp.*, CCE-15-732, 2018 WL 3128996, at *3 (M.D.N.C. June 26,

2018) (explaining in ERISA case that "[f]raudulent concealment means more than a mere failure

to disclose disparate pieces of information, even in the fiduciary context. Rather, it requires

fraud, or, at the very least, a course of conduct designed to conceal, and 'affirmatively directed at

deflecting litigation.'") (internal citations omitted); *Jones v. Saxon Mortg., Inc.*, 980 F. Supp.

842, 846 (E.D. Va. 1997), *aff'd*, 161 F.3d 2 (4th Cir. 1998), and *aff'd*, 537 F.3d 320 (4th Cir.

1998) ("Indeed, fraudulent concealment requires some act in addition to the commission of the

initial fraudulent act because it implies conduct…affirmatively directed at deflecting litigation").

Plaintiffs fail to allege that West Town committed any "affirmative acts of concealment"

"directed at deflecting litigation" to toll the limitations period. Rather, the only conduct alleged

is either (1) not attributable to West Town, (2) not false or misleading, (3) nothing more than "an

14

alleged failure to own up to illegal conduct," or (4) has nothing to do with "deflecting litigation". Whichever is the case, the allegations are insufficient to demonstrate "affirmative acts of concealment" by West Town.

*First*, Plaintiffs allege that West Town and All Star used "sham invoices and payment records [to create] an ongoing false record concealing and preventing discovery of the fact that any thing of value was exchanged…" Compl., ¶ 246.[10] While the existence of such documents may help *during litigation* to establish a violation of either RESPA or RICO, they have nothing to do with *deflecting litigation*. In addition, Plaintiffs do not and cannot plausibly allege that they had any reason to know about, much less review, West Town's vendor and marketing invoices and payment records. If Plaintiffs were not aware of and did not see the "invoices and payment records," they cannot possibly claim that these same documents were used to conceal the claims from them.

*Second*, Plaintiffs point to West Town's use of "fraudulent marketing materials," and, specifically, assertions that: "borrowers could save '30-40% on title fees with All Star,' All Star had 'competitive pricing', was a part of West Town's 'experienced team of real estate professionals', and was 'Our Preferred Title Company.'" Compl. ¶ 248. As an initial matter, the Complaint is devoid of any allegation that these Plaintiffs ever received, much less saw, the allegedly "fraudulent marketing materials." Absent such allegations, Plaintiffs cannot possibly claim that these marketing materials actively misled *them* in a fashion that prevented *them* from recognizing the validity of their claims within the statutory period. *See Minter v. Wells Fargo Bank, NA*., WMN-07-3442, 2013 WL 1795564, at *4 (D. Md. Apr. 26, 2013) (because "a

---

[10] Notably, Plaintiffs do not explain why or how the alleged invoices and payments were fraudulent. Plaintiffs do not claim that the third-party marketing services companies that submitted the invoices were fake entities nor do they dispute that All Star's payments to these companies were for advertising and marketing services actually performed. Absent such allegations, the invoices and payments are not "shams" as characterized by Plaintiffs.

RESPA violation [is] not a self-concealing wrong which satisfies the fraudulent concealment element of tolling," the circumstances of each individual borrower's transaction are "relevant to the concealment and due diligence inquiries of tolling").

Moreover, nothing in the Complaint suggests that the latter two assertions—that All Star was "part of West Town's 'experienced team of real estate professionals'" and "'Our Preferred Title Company'"—were in any way false or fraudulent. To the contrary, the bulk of Plaintiffs' claims suggest that West Town *did work* with All Star and that All Star was, in fact, a "Preferred Title Company."[11]  Compl. ¶ 248 and Ex. 73. Further, as puffery and mere expressions of opinion, none of these alleged statements concerning pricing amount to fraudulent representations as a matter of law. *See Hogan v. Maryland State Dental Ass'n*, 155 Md. App. 556, 567 (2004) ("This Court has held that fraud claims must be based on fact, not vague statements or expressions of opinion.") (citing *McGraw v. Loyola Ford, Inc.*, 124 Md. App. 560, 582 (1999)).

---

[11] Based on Plaintiffs' allegations, the co-marketing arrangement between All Star and West Town allowed the two companies to jointly market their services to consumers through mailed advertisements like the ones attached as Exhibit 73 to the Complaint.  According to Plaintiffs, the co-marketing advertisements were either distributed by a third-party marketing services company with All Star paying some or all of the costs or printed, stuffed in envelopes, addressed and mailed by loan officers at West Town with All Star contributing stamps and sometimes lead lists. *See, e.g.*, Compl. ¶¶ 47, 48, 57, 60, 142, and Exs. 4, 51, 73, thereto.  Plaintiffs allege that All Star's payments or contributions in furtherance of the co-marketing relationship resulted in the referral of title and settlement services in violation of Section 8(a) of RESPA.  Plaintiffs pursue this theory despite RESPA's safe-harbor provision expressly allowing for the payment of goods and services like the co-marketing alleged in the Complaint. *See* 12 U.S.C. § 2607(c)(2) ("Nothing in this section shall be construed as prohibiting . . . the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed.").  While Plaintiffs theorize that All Star's payments are "tied" to the referral of settlement services, the safe-harbor protections apply so long as the payments "bear[] a reasonable relationship to the market value of the services performed" and there is no allegation in the Complaint that such relationship does not exist. *See PHH Corp. v. CFPB*, 839 F.3d 1, 41 n.22, 42 (D.C. Cir. 2016) (interpreting Section 8(c) of RESPA to allow transactions between businesses that may be "connected to, conditioned on, or tied to referrals" "so long as reasonable market value was paid and the services were actually performed"), *reinstated in relevant part and rev'd on other grounds*, 881 F.3d 75 (D.C. Cir. 2018).  Although West Town is not moving to dismiss the Complaint on this basis, West Town believes that if Plaintiffs are able to survive dismissal, discovery in this case will demonstrate that the co-marketing arrangement alleged here does not violate Section 8(a) of RESPA.

Additionally, the alleged statements, even if made in an initial advertisement to Plaintiffs *before any referral was made*, have nothing whatsoever to do with concealing from Plaintiffs the alleged scheme between West Town and All Star. To the contrary, the very fact that West Town expressly promoted its relationship with All Star as "preferred" belies any suggestion of concealment. *See* Compl., Ex. 73. If anything, a reasonably diligent consumer might *question* why such a business relationship existed, or inquire about the nature and extent of the disclosed relationship. Ultimately, nothing in the allegedly "fraudulent marketing materials" served to deflect litigation or otherwise conceal any cause of action from Plaintiffs, particularly since Plaintiffs do not even allege that they were exposed to the allegedly false statements.

*Third*, Plaintiffs allege that West Town was required to report the alleged kickback payments on loan documents provided to Plaintiffs during the loan process. *See, e.g.*, Compl. ¶ 268 ("West Town omits and fails to describe anywhere on a borrower's HUD-1 statement the amount of the kickback received by West Town related to the borrower's loan..."). Plaintiffs' reliance on the HUD-1 statements is flawed because the regulations on which Plaintiffs rely do not impose any duty of disclosure *on West Town*, but, rather, *on the settlement agent*—in this case, All Star. Compl. ¶¶ 267-68. Specifically, applicable federal regulations governing the information to be disclosed on HUD-1s specifically provides that "*[t]he settlement agent shall use the HUD–1 settlement statement* in every settlement involving a federally related mortgage loan in which there is a borrower and a seller." 12 C.F.R. § 1024.8(a) (emphasis added). Appendix A to this regulation further provides that: "[t]he instructions for completion of the HUD–1 are *primarily for the benefit of the settlement agents who prepare the statements* and need not be transmitted to the parties as an integral part of the HUD–1." 12 C.F.R. § 1024, App. A (emphasis added). Because the statements on the HUD-1s were not made *by West Town*, they

cannot constitute "affirmative acts of concealment" *by West Town* sufficient to plead fraudulent concealment in a claim *against West Town*.

**Fourth**, Plaintiffs allege that West Town included false information in Block 4 of the Good Faith Estimate ("GFE") provided to them under applicable federal regulations. Compl. ¶¶ 261-265. While the disclosures on the GFE, unlike the disclosures on the HUD-1s, may be attributable to West Town, these alleged misstatements cannot support a fraudulent concealment theory because the GFE is provided to borrowers no later than three days after their loan applications are received. *See* 12 C.F.R. § 1024.7(a) ("not later than 3 business days after a lender receives an application...the lender must provide the applicant with a GFE."). It is inconceivable, therefore, that an alleged misstatement made in the GFE could have concealed from Plaintiffs any facts related to the scheme alleged in the Complaint when it was unknown at that time whether any of Plaintiffs would be approved for a loan, which title company Plaintiffs would use ans whether Plaintiffs would ultimately close on their loan or abandon the transaction entirely. Nor can it be said that these alleged misstatements were in any way "directed at deflecting litigation." *Pocahontas*, 828 F.2d at 219.

Moreover, Plaintiffs allege that the "Kickback Surcharge" should have been included in the amounts reflected in Line 801 or 808 of their HUD-1s and that the failure to include this "surcharge" is an affirmative act of concealment.[12] Compl. ¶¶ 268, 270. Contrary to the thrust of the Complaint, Plaintiffs' allegation necessarily concedes that these payments were for services rendered by West Town. *See* 12 C.F.R. § 1024, App. A (providing that Line 801 "must include any amounts received for origination services, including administrative and processing services, performed by or on behalf of the loan originator" and Line 808 be used to record third party services required by the loan originator). If true, such a "surcharge" would be entirely

---

[12] Section 800 of the HUD-1 is reserved for fees related to the origination of the loan.

18

permissible under RESPA. *See* 12 U.S.C. § 2607(c) ("Nothing in this section shall be construed as prohibiting…the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed…"). The gravamen of Plaintiffs' Complaint, however, is that these payments were kickbacks — not "amounts received for origination services" or third party services required by the lender. Plaintiffs cannot have it both ways.

On the other hand, if Plaintiffs are correct that the "Kickback Surcharge" should have been included in Section 800 rather than Section 1100 of their HUD-1s, the only thing this would have revealed is that more money was paid to West Town for originating the loan and less money was paid to All Star for title charges. Plaintiffs' total closing costs, however, would have remained the same. It is unclear how this proposed reallocation would have given Plaintiffs any more or any less information about the alleged kickback scheme. Rather, what Plaintiffs appear to suggest is that West Town or All Star should have noted the term "kickback" on their HUD-1s or GFEs. Under well settled Fourth Circuit authority, however, "it can hardly be imagined that illegal activities would ever be so gratuitously revealed." *Pocahontas*, 828 F.2d at 219. *See also Arthur v. Ticor Title Ins. Co. of Fla.*, 569 F.3d 154, 159 (4th Cir. 2009) (rejecting RESPA and negligent misrepresentation claims premised on non-disclosure in HUD-1s); *Riddle v. Bank of Am. Corp.*, 2013 WL 6061363, at *9 (E.D. Pa. Nov. 18, 2013) ("Plaintiffs are trying to turn Defendants' failure to inform them that they were running a scheme in violation of RESPA into an affirmative act of concealment. …[S]ilence is insufficient to toll the statute of limitations in RESPA cases; the defendant must have performed an independent act of concealment upon which the plaintiff justifiably relied."), *aff'd*, 588 F. App'x 127 (3d Cir. 2014); *Moll v. U.S. Life Title Ins. Co. of N.Y.*, 700 F. Supp. 1284, 1293, n. 6 (S.D.N.Y. 1988) ("[W]ere this Court to hold

that entries on HUD-1 forms, standing alone, constitute evidence of fraudulent concealment, the RESPA statute of limitations would have little meaning.").

While the Fourth Circuit recently indicated that misstatements on HUD-1s and GFEs could constitute "affirmative acts of concealment", its treatment of the statutes and regulations underlying these loan documents is cursory and without any meaningful discussion. *See Edmonson*, 2019 WL 1873270, at *3. While the Court in *Edmonson* quotes certain portions of 12 C.F.R. § 1024, App. A and App. C, it makes no mention of the broader structure of these regulations and, particularly, the facts that (1) the HUD-1 is prepared by the settlement agent (not the lender), and (2) the GFE is prepared before the title company/settlement agent is even selected.[13] Nevertheless, the Fourth Circuit's statements do not absolve Plaintiffs of their burden of alleging how alleged misstatements made (1) by a party other than West Town, (2) at a time when the possibility of a kickback payment (and, for that matter, the transaction itself) was uncertain, constitute affirmative acts of concealment by West Town.

***Fifth***, Plaintiffs accuse West Town of reallocating title and settlement services fees so that the APR on their loans would appear lower. Compl. ¶ 253 ("West Town and All Star chose to falsely allocate the charges for title and settlement services associated with a borrower's loan…thereby false minimizing the APR reported on West Town borrowers' loan documents and required federal disclosures"). Although Plaintiffs allege that the APR indicated on their loan documents was somehow manipulated, Plaintiffs allege no facts showing how they were misled as a result of allocating a charge for "title examination" rather than labeling the same charge as a "closing fee," or for charging a fee for performing an "abstract of title" rather than a "settlement

---

[13] It is not surprising that the Fourth Circuit paid only limited attention to these issues, as its focus was the doctrinal difference between equitable tolling and fraudulent concealment. *See Edmonson*, 2019 WL 1873270, at *11 ("In sum, we hold that Menominee does not supplant this Court's long-standing three-step framework for analyzing allegations of fraudulent concealment.").

fee"—particularly given that all of these fees and charges would be paid to All Star. Nor do Plaintiffs allege how the alleged APR manipulation concealed the kickback scheme at the heart of their Complaint. After all, even if certain fees were not included in the APR calculations, the fees allegedly excluded from the calculation *were still included* in the total cost of the title and settlement services disclosed on Plaintiffs' HUD-1s and represented charges for services actually performed.

Finally, the mere fact that certain items on Plaintiffs' loan documents may have been allocated or labeled incorrectly does not plausibly allege—or, as required to establish fraudulent concealment, *specifically allege*—that the alleged miscalculations in the APR were made in order to conceal any cause of action from Plaintiffs. Indeed, the Complaint does not identify *who* made the alleged miscalculations or contain any allegation regarding the *intent to defraud*. Absent such allegations, the alleged APR miscalculations do not support a finding of fraudulent concealment.[14]

---

[14] Plaintiffs claim that the alleged miscalculations in the APR allowed West Town to conceal its "coordinated business relationship" with All Star. *See* Compl. ¶ 259. In addition to the fact that this claim directly contradicts Plaintiffs' other allegations that West Town promoted All Star as its "Preferred Title Company," Compl. ¶ 248, the term "coordinated business relationship" has no legal significance. To the extent Plaintiffs intended to allege the existence of an undisclosed "affiliated business arrangement," the allegations in the Complaint do not support the claim. An "Affiliated Business Arrangement" ("ABA") is a term defined under RESPA as follows:

> an arrangement in which (A) a person who is in a position to refer business incident to or a part of a real estate settlement service involving a federally related mortgage loan, or an associate of such person, has either an affiliate relationship with or a direct or beneficial ownership interest of more than 1 percent in a provider of settlement services; and (B) either of such persons directly or indirectly refers such business to that provider or affirmatively influences the selection of that provider.

*See* 12 U.S.C. § 2602(7). There are no allegations in the Complaint that West Town and All Star had "an affiliated relationship" (as opposed to a "coordinated relationship", whatever that may be) or that West Town has or had "a direct or beneficial ownership interest" in All Star. Accordingly, regardless of how Plaintiffs define their self-created term "coordinated business relationship," it is irrelevant to the fraudulent concealment analysis.

In sum, Plaintiffs have failed to allege any "affirmative acts of concealment" by West Town "directed at deflecting litigation" so as to sufficiently plead fraudulent concealment.  On this basis alone, Plaintiffs' claims under RESPA and RICO should be dismissed as time-barred.

**c.  Plaintiffs have not alleged that they acted with "due diligence".**

Plaintiffs also fail to allege that they acted with the requisite due diligence to establish fraudulent concealment.  *Marlinton*, 71 F.3d at 122 ("a plaintiff must demonstrate...the exercise of due diligence" to invoke equitable tolling).   While the question of whether a plaintiff exercised due diligence generally involves a fact-intensive inquiry into what each plaintiff knew, and when they knew it, the Complaint still must satisfy applicable pleading requirements.  *See Edmonson*, 2019 WL 1873270, at *11, 13;  *Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 536– 37 (D. Md. 2011) ("Under Rule 9(b) [], the party alleging fraudulent concealment for the purpose of tolling the statute of limitations must plead the circumstances with particularity.").

In the Complaint, Plaintiffs offer only vague and conclusory allegations regarding their purported diligence, none of which overcome the unavoidable fact that Plaintiffs simply did nothing to investigate their claims in the many years that passed since their loans closed. Although courts have recognized that a plaintiff's inaction may be excused where "there is nothing to provoke inquiry," the allegations in the Complaint and the exhibits attached thereto indicate that Plaintiffs were aware of the co-marketing/business relationship between All Star and West Town and, therefore, were "aware of facts that should have excited further inquiry on [their] part." *Id.* at 128. *See Baehr*, 2018 WL 6434502, at *13 (rejecting fraudulent concealment in RESPA action where the plaintiffs "exercised no diligence whatsoever despite the apparent existence of a business relationship" between the realtor and title company).   In such circumstances, litigants cannot just "sit on their fanny for [] years, making no inquiry...and insist

22

that [their] indolence tolled the statute of limitations." *Knauf Insulation, Inc. v. S. Brands, Inc.*, 820 F.3d 904, 909 (7th Cir. 2016) (Posner, J.); *see also Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 972 (11th Cir. 2016) ("We have no difficulty concluding, as a matter of law, that a plaintiff who does nothing for two years is not diligent."). While the Complaint artfully embellishes Plaintiffs' inaction, a careful review of Plaintiffs' allegations confirms that they failed to act with the diligence required for fraudulent concealment.

Plaintiffs' first assertion of diligence is that: "Plaintiffs exercise [*sic*] reasonable diligence before, during and after the closing of their refinance." Compl. ¶¶ 273, 290, 307, 324, 341, 358).[15] This conclusory allegation is entitled to no weight and does not help Plaintiffs meet their burden of establishing their due diligence.

The second assertion of diligence is that: "Plaintiffs act [*sic*] diligently during the closing or settlement of their loan. As a condition of funding their loan, West Town requires the [ ] Plaintiffs to participate in a closing, and they attend and fully participates [*sic*] in the required closing." Compl. ¶¶ 280, 297, 314, 331, 348, 365). This allegation is also conclusory and says nothing about *how* Plaintiffs acted diligently during the closing process. *See Cunningham*, 814 F.3d at 163 (finding that "full participation in the loan process" is not sufficient to establish the due diligence element of fraudulent concealment); *White v. PNC Fin. Servs. Group, Inc.*, 2013 WL 3090823, at *7 (E.D. Pa. June 20, 2013) (dismissing RESPA claim as time-barred because "I cannot say on the facts alleged that Plaintiffs' participation in their loan transactions suffices by itself to constitute reasonable due diligence."). Notably, Plaintiffs do not allege that they ever asked or inquired about the nature, purpose, or terms of West Town's advertised relationship with All Star. Nor do Plaintiffs allege that they ever (i) compared prices with other title

---

[15] The Complaint uses the same "formula" to allege each 'set' of Plaintiffs' diligence. *Compare* Compl. ¶¶ 273, 280, 287, 288 (Somerville); ¶¶ 290, 297, 304, 305 (McCrainie); ¶¶ 307, 314, 321, 322 (Whitley); ¶¶ 324, 331, 338, 339 (Wessell); ¶¶ 341, 348, 355, 356 (Hoffman); ¶¶ 358, 365, 372, 373 (Kline).

companies, (ii) questioned the amount of All Star's fees, or (iii) asked their loan officers about using a title company other than All Star. Plaintiffs' failure to undertake any such inquiry—or to otherwise investigate their intended transactions—betrays their assertion of diligence. *See Baehr*, 2018 WL 6434502, at *13. Indeed, only one of the six sets of Plaintiffs (the Klines) alleges that they even *reviewed* the documents presented to them at closing. *Id.* ¶ 365. This fact alone is fatal to the Somerville, McCrainie, Whitley, Wessell, and Hoffman Plaintiffs' assertions of diligence.[16]

Plaintiffs' assertions of their diligence in the closing process are further belied by their allegations of "supracompetitive pricing" for the title services provided by All Star. *See, e.g.,* Compl. ¶¶ 41, 43. That is, Plaintiffs claim that they were charged "supracompetitive" prices but also allege that they received advertisements promoting the 30-40% discount offered by All Star. *Compare* Compl. ¶ 41, *with id.* ¶248. This alone placed Plaintiffs on inquiry notice; yet, according to the Complaint, no such inquiry was ever pursued.[17]

Even if Plaintiffs had no reason or interest in investigating All Star's prices before or at the time of closing, RESPA's one-year and RICO's four-year limitations periods afforded them ample time to make such inquiries. Yet, the Complaint contains no allegation that any of the Plaintiffs ever did so. While *Marlinton* recognizes that a plaintiff's claim may not be time-barred "if reasonable further inquiry would not have revealed the basis" for the claim, so, too, does this rule require *some action* where reasonable further inquiry *would have* revealed the basis for the claim. *Marlinton*, 71 F.3d at 127. While reasonable further inquiry might have confirmed

---

[16] These same sets of Plaintiffs also allege that they are not in possession of their HUD-1s. Compl. ¶¶ 281, 298. 315, 332, 349. Their failure to retain these documents further places into doubt their allegations of diligence "before, during and after" the closing of their loans.

[17] A familiar analogy helps to illustrate Plaintiffs' lack of diligence. Just as a reasonably diligent automobile owner might get a second opinion if informed by the mechanic that new brakes would cost over $2,000, so, too, would a reasonably diligent borrower seek a second opinion if he or she thought that the title services offered were unusually expensive or, as Plaintiffs allege, "supracompetitively" priced.

Plaintiffs' suspicions of supracompetitive pricing and prompted further inquiry, the unavoidable fact is that Plaintiffs simply did nothing. *See Thomas v. Ocwen Federal Bank FSB*, 2002 WL 99737, at * (N.D. Ill. Jan. 25, 2002) (borrower failed to exercise due diligence for purposes of equitable tolling when she took no efforts to inquire about the allegedly offensive charges when she signed the HUD-1 form and TILA statement or anytime thereafter and noting that "[i]f she signed the documents without reading them, she cannot argue that she acted diligently").

Nor do Plaintiffs plausibly allege that they exercised any diligence with respect to the "too-good-to-be-true" risk. That is, Plaintiffs allege that borrowers generally—although not Plaintiffs themselves—relied on advertisements indicating that All Star's title services would be 30-40% *less expensive* than those available from other title companies. Compl. ¶ 248. Such a substantial discount should give a reasonably diligent consumer more than ample reason to question why he/she was being offered this exceptional price.[18] Yet, the Complaint contains no allegation that anyone ever inquired or took any action to determine why All Star and West Town were advertising such a significant discount. Thus, contrary to Plaintiffs' conclusory assertions of diligence, the plain allegations of the Complaint suggest that Plaintiffs were, at the very least, on inquiry notice that something was amiss at or before the time of their loan closings.

Plaintiffs' third assertion of diligence is that in mid- to late 2018, years after the closing of their loans, "Plaintiffs receive [*sic*] a letter from [Plaintiff's] counsel describing an investigation of All Star and West Town," and "within days" after receiving the letter, they "contact [sic] and retain [sic] counsel" and then, "within months" after that they filed the instant Complaint on February 19, 2019. Compl. ¶¶ 287-88 (Somerville); ¶¶ 304-05 (McCrainie); ¶¶ 321-322 (Whitley); ¶¶ 338-39 (Wessell); ¶¶ 355-56 (Hoffman); ¶¶ 372-73 (Kline). Even

---

[18] Following the analogy from above, if a car owner were informed that new brakes would cost only $200, so, too, would reasonable diligence require some further inquiry into the reason for the steep discount.

looking beyond the problems posed by "lawyerly intervention", *see infra*, these activities have no bearing on the diligence analysis because an individual's receipt of a lawyer's solicitation is entirely beyond that person's control. Suffice it to say, if Plaintiffs had taken even some steps to investigate either (1) the "supracompetitive" pricing of their title and settlement services or (2) the 30-40% advertised discount, "they would have found breadcrumbs leading them toward a potential RESPA claim." *Cunningham*, 814 F.3d at 162, n. 3. However, the Complaint makes clear that Plaintiffs simply did nothing until they were contacted by their solicitors years after the statute of limitations expired on their RESPA and RICO claims.

Even more fundamentally, Plaintiffs' purported diligence *in mid- to late 2018* is legally irrelevant because the fraudulent concealment requires Plaintiffs to exercise due diligence *within the statutory period*. *Marlinton*, 71 F.3d at 122. If diligent pursuit of claims were permitted at any time, even years after the limitations period had expired, then statutes of limitation would have no meaning. Thus, contrary to the allegations in the Complaint, Plaintiffs' actions taken in 2018, after receiving their lawyers' solicitation letters, and after the statute of limitations on their claims expired, have no bearing on the equitable tolling analysis. *See Riddle*, 2013 WL 6061363, at *6 ("If a plaintiff could revive his or her claim by being diligent after the statute of limitations had run, the statute of limitations would be meaningless."). Addressing similar attempts to resurrect long-expired claims, courts have not hesitated to conclude that a plaintiff's inaction between the time of loan closing and receipt of communication from counsel does not amount to reasonable diligence. *Cunningham*, 814 F.3d at 162. For this reason, too, Plaintiffs fail to allege the diligence required for fraudulent concealment.

**d. Plaintiffs' "lawyerly intervention" theory does not toll the statute of limitations.**

Plaintiffs attempt to justify their lack of diligence by alleging that, prior to receiving their lawyers' solicitation letters, there was no "indication of any potential wrongful, illegal, and/or actionable conduct by anyone." Compl. ¶¶ 287, 304, 321, 338, 355, 372. Plaintiffs allege the date on which they received Counsel's solicitation letter and suggest that because they filed suit within months after receiving the letter, they acted with "due diligence." *Id.*, 288, 305, 322, 339, 356, 373. Not only is this suggestion legally unsupportable, *see supra*, but the proposition that the statute of limitations does not begin to run until a lawyer tells a prospective client that he might have a claim is simply wrong. Allowing counsel, rather than the allegedly injured plaintiff, to drive decisions of whether to pursue relief inverts the fundamental order of the attorney-client relationship and borders on the much derided and still unlawful practice of barratry. *See* Md. Code Ann., Bus. Occ. & Prof. § 10-604(b) (prohibiting a person "[w]ithout an existing relationship or interest in an issue" from soliciting "for personal gain…another person to sue or to retain a lawyer to represent the other person in a lawsuit"). Thus, it is unsurprising that courts have repeatedly rejected the "lawyerly intervention" theory advanced here by Plaintiffs.

In *Cunningham*, the Third Circuit rejected the plaintiffs' reliance on their lawyers' solicitation letters as an indication of their diligence. 814 F.3d at 161-62. Emphasizing the plaintiffs' failure to take any steps after their loan closings to investigate possible violations, and noting the existence of a number of warnings of problems with their loan closings, the court concluded its analysis with a passage that is equally applicable here:

> Indeed, accepting Plaintiffs' theory in this case—toll indefinitely the limitations period for claims under RESPA until a lawyer can find the right plaintiff to join a lawsuit and notify other putative plaintiffs—would effectively write the statute of limitations out of RESPA.

*Id.* at 164. The court in *Riddle* similarly rejected the "lawyerly intervention" theory, explaining:

> Plaintiffs' argument fails, because it renders the statute of limitations a nullity. Plaintiffs' theory would provide them with an unlimited time to resuscitate stale claims and would leave the Court with no way to determine when the clock begins to run on their claims. Under Plaintiffs' theory, when would the statute of limitations run? One year after Plaintiffs received their first solicitation letter? One year after Plaintiffs first met with lawyers to discuss their claims? Is there a point in time in which Plaintiffs had to seek advice of counsel, rather than having counsel approach them?

2013 WL 6061363, at *7. Ultimately, Plaintiffs' theory that the statute of limitations should be tolled until a plaintiff receives a solicitation letter would mean that attorneys—not plaintiffs themselves, and not Congress—would control the limitations period. This simply cannot be the law in this District, and this Court should reject Plaintiffs' attempt to craft such a result.

## B. PLAINTIFFS FAIL TO STATE A PLAUSIBLE SHERMAN ACT CLAIM.

### 1. To Avoid Dismissal, A Plaintiff Must Allege Every Element Of A Sherman Act Claim.

To state a plausible claim under the Sherman Act, a complaint must contain "allegations covering all the elements that comprise the theory for relief." *Estate Constr. Co. v. Miller & Smith Holding Co., Inc.*, 14 F.3d 213, 220 (4th Cir. 1994) (internal citations omitted) (citing *U.S. v. Employing Plasterers Ass'n*, 347 U.S. 186, 189 (1954)). "Moreover, the allegations must be stated in terms that are neither vague nor conclusory." *Estate Constr.*, 14 F.3d at 220–21. "Although we will assume that the plaintiffs can prove the facts that they allege in their complaint, 'it is not…proper to assume that…the defendants have violated the antitrust laws in ways that have not been alleged.'" *Id.* at 221 (quoting *Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983)).

### 2. The Complaint Fails To State A Plausible Claim For Unlawful Price-Fixing.

Section 1 of the Sherman Act forbids "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade." 15 U.S.C. § 1. To state a claim under Section 1, a plaintiff must show (1) a combination or some form of concerted action between at least two

legally distinct economic entities (2) that imposed an unreasonable restraint of trade. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002) (citing *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 702 (4th Cir. 1991) (en banc)). In addition, a plaintiff must allege "the existence of 'antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' act unlawful.'" *Dickson*, 309 F.3d at 202-03.

"Agreements that fall within the scope of Section 1 are characterized as either 'horizontal' or 'vertical.'" *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 376 (S.D.N.Y. 2016); *In re Mid-Atlantic Toyota Antitrust Litig.*, 560 F. Supp. 760, 779 (D. Md. 1983). Horizontal conspiracies involve agreements among *competitors at the same level* of market structure to stifle trade, such as agreements among manufacturers or distributors to fix prices for a particular product. *Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.*, 854 F.2d 802, 805 (6th Cir. 1988). Vertical conspiracies, by contrast, involve agreements among *actors at different levels* of market structure to restrain trade, "such as agreements between a manufacturer and its distributors to exclude another distributor from a given product and geographic market." *Id.* at 805.

While Plaintiffs accuse West Town of engaging in unlawful price fixing, nowhere in the Complaint do they allege the existence of either a "horizontal" or "vertical" agreement. This is not an oversight but, rather, artful pleading because, as explained below, the allegations in the Complaint are inadequate to establish either a horizontal or vertical price-fixing theory.

### a. There is no horizontal price-fixing agreement.

Plaintiffs are unable to allege a *horizontal agreement* between West Town and All Star for the plain and simple reason that West Town and All Star are not competitors. *See U.S. v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972) (describing "an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition" as

29

a "classic example" of a horizontal restraint in "*per se* violation of § 1"). The allegations in the Complaint confirm that West Town does not operate in the same market as or compete against All Star. Indeed, West Town is "a commercial bank" that "engage[s] in the business of consumer mortgage brokering and/or origination and/or lending," whereas All Star is a "title and settlement service provider" that "provides title and settlement services on residential mortgage loans, refinances and reverse mortgages secured by real property." Compl. ¶¶ 15, 19. Given that Plaintiffs do not allege that West Town provides title or settlement services in competition with All Star, or that All Star brokers or originates residential mortgage loans in competition with West Town, there can be no horizontal price-fixing agreement. Thus, to the extent that Count II is based on a horizontal price-fixing agreement, it fails to state a claim for relief.[19]

> ### b. There is no vertical price-fixing agreement.

Nor can Plaintiffs plausibly allege the existence of a vertical price-fixing agreement. First, Plaintiffs do not allege a vertical relationship between West Town and All Star. Second, the Complaint is devoid of any allegation of harm to competition in any identified relevant market. Thus, for either or both of these reasons, Plaintiffs fail to state a Sherman Act claim based on vertical price-fixing.

> #### (1) Plaintiffs fail to allege a vertical relationship.

Plaintiffs fail to allege that West Town and All Star are vertically aligned and that one of them resold the services of the other at an agreed upon price. Relationships among actors at different levels of market structure, "such as agreements between a manufacturer and its

---

[19] While Plaintiffs vaguely refer to other "Participating Lenders," no lender other than West Town is identified in the Complaint, and there are no facts suggesting a conspiracy between these other lenders and West Town. Accordingly, Plaintiffs cannot rely on their general reference to "Participating Lenders" to allege the existence of a horizontal price-fixing agreement. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015) ("A plaintiff in a § 1 case cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group.").

distributors to exclude another distributor from a given product and geographic market" are deemed vertical. *Crane & Shovel*, 854 F.2d at 805; *K-Flex, Inc. v. Armacell, Inc.*, 299 F. Supp. 3d 730, 734 (E.D.N.C. 2017). The Complaint is devoid of any allegation that West Town and All Star are in a vertical relationship with one another. Although both companies provide services within complimentary industries, West Town and All Star are alleged to provide different services to customers: the Complaint alleges that West Town is in the business of making residential mortgage loans, whereas All Star is a provider of title and settlement services. Compl. ¶¶ 15 and 19. Assuming the truth of these allegations, it is legally impossible for West Town and All Star to enter into a vertical price fixing agreement.

Vertical price fixing (commonly referred to as resale price maintenance) occurs when resale prices are imposed by a supplier or manufacturer on its distributors or resellers. *Valuepest.com of Charlotte, Inc. v. Bayer Corp.*, 561 F.3d 282, 383 (4th Cir. 2009). Under a typical vertical price-fixing or "resale price maintenance" scheme, the manufacturer coerces a dealer to adopt an artificially inflated retail price for the goods he resells at retail. *See Dr. Miles Med. Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 404 (1911). Thus, to allege that West Town and All Star engaged in illegal vertical price-fixing, Plaintiffs must plead facts showing (1) that West Town was reselling title and/or settlement services it purchased from All Star to Plaintiffs, and (2) that West Town and All Star reached agreement on the resale price. *Kingray, Inc. v. NBA, Inc.*, 188 F. Supp.2d 1177, 1188 (S.D. Cal. 2002). Even drawing all reasonable inferences in favor of Plaintiffs, the arrangement alleged in the Complaint bears no resemblance, in either form or substance, to a resale price maintenance agreement that satisfies both of these elements.

31

Nowhere in Plaintiffs' lengthy Complaint do they allege that All Star sold its services to West Town, which, in turn, resold All Star's title services (or vice-versa) to borrowers. Not only do Plaintiffs fail to assert that West Town *resells* All Star's services, but they also do not allege that West Town and All Star agreed on a *resale* price for those services. Absent such allegations, Plaintiffs fail to state a claim for vertical price fixing. At best, the allegations suggest that All Star set the pricing for its services based, in part, on the amount of money it spent on co-marketing with West Town. While these allegations may be relevant to Plaintiffs' Section 8 RESPA claim, they do not support an unlawful vertical price-fixing claim. *See Mularky v. Holsum Bakery, Inc.*, 146 F.3d 1064, 1065 (9th Cir. 1998) (noting that § 1 does not prohibit a business from unilaterally setting its prices, even if those prices are artificially high or low).

### (2) Plaintiffs do not identify a relevant market where competition has suffered.

Plaintiffs' vertical price-fixing theory also fails because Plaintiffs do not identify a relevant market within which the alleged anticompetitive effects of West Town's actions occurred. "Until a market's parameters are reasonably well defined, a court cannot know whether a defendant has unreasonably restricted trade in that market. For this reason, 'it is difficult or impossible to determine the plausibility of an antitrust claim if the relevant market is untenably defined.'" *Gross v. Wright*, 185 F. Supp.3d 39, 49-50 (D.D.C. 2016) (quoting *Suture Express, Inc. v. Cardinal Health 200, LLC*, 963 F. Supp. 2d 1212, 1222 (D. Kan. 2013)).

While "market definition is a deeply fact-intensive inquiry [and] courts hesitate to grant motions to dismiss for failure to plead a relevant product market," *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 442 (4th Cir. 2011) (quoting *Todd v. Exxon Corp.*, 275

F.3d 191, 200-01 (2d Cir. 2001)). the Fourth Circuit has noted that dismissal is warranted where there exist "'glaring deficiencies,' such as failing to allege a relevant market." *Id.* at 444.

Here, the "glaring deficiency" is Plaintiffs' failure to make any effort to define the relevant market where the alleged anticompetitive effects of West Town's actions occurred. *See Oksanen,* 945 F.2d at 709. While the Complaint alleges economic harm suffered by a proposed class of borrowers, residing in various states, whose loans were brokered or originated by West Town and closed by All Star over a period of seven years, Plaintiffs do not identify any product, service, or geographic market restrained by West Town's alleged conduct or its co-marketing arrangement with All Star.[20] A plaintiff cannot federalize its private economic injuries "merely by dressing them up in the language of antitrust." *Dial a Car, Inc. v. Transp., Inc.,* 884 F. Supp. 584, 588 (D.D.C. 1995). Accordingly, Plaintiffs are unable to state a plausible claim under the Sherman Act for vertical price-fixing. *See Worldwide Basketball and Sport Tours, Inc. v. National Collegiate Athletic Ass'n,* 388 F.3d 955, 962 (6th Cir.2004) (failure to plausibly allege a relevant market "is a proper ground for dismissing a Sherman Act claim") (quoting *Nat'l Hockey*

---

[20] While Plaintiffs refer to the relevant market as the "market for title and settlement services on residential mortgage loans, refinances and reverse mortgages," this proposed market definition would not support a plausible Section 1 claim for at least two reasons. Compl. ¶ 36. *First*, Plaintiffs fail to allege a relevant geographic market. If Plaintiffs intend to identify a nationwide market to correlate to their Antitrust Class definition, the absence of factual allegations supporting such a broad definition would render it implausible. *Second,* even if Plaintiffs were able to plead such a broad market definition, the Complaint does not allege that West Town possessed a sufficient share of the market or power to restrain competition in such a broad area. *See* n.21, *infra.* Conversely, if Plaintiffs intend to define the relevant market consistent with their Antitrust Class definition as borrowers of certain loans brokered by West Town for whom All Star provided settlement services, this limited market definition, lacking consideration of interchangeable substitutes, would also warrant dismissal. *See Am. Online, Inc. v. GreatDeals.Net,* 49 F. Supp. 2d 851, 857-59 (E.D. Va. 1999). Indeed, a complaint that alleges a market consisting of a single service provider's customers is insufficient to state a claim. *See, e.g. Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d, 430, 438 (3d Cir. 1997) (rejecting market that only included Domino's). *Cf. Eastman Kodak Co. v. Image Technical Services. Inc.,* 504 U.S. 452, 481-82 (1992) (single brand of a product or service may be a relevant market under the Sherman Act only if no substitute exists for that brand's products or services). Here, if Plaintiffs' market definition is limited to West Town borrowers serviced by All Star, their Section 1 claim is legally insufficient because it lacks reference to reasonably interchangeable substitutes, and should be dismissed.

*League Players' Assoc. v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 719-20 (6th Cir. 2003)); *Am. Online, Inc.,* 49 F. Supp. 2d at 858 ("Where the relevant market proposed by the plaintiff is not even alleged to encompass all interchangeable substitute products, the market is legally (rather than factually) insufficient, and a motion to dismiss is appropriate.").

### 3. Plaintiffs Fail to Allege An Unlawful Refusal To Deal Or Exclusive Dealing.

Within the context of their price-fixing claim, Plaintiffs accuse West Town and All Star of engaging in exclusive dealing and concerted refusal to deal, yet provide no factual support for this allegation. As a result, it is difficult to discern from the Complaint whether Plaintiffs are pursuing separate claims for exclusive dealing and/or for refusal to deal. Regardless, Plaintiffs fail to satisfy the most basic pleading requirements, and their claims under either theory should be dismissed.

#### a. Plaintiffs' allegation of an inter-company conspiracy is legally insufficient to state a claim for concerted refusal to deal.

The Complaint fails to state a claim for concerted refusal to deal. Plaintiffs assert that "*West Town and its employees* and/or agents violated the Sherman Act *by conspiring to and agreeing* to supporting [sic] the Price Fixing an Minimum Fee Agreements *through a concerted refusal to deal* with non-cartel title and settlement service companies on all West Town loans generated by the Kickback Agreement[.]" *See* Compl. ¶ 401(b) (emphases added). Plaintiffs' use of antitrust nomenclature like "*concerted refusal to deal*", however, does not magically give rise to a cognizable claim, because, as a matter of law, West Town cannot be found to conspire with its <u>own</u> employees under Section 1 of the Sherman Act. *See, e.g., Copperweld Corp.v. Independence Tube Corp.*, 467 U.S. 752, 770-71 (1984) (alleged conspiracies between a corporation and its officers or employees entail merely unilateral action not subject to Section 1). On this basis alone, Plaintiffs' claim for exclusive dealing or refusal to deal should be dismissed.

34

**b. Plaintiffs do not and cannot allege sufficient facts to establish the existence of a "cartel" to support a claim for concerted refusal to deal.**

Similarly flawed is Plaintiffs' sporadic interjection of a so-called "Cartel Agreement" under which West Town allegedly received kickbacks in exchange for the referral of borrowers to All Star for title and settlement services. Plaintiffs' use of the "cartel" label is inapposite because cartels are characterized by "horizontal price fixing, output limitations, and market division," and none of these hallmarks are alleged here. *Freedom Holdings. Inc. v. Spitzer*, 447 F. Supp. 2d 230, 251 (S.D.N.Y. 2004). *See also* IIA Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 405a, at 26 (2d ed. 2002) ("Competing firms form a cartel when they replace independent decisions with an agreement on price, output, or related matters."). Accordingly, Plaintiffs' attempt to sensationalize their claim by using the term "cartel" is unavailing.

**c. Plaintiffs do not and cannot allege that West Town had sufficient market power to restrain or foreclose competition to state a claim for exclusive dealing.**

Beyond their failure to allege the existence of a relevant market, Plaintiffs also fail to allege that West Town had sufficient market power to restrain or foreclose competition; elements that are required to state an exclusive dealing claim under Section 1. The legality of vertical restraints on trade (including exclusive dealing) is subject to analysis under the "rule of reason." *Continental T.V. v. GTE Sylvania*, 433 U.S. 36 (1977); *Standard Oil Co. v. U.S.*, 337 U.S. 293 (1949). Whether a vertical restraint constitutes an "unreasonable restraint" on trade and suppresses competition within the relevant market turns on whether the restraint forecloses competition in a substantial share of the line of commerce affected. *Kolon*, 637 F.3d at 451; *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group LP*, 592 F.3d 991 (9th Cir. 2010) ("Under the antitrust rule of reason, an exclusive dealing arrangement violates Section 1 only if

its effect is to foreclose competition in a substantial share of the line of commerce affected.")
(internal quotation marks and citation omitted).

Whether the challenged restraint forecloses competition requires "[a] threshold inquiry in
any Rule of Reason case [of] whether the defendant had market power" in the relevant product
and geographic markets. *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.,*
889 F.2d 524, 528 (4th Cir.1989) (internal citations omitted).   The reason for this threshold
inquiry is that "'[f]irms lacking market power, if they wish to survive, cannot adopt restraints
that have anticompetitive effects.  Thus such firms cannot have an effect on interbrand
competition.  Consequently, a finding of no market power precludes any need to further balance
the competitive effects of a challenged restraint.'" *Id.* at 529 (quoting *Assam Drug Co. v. Miller
Brewing Co.,* 798 F.2d 311, 316 (8th Cir.1986)).  To prove market power, the plaintiff must first
establish the relevant product and geographic markets. *Satellite Television & Associated
Resources v. Continental Cablevision,* 714 F.2d 351, 355 (4th Cir.1983).

Here, Plaintiffs do not and cannot allege that West Town possessed market power.[21]  The
Complaint makes no mention of any relevant product or geographic market—the first step to
stating a claim for exclusive dealing.  Without reference to a relevant product or geographic

---

[21] "Courts have consistently held that firms with market shares of less than 30% are presumptively
incapable of exercising market power." *Commercial Data Servers, Inc. v. Int'l Bus. Machines Corp.,* 262
F. Supp. 2d 50, 74 (S.D.N.Y. 2003) (citation omitted); *see also Jefferson Parish Hosp. Dist. No. 2 v.
Hyde,* 466 U.S. 2, 26–27 (1984) (Section 1 claim; finding that 30% market share does not constitute
"dominant market position"). There is no set of facts that Plaintiffs could ever plausibly allege to show
that West Town had a 30% or more market share of the mortgage lending origination market in any
geographic area. To put this in perspective, the five largest commercial banks in the United States—Wells
Fargo, JP Morgan, Bank of America, U.S. Bancorp. and Citigroup—*together* only held a 25-27% market
share in mortgage lending origination in 2017.  *See* Forbes.com, "Largest U.S. Commercial Banks
Continue To Lose Market Share In The Mortgage Industry," June 7, 2018 (available at:
https://www.forbes.com/sites/greatspeculations    /2018/06/07/largest-u-s-commercial-banks-continue-to-
lose-market-share-in-the-mortgage-industry_1883f7be9e86 (accessed May 21, 2019)). If these national
banks *combined* held less than a 27% market share in mortgage lending origination in 2017, any
suggestion that a small community bank like West Town had sufficient market share to restrain or
foreclose competition is utter nonsense.

market, it is impossible for Plaintiffs to allege that West Town possesses market power sufficient to foreclose competition—or that West Town's improper use of this market power restrained or foreclosed competition. *See, e.g., Dickson,* 309 F.3d at 207-11 (plaintiff cannot state a viable Section 1 claim without allegations of the defendants' power or share in the relevant product market). As a result, Plaintiffs are unable to state a plausible claim for exclusive dealing.

Finally, the facts pled and as set forth in the exhibits attached to and incorporated by reference into the Complaint belie any Section 1 claim against West Town for exclusive dealing or refusal to deal. According to the Complaint, West Town agreed to co-market its services with All Star, and to refer borrowers to All Star for title services, but there are no allegations that suggest that the relationship was exclusive.[22] To the contrary, the allegations reflect repeated instances where West Town referred, and its borrowers utilized, title and settlement service providers other than All Star in connection with the loans originated or brokered by West Town.

### 4.  Plaintiffs Have Not Alleged An Antitrust Injury To Confer Antitrust Standing.

Plaintiffs have failed to plausibly allege an "antitrust injury" necessary to confer standing upon them to bring antitrust claims. 15 U.S.C. § 15. "Antitrust standing is distinct from constitutional standing in which a mere showing of harm in fact will establish the necessary injury." *Port Dock & Stone Corp. v. Oldcastle N.E. Inc.,* 507 F.3d 117, 121 (2d Cir. 2007) (citing *Assoc. Gen. Contractors,* 459 U.S. at 519, n. 31). "In addition to injury-in-fact to the plaintiff's business or property caused by the antitrust violation, antitrust standing for a private plaintiff requires a showing of a special kind of 'antitrust injury.'" *Id.* Antitrust injury is "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful.'" *Novell Inc. v. Microsoft Corp.,* 505 F.3d 302, 311 (4th Cir. 2007)

---

[22] To the contrary, at least one of the exhibits to the Complaint confirms that loans originated by West Town were closed by title companies *other than All Star. See* Compl., Ex. 16 (indicating that "30+ closing with [All Star] in December, 11 with Capital, and 5 with Genuine").

(quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).   Courts have clarified that "because the antitrust laws are intended to protect competition and not simply competitors, only injury caused by damage to the competitive process may form the basis of an antitrust claim." *Thompson Everett Inc. v. Nat'l Cable Adver.*, 57 F.3d 1317, 1325 (4th Cir. 1995).

While Plaintiffs allege a personal economic injury, there are no allegations from which one could plausibly infer injury to competition in any market as a whole.   Notwithstanding the conclusory allegations of "supracompetitive prices", Compl. ¶¶ 5, 7, 41, the Complaint is devoid of any allegations plausibly demonstrating how the alleged conduct led to "supracompetitive prices" ***across an entire market***, or that any competitor has been ***actually excluded from the market*** as a result of the alleged conduct.   At best, Plaintiffs allege only a personal injury (*i.e.*, they were charged more for settlement services than they should have been) and not an injury to competition itself.   While such allegation may be sufficient to confer Article III standing, it is insufficient as a matter of law to confer "antitrust standing." *See Patel v. Scotland Mem'l Hosp.*, 91 F.3d 132 (4th Cir. 1996) (*per curiam*) (recognizing that "[p]ersonal economic injury alone" is insufficient to support a § 1 claim of the Sherman Act because "[t]here must be some cognizable effect on the competitive market.").   Plaintiffs' failure to allege an "antitrust injury" is fatal and requires dismissal of their Sherman Act claim. *See Port Dock & Stone*, 507 F.3d at 124 (dismissing antitrust complaint for failure to allege antitrust standing).

## C.  PLAINTIFFS FAIL TO STATE A PLAUSIBLE RICO CLAIM.

### 1.  RESPA Is Not A Predicate Act Of RICO.

The gravamen of Plaintiffs' Complaint is that certain loan officers and branch managers of West Town violated RESPA by allegedly accepting kickbacks from All Star for referring

West Town's customers to All Star. Compl. ¶¶ 2-3.[23]  A violation of RESPA, however, is not a predicate act of "racketeering activity" which may give rise to a claim under RICO.

Perhaps recognizing that the heart of their claim does not permit them to seek the treble damages available under RICO, Plaintiffs attempt to reformulate their claim to allege mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343)—activities which may serve as predicate acts for their RICO claim.  In so doing, however, Plaintiffs disregard the caution with which this Court, in accord with the Fourth Circuit and several other Courts of Appeal, views RICO claims involving these predicate acts.  Indeed, as the Court explained in *Becker*:

> *[T]he Fourth Circuit is 'cautious about basing a RICO claim on predicate acts of mail and wire fraud because' l*it will be the unusual fraud that does not enlist the mails and wires in its service...' *Al-Abood*, 217 F.3d at 238 (*quoting Anderson v. Found. for Advancement, Educ. and Employment of Am. Indians*, 155 F.3d 500, 506 (4th Cir. 1998)) (internal quotation marks omitted) (alteration in *Anderson*).  'This caution is designed to preserve a distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity.' *Al-Abood*, 217 F.3d at 238.

*Becker*, 2019 WL 1415483, at *19.  *See also Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025-1026 (7th Cir. 1992) (noting that "civil RICO plaintiffs persist in trying to fit a square peg in a round hole by squeezing garden-variety business disputes into civil RICO actions"); *Calcasieu Marine Nat. Bank v. Grant*, 943 F.2d 1453, 1463 (5th Cir. 1991) ("although Congress wrote RICO in broad, sweeping terms, it did not intend to extend RICO to every fraudulent commercial transaction"); *Biggs v. Eaglewood Mortg., LLC*, 582 F. Supp. 2d 707, 714 (D. Md. 2008); *Foster v. Wintergreen Real Estate Co.*, 363 F. App'x 269, 274 (4th Cir. 2010).

---

[23] Compl. ¶ 2 ("Plaintiffs...are victims of an illegal kickback and price fixing scheme between West Town and All Star..."); *id.* ¶ 3 ("Under the scheme, West Town, by and through its branch managers, loan officers, agents, and/or other employees, received and accepted illegal kickbacks in exchange for the assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services in violation of [RESPA].").

The Fourth Circuit's repeated call for caution suggests that even if Plaintiffs were able to cobble together enough allegations to state a claim under RICO—which, as explained below, they cannot—the type of fraud alleged in the Complaint "is not sufficiently outside the heartland of fraud cases to warrant RICO treatment." *Al-Abood*, 217 F.3d at 238.

The putative RICO fraud in this case is premised on a consumer dispute which did not "pose a special threat to the social well-being" and which, while allegedly injurious to Plaintiffs, did not deter them from consummating or benefiting from their financing transactions.[24] Perhaps even more importantly, federal law already provides Plaintiffs with a statutory cause of action—RESPA—to seek relief for the alleged kickbacks in the real estate settlement process. Had Congress intended that every RESPA violation also be actionable under RICO, then Congress would have made RESPA a predicate act under 18 U.S.C. § 1961(1). The fact that Congress listed over thirty-five (35) federal statutory offenses as RICO predicate acts, but did not include RESPA among them, confirms this view that the legislature did not envision the use of RICO to vindicate claims based on violations of RESPA. Accordingly, even if Plaintiffs were able to state a claim under RICO—which, as explained below, they cannot—the allegations in the Complaint indicate that this case "is not sufficiently outside the heartland of fraud cases to warrant RICO treatment." *Al-Abood*, 217 F.3d at 238.

## 2. Plaintiffs Fail To Allege A Fraudulent Scheme By West Town.

Plaintiffs' RICO claims are based on West Town's alleged commission of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343). "To plead mail or wire fraud, a plaintiff must show: (1) a scheme disclosing intent to defraud; and (2) the use, respectively, of the mails or

---

[24] In this way, this case is unlike *Thomas v. Ross & Hardies*, 9 F. Supp. 2d 547 (D. Md. 1998), in which the defendants' agents took money from homeowners promising to pay off their mortgages, but pocketed it instead—and were criminally convicted as a result.

interstate wires in furtherance of the scheme." *Chambers*, 43 F. Supp. 3d at 593. Moreover, as the Fourth Circuit has explained, "where fraud is alleged as a proximate cause of the injury, the fraud must be a 'classic' one. In other words, the plaintiff must have justifiably relied, to his detriment, on the defendant's material misrepresentation." *Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 337 (4th Cir. 1996). *See also Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008) ("In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation."). Thus, in order for Plaintiffs to state a claim under RICO, they must allege with particularity that West Town intended to defraud them and that Plaintiffs relied on West Town's misrepresentations to Plaintiffs' detriment. The Complaint fails to do so.

The Complaint points to three types of alleged misrepresentations and/or concealment. *First,* Plaintiffs allege that West Town and All Star used "sham invoices and payment records [to create] an ongoing false record concealing and preventing discovery of the fact that any thing of value was exchanged…" Compl. ¶ 246. *Second*, Plaintiffs point to West Town's use of "fraudulent marketing materials," and, specifically, assertions that: "borrowers could save '30-40% on title fees with All Star,' All Star had 'competitive pricing', was a part of West Town's 'experienced team of real estate professionals, and was 'Our Preferred Title Company.'" *Id.* ¶ 248. *Third*, the Complaint alleges that West Town failed to report the alleged kickback payments on loan documents provided to Plaintiffs during the loan process, and, thus, fraudulently concealed material facts from Plaintiffs. *See, e.g., id.* ¶ 253 ("West Town and All Star chose to falsely allocate the charges for title and settlement services associated with a borrower's loan…thereby false minimizing the APR reported on West Town borrowers' loan documents and required federal disclosures"); *id.* ¶ 268 ("West Town omits and fails to describe anywhere on a borrower's HUD-1 statement the amount of the kickback received by West Town

related to the borrower's loan…").  These allegations, even if true, are legally insufficient to state mail or wire fraud claims against West Town.

As a threshold matter, Plaintiffs cannot rely on the theory of fraudulent concealment because they have not and cannot allege the existence of a fiduciary relationship between themselves and West Town.  Under well-settled principles of Maryland law, "non-disclosure does not constitute fraud unless a special duty to disclose exists." *Hogan*, 155 Md. App. at 566. "A duty to disclose arises in certain relationships such as a confidential or fiduciary relationship." *Id.* "'[T]he relationship of a bank to its customer in a loan transaction is ordinarily a contractual relationship between debtor and creditor, and is not fiduciary in nature.'" *Boardley v. Household Fin. Corp. III*, PWG-12-3009, 39 F. Supp. 3d 689, 717 (D. Md. 2014) (quoting *Yousef v. Trustbank Sav. F.S.B.*, 81 Md. App. 527 (1990)).  Because Plaintiffs and West Town were engaged in arms' length residential loan transactions, there was no fiduciary relationship between them to support a fraud in the omission claim.  *Boardley*, 39 F. Supp. 3d at 717-18 (dismissing fraudulent concealment claim where the plaintiffs failed to allege circumstances giving rise to fiduciary relationship between themselves and lender).

Even if West Town could be liable on a fraudulent concealment theory, the "affirmative acts of concealment" alleged in the Complaint turn on a fundamentally flawed premise: that the failure to disclose kickback payments in Plaintiffs' loan documents constitutes a misrepresentation or a fraud.  As noted above, the Fourth Circuit has rejected RESPA and negligent misrepresentation claims premised on non-disclosure on HUD-1 forms. *Arthur*, 569

F.3d at 159.[25]  Indeed, these materials cannot be the basis for *misrepresentation* claims so long as the title fees itemized on the HUD-1s *were accurate* and, in this case, they were.  That is, the settlement charges reflected in section 1100 of their HUD-1s were precisely the amount of title fees charged to and paid by Plaintiffs.  As such, the HUD-1s were accurate, despite Plaintiffs' argument that All Star used a portion of those fees to pay the alleged kickbacks.  *See generally Moll*, 700 F. Supp. at 1291-92 (accurate HUD-1 disclosures not fraudulent).  Because Plaintiffs' HUD-1s do not contain any misrepresentation, these forms cannot give rise to a fraud claim.

Finally, while Plaintiffs point to certain affirmative representations by West Town in marketing materials, these alleged statements are not legally actionable and cannot be the basis for the mail or wire fraud alleged in the Complaint.  Specifically, Plaintiffs assert that West Town falsely represented that: "borrowers could save '30-40% on title fees with All Star,' All Star had 'competitive pricing', was part of West Town's 'experienced team of real estate professionals, and was 'Our Preferred Title Company.'" Compl. ¶ 248. The statements about All Star's pricing are puffery and mere expressions of opinion which cannot amount to fraudulent representations as a matter of law.  *See Hogan*, 155 Md. App. at 567 ("This Court has held that fraud claims must be based on fact, not vague statements or expressions of opinion.") (citing *McGraw v. Loyola Ford, Inc.*, 124 Md. App. 560, 582 (1999)).  With respect to the statements regarding West Town's relationship with All Star, the bulk of Plaintiffs' allegations suggest that West Town *did work* with All Star and that All Star was, in fact, West Town's "Preferred Title Company."  *Id.*  Accordingly, these alleged representations are either (1) not false, or (2) not

---

[25] Nothing in the decision in *Edmonson* limits the Fourth Circuit's holding in *Arthur*.  While *Arthur* dealt with the affirmative cause of action for negligent misrepresentation (which is a tort closely related to fraud), *Edmonson* addressed fraudulent concealment in the tolling context only.  The requirements for tolling are, of course, different than the elements of an affirmative cause of action for fraud.  *See Edmonson*, 2019 WL 1873270, at *7; *Arthur*, 569 F.3d at 162 (citing *Lloyd v. Gen. Motors Corp.*, 397 Md. 108 (2007)).

legally actionable, and, therefore, cannot be the basis for the mail or wire fraud underlying Plaintiffs' RICO claim.

Because Plaintiffs fail to allege that West Town made any legally actionable misrepresentation, they fail to plausibly allege that West Town engaged in a fraudulent scheme. Absent plausible allegation of such a scheme, Plaintiffs are unable to state a claim under RICO.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs fail to state a plausible claim for relief, and the Complaint should be dismissed *with prejudice*.

Respectfully submitted,

_____/s/_____
Brian L. Moffet (Fed Bar No. 13821)
Ranak K. Jasani (Fed. Bar No. 27383)
Michael B. Brown (Fed. Bar No. 19641)
MILES & STOCKBRIDGE, P.C.
100 Light Street
Baltimore, Maryland 21202
410-727-6464
bmoffet@milesstockbridge.com

*Attorneys for Defendant*
*West Town Bank & Trust*

# EXHIBIT 1

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

Case 8:19-cv-00490-RJM   Document 17-1   Filed 05/28/19   Page 47 of 101

# UNITED STATES DISTRICT COURT

for the

District of Maryland

| | |
|---|---|
| Edward J. Fangman, et al. | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | )    Civil Action No.   1:14-CV-00081-RDB |
| Genuine Title, LLC, et al. | ) |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:      Custodian of Records, Washington First Bank (Formerly Alliance Bank)
c/o The Corporation Trust Incorporated, 351 West Camden Street, Baltimore, MD 21201

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

     See Exhibit A

| Place: Smith, Gildea & Schmidt, LLC<br>     600 Washington Avenue, Suite 200<br>     Towson, MD 21204 | Date and Time:<br><br>     08/24/2016 9:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

     The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   8/5/16

     *CLERK OF COURT*

                                OR          _____

      _____                           *Attorney's signature*
         *Signature of Clerk or Deputy Clerk*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____

Edward J. Fangman, et al., Plaintiffs _____ , who issues or requests this subpoena, are:

Michael P. Smith, Sarah Zadrozny, Smith, Gildea & Schmidt, LLC, 600 Washington Ave., Ste 200, Towson, MD 21204,
mpsmith@sgs-law.com, szadrozny@sgs-law.com, 410-821-0070

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   1:14-CV-00081-RDB

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

◻ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

◻ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
  (i) is a party or a party's officer; or
  (ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
 (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
 (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
 (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
  (i) fails to allow a reasonable time to comply;
  (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
  (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  (iv) subjects a person to undue burden.
 (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
  (i) disclosing a trade secret or other confidential research, development, or commercial information; or

  (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
 (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
 (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
 (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  (i) expressly make the claim; and
  (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

EDWARD J. FANGMAN, et al.,
Plaintiffs,

v.

GENUINE TITLE, LLC,
Defendants.

Civil Action No.: 1:14-CV-00081-RDB

## INSTRUCTIONS

1. Your response to these Requests shall include all information available to you or through your agents, representatives, and, unless privileged, your past and present attorneys.

2. These Requests are continuing in character so as to require you promptly to amend or supplement your Answers if you obtain further responsive information before trial.

3. If in answering these Requests you encounter any ambiguities construing either a question, instruction, or definition, set forth the matter deemed ambiguous and the construction used in answering.

4. If you are withholding any documents under a claim of privilege (including but not limited to, the work product doctrine), please provide the information set forth in FRCP 26(b)(5) and Discovery Guideline 9(c)(ii)(b), including:

   a) the basis for each objection and grounds for your refusal to answer, including the nature of any privilege asserted;

   b) the type of document, the general subject matter of the document, the date of the document, and such other information as is sufficient to identify the document, including, where appropriate, the author, addressee, custodian, and any other recipient of the document, and where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other, in a manner that, without revealing the information claimed to be protected, will enable this party to assess the applicability for the privilege or protection claimed by you.

5. When a document contains both privileged and non-privileged material, the non-privileged material must be disclosed to fullest extent possible without thereby disclosing the privileged material. If a privilege is asserted with regard to part of the material contained in a document, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed. When a document has been redacted or altered in any fashion, identify as to each document, the reason for the redaction or alteration, the date of the redaction or

alteration, and the person performing the redaction or alteration.   Any redaction must be clearly visible on the redacted document.

6.  If production of any requested document(s) is objected to on the grounds that production is unduly burdensome, describe the burden or expense of the proposed discovery.

7.  If you are withholding the document for any reason other than an objection that it is beyond the scope of discovery or that the request is unduly burdensome, identify as to each document, and in addition to the information requested in 4(b), please state the reason for withholding the document.

8.  Your responses shall include all documents related to each request that will identify each recipient of the document as well as the dates that each recipient would have first received same.

9.  In the event that the requested records are stored on computer hardware or software, Plaintiffs request that any such information, including notes, correspondence, documents, databases, programs, reports, electronic mail, or spread sheets be produced by either printing and producing hard copies of such information or data, downloading such information or data to floppy disk and producing the disk, or by allowing Plaintiffs to inspect the computer system that would give Plaintiffs access to the requested information in native format.

## DEFINITIONS

As used in these requests, the following terms are to be interpreted in accordance with these definitions:

(a)      The term **"person"** includes any individual, joint stock company, unincorporated association or society, municipal or other corporation, the State, its agencies or political subdivision, any court, or any other governmental entity.

(b)      The terms **"you"** or **"your"** include the person(s) to whom these requests are addressed, and all of that person's agents, representatives or attorneys.

(c)      The terms **"document"** or **"documents"** are defined to be synonymous in meaning and equal in scope to the usage of the term "documents" in FRCP 34 and includes, but is not limited to, all writings, electronic mailing drawings, graphs, charts, photographs, recordings, and other data compilations from which information can be obtained, translated, if necessary, by you through detection devices into reasonable usable form.

(d)      The terms **"record"** or **"records"** includes any memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation.

(e)    The present tense includes the past and future tenses.  The singular includes the plural, and the plural includes the singular.  "All" means "any and all;" "any" means "any and all."  "Including" means "including but not limited to."  "And," "and/or" and "or" encompass both "and" and "or."  Words in the masculine, feminine, or neuter form shall include each of the other genders.

## DOCUMENT SCHEDULE

1. All records and documents pertaining to any and all other accounts or deposits of money of any nature whatsoever in which ALL STAR TITLE, INC has any interest or power of withdrawal whatsoever, either individually or in conjunction with any other person or entity.  This request shall apply to any checking account, savings account, or any other account of deposit, and shall include copies of any and all monthly statements, records of deposit, and cancelled checks for each such account from January 1, 2009 to December 31, 2014.

2. All cancelled checks written by ALL STAR TITLE, INC on any account held by ALL STAR TITLE, INC from January 1, 2009 to December 31, 2014.

3. All records and documents pertaining to any and all credit card accounts whatsoever in which ALL STAR TITLE, INC has any interest whatsoever.  This shall include copies of any and all monthly statements showing all charges and/or transactions made on any WASHINGTON FIRST BANK (FORMERLY ALLIANCE BANK) credit card from January 1, 2009 to December 31, 2014.

Michael Paul Smith, #23683
Sarah Zadrozny, #13911
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, Maryland 21204
410-821-0070
410-705-6461 (fax)
mpsmith@sgs-law.com
szadrozny@sgs-law.com

**Certification Pursuant to Md. Code Ann., Fin. Inst. § 1-304**

I HEREBY CERTIFY that a copy of this and its corresponding subpoena were served

upon All Star Title, Inc., c/o Jason Horwitz, Resident Agent, whose records are sought by this

subpoena.

Jason Horwitz
1314 Bedford Avenue
Suite 202
Baltimore, MD 21208

Michael Paul Smith
Sarah A. Zadrozny
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, Maryland 21204
410-821-0070/ 410-821-0071 (f)
*Attorneys for Plaintiffs*

CERTIFICATION OF CUSTODIAN OF RECORDS
OR OTHER QUALIFIED INDIVIDUAL

I, _____ , do hereby certify that:

(1) I am the Custodian of Records of or am otherwise qualified to administer the records for

_____ (identify the organization that

maintains the records), and

(2) The attached records:

    a.   Are true and correct copies of the records that were made at or near the time of

        the occurrence of the matters set forth, by or from the information transmitted by,

        a person with knowledge of these matters; and

    b.   Were kept in the course of the regulated conducted activity; and

    c.   Were made and kept by the regularly conducted business activity as a regular

        practice.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Signature

_____
Printed Name

_____
Title

_____
Date

# EXHIBIT 2

**GODSWILL UCHE**
2103 Lukewood Drive
Gwynn Oak, MD 21207

     Plaintiff

v.

**ALL STAR TITLE, INC.**
1421 Clarkview Road, Suite 108
Baltimore, MD 21209

Serve on:
Jason Horwitz, Resident Agent
1314 Bedford Avenue, Suite 202
Baltimore, MD 21208

    Defendant.

\*    \*   \*   \*   \*   \*   \*

\*

\*

\*

\*

\*

\*

\*

\*

    IN THE

    CIRCUIT COURT

    OF MARYLAND

    FOR

    BALTIMORE COUNTY

    CASE NO. _____

\*   \*   \*   \*   \*   \*

## COMPLAINT

    Plaintiff Godswill Uche, on behalf of himself and the entire class of persons similarly situated, by and through his attorneys, Michael Paul Smith, Melissa L. English and Sarah A. Zadrozny of Smith, Gildea & Schmidt, LLC and Timothy F. Maloney, Veronica B. Nannis and Megan Benevento of Joseph, Greenwald and Laake, P.A., files this Class Action Complaint, sue the defendants for cause, claim damages, and state as follows:

## INTRODUCTION

1.    Plaintiff and Class Members are victims of an illegal kickback scheme between residential mortgage lenders and Defendant All Star Title, Inc. ("All Star").

2.    Under the scheme, All Star paid and residential mortgage lenders, along with their brokers, branch managers, loan officers, agents and other employees, (collectively, "Participating Lenders") received and accepted, unearned fees and kickbacks in violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq.* ("RESPA").

1

3.      All Star paid these kickbacks and unearned fees to Participating Lenders under a quid pro quo agreement for the payment of kickbacks and unearned fees in exchange for the referral of residential mortgage loans, refinances, and reverse mortgages to All Star for title and settlement services.

## PARTIES

4.      Plaintiff brings this action pursuant to Md. Rule 2-231 as a class action on his own behalf and on behalf of the entire class of people similarly situated.

5.      Plaintiff Godswill Uche is a resident of Baltimore County, Maryland.

6.      Defendant All Star Title, Inc. is a Maryland corporation with a principal place of business of 1314 Bedford Avenue, Suite 202, Baltimore, Maryland.  At all relevant times, All Star was registered and authorized to conduct business in Maryland, North Carolina, Florida, and, on information and belief, other places.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter and the parties to this action.

8.      Venue is proper in this Court pursuant to Md. Code Ann., Courts & Jud. Proc. Art., §6-201 because All Star's principal place of business in Maryland is located in Baltimore County.

## FACTUAL ALLEGATIONS FOR INDIVIDUAL AND CLASS RELIEF

I.      **Real Estate Settlement Procedures Act (RESPA)**

9.  Congress enacted RESPA in 1974 as a response to abusive practices present in the residential mortgage lending and real estate settlement services market stemming from the prevalence of coordinated business relationships between residential mortgage lenders and brokers and title and settlement services companies.

2

10. Congress determined that the kickbacks and unearned fees that were the backbone of these coordinated business relationships harmed consumers by creating conflicts of interest between mortgage lenders and borrowers. Mortgage lenders would refer borrowers' loans to title and settlement service providers to collect a kickback or unearned fee, regardless of the quality of services provided by the title and settlement service provider, thereby placing the lender's interest in receiving a kickback or unearned fee higher than seeking benefits a title and settlement service provider may offer the borrower.

11. As a result, Congress concluded that kickbacks and unearned fees harmed borrowers by depriving them of: (1) the improvements in service and quality resulting from "healthy competition generated by independent settlement service providers", (2) a lender's or broker's "impartial advice" and "professional evaluation" of title and settlement service companies, and (3) price competition such that consumers paid more for title and settlement services than they would have paid without the coordinated business relationships. *See* H.R. Rep. No. 97-532 at 52 (1982); *see also*, U.S. Gov't Accountability Office, *Title Insurance: Actions Needed to Improve Oversight of the Title Industry and Better Protect Consumers* (Apr. 2007).

12. The purpose of 12 U.S.C. § 2607 is to protect consumers from all of the harms resulting from coordinated business relationships by eliminating the payment of kickbacks and unearned fees in connection with settlement services provided in federally related mortgage transactions. 12 U.S.C. § 2607 states in relevant part:

> (a) Business Referrals. No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving

a federally related mortgage loan shall be referred to any person.

(b) Splitting charges. No person shall give and no person shall accept any portion, split or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving federally related mortgage loan other than for services actually performed.

13. 12 U.S.C. § 2607(d)(2) states in relevant part:

Any person or persons who violate the prohibitions or limitations of [12 USC § 2607] shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service.

## II. The Kickback Scheme

14. At all relevant times, All Star was a title and settlement services company licensed in various states, including Maryland, and regulated by the Maryland Insurance Commissioner.

15. By at least 2009, All Star perpetrated the Kickback Scheme by adopting the business model and practice of paying kickbacks to Participating Lenders and their brokers in exchange for the referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services.

16. Brandon Glickstein, the Marketing Manager for Genuine Title LLC, testified at deposition before the Maryland Insurance Administration regarding his knowledge that All Star was engaging in a Kickback Scheme involving the payment of illegal kickbacks in exchange for the referral of residential mortgage loans to All Star for title and settlement services. **Exhibit A**, Glickstein 6/12/14 Deposition, 224:4-225:5.

17. All Star paid Participating Lenders kickbacks in several different forms including, but not limited to, Referring Cash, All Star financed marketing credits with third party marketing

4

service companies, and free marketing materials, e.g., borrowers' leads data, postage, and/or direct mail design, fulfillment and mailing services.

### a. All Star's Payment of Referring Cash to Participating Lenders' Brokers

18. All Star paid Referring Cash directly to Participating Lenders' mortgage brokers, employees and/or agents in exchange for the Participating Lenders assignment and referral of loans, refinances or reverse mortgages to All Star for title and settlement services.

19. All Star calculated and paid Referring Cash kickbacks on a regular basis, and, upon information and belief, no less often than once per month.

20. In some instances, All Star paid Referring Cash kickbacks to sham LLCs set up by Participating Lenders' brokers for the purpose of receiving and accepting illegal kickbacks. All Star's payment of kickbacks to Participating Lenders by and through sham LLCs had the additional purpose of concealing, and did so conceal, the kickbacks and Kickback Scheme from regulators and borrowers, including Plaintiff and Class Members.

21. All Star paid Referring Cash kickbacks to Participating Lenders brokers solely in exchange for the assignment and referral of residential mortgage loans, refinances and reverse mortgages under the Kickback Scheme and no legitimate services were provided by Participating Lenders, or their employees or agents, associated with the kickbacks.

### b. All Star's Payment of Marketing Credits for Participating Lenders' Brokers

22. All Star also paid kickbacks to Participating Lenders, and their employees and/or agents, in the form of All Star financed credits with third party marketing service companies used by Participating Lenders' branch managers, mortgage brokers, loan officers and/or other employees for marketing directly to potential borrowers.

5

23. All Star financed a marketing credit in an amount equal to a per unit credit for each referred loan, refinance or reverse mortgage that a Participating Lender assigned and referred to All Star under the Kickback Scheme, and which was in fact closed by All Star.

24. **Exhibit B** contains invoices from Azevedo Solutions Group, Inc. ("Azevedo") reflecting marketing credits paid for by All Star. All Star structured the marketing credit such that it would order and be billed for the entire cost of a marketing service for a Participating Lenders' mortgage broker. The marketing services company would then bill the mortgage broker for a portion of the services ordered by All Star. When the mortgage broker paid the broker's invoice, the amount the broker paid was applied to All Star's invoice as a "credit". The remaining balance on the All Star invoice was paid by All Star and represents the marketing credit kickback.

25. Plaintiff believes, and therefore avers, that All Star used other payment and billing structures to facilitate the payment of marketing credit kickbacks.

26. Plaintiff believes, and therefore avers, that All Star used other third party marketing companies in addition to Azevedo to facilitate marketing credit kickbacks to Participating Lenders' employees and/or agents, including, but not limited to: AMG Lead Source, Best Rate Referrals, Titan List & Mailing Services, Lendanear Data & Direct Mail Services, Influence Direct, Inc., and Camber Marketing Group.

27. Plaintiff believes, and therefore avers, that the marketing credits were structured to conceal, and did so conceal, the payment, receipt and acceptance of the marketing credit kickbacks from regulators and borrowers, including Plaintiff and Class Members.

28. All Star financed marketing credit kickbacks to Participating Lenders' brokers solely in exchange for the assignment and referral of residential mortgage loans, refinances and reverse mortgages under the Kickback Scheme and no legitimate services were provided

6

by Participating Lenders, or their employees or agents, associated with the marketing credit kickbacks.

**c. All Star Provided Free Marketing Materials for Participating Lenders' Brokers**

29. Plaintiff believes, and therefore avers, that All Star paid and Participating Lenders and their employees and/or agents received and accepted kickbacks in the form of free marketing materials, such as free direct mail services and materials, postage, and sales and marketing leads.

30. Jay Zukerberg, President of Genuine Title LLC, testified in deposition to the Maryland Insurance Administration that, in addition to Referring Cash kickbacks, All Star paid certain Participating Lenders' brokers kickbacks in the form of free mailing lists, mail handling services, and postage. **Exhibit C**, Zukerberg 4/24/14 Depo., 69:21-73:7.

31. Based on All Star's continuing pattern of practice, Plaintiff believes, and therefore avers, that All Star paid other Participating Lenders' mortgage brokers kickbacks in the form of free marketing materials and postage.

32. Plaintiff believes, and therefore avers, that the free marketing materials kickbacks were structured to conceal, and did so conceal, the payment, receipt and acceptance of the free marketing materials kickbacks from regulators and borrowers, including Plaintiff and Class Members.

33. All Star paid free marketing materials kickbacks to Participating Lenders' brokers solely in exchange for the assignment and referral of residential mortgage loans, refinances and reverse mortgages under the Kickback Scheme and no legitimate services were provided by Participating Lenders, or their employees or agents, associated with the free marketing materials kickbacks.

7

34. Participating Lenders, and/or their employees and/or agents, in fact assigned referred loans to All Star pursuant to the Kickback Scheme. The Participating Lenders, and their employees and/or agents, assigned and referred loans to All Star because of the Kickback Scheme and to obtain a kickback from All Star.

35. All Star paid kickbacks instead of lowering prices of its title and settlement services or otherwise competing for borrowers on the basis of service, quality or other consumer benefit. All Star did this because paying kickbacks was an easier and more effective way to build market share in the title and settlement services industry.

36. All Star's payment of illegal kickbacks and unearned fees deprived borrowers, including Plaintiff and Class Members, of kickback-free settlement services, their broker's impartial evaluation of All Star's service and quality, and the consumer benefits of fair competition among independent title and settlement service providers.

37. As a result, borrowers, including Plaintiff and Class Members, paid higher settlement charges than they would have without the illegal kickbacks because the Participating Lenders' Referring Brokers performed no services in exchange for the kickbacks and All Star paid kickbacks instead of lowering the cost of title and settlement services for borrowers.

### FACTS FOR CLASS REPRESENTATIVE UCHE

38. In or about October, 2015, Plaintiff Godswill Uche obtained a residential mortgage from First Choice Loan Services, Inc. ("First Choice") through First Choice mortgage broker Jason McCotter in relation to the refinancing of Plaintiff's residential real property in Baltimore County, Maryland.

39. First Choice broker McCotter assigned and referred Plaintiff's Refinance to All Star for title and settlement services. On the basis of this assignment and referral, Plaintiff was

8

charged for title and settlement services by All Star and paid for those title and settlement services out of the proceeds of his First Choice loan which settled on October 7, 2015.

40. First Choice broker McCotter assigned and referred the Plaintiff's Refinance to All Star for title and settlement services pursuant to an agreement with All Star for kickbacks as a quid pro quo for assignment of loans, refinances and reverse mortgages to All Star for title and settlement services, and, upon information and belief, did so receive kickbacks and unearned fees from All Star.

41. All Star charged Plaintiff for title and settlement services associated with his Refinance and Plaintiff paid for those charges out of the proceeds of his First Choice loan. A portion of that payment was illegally split and shared with First Choice through the payment of the illegal kickbacks.

42. As a direct and proximate result of its action, All Star harmed Plaintiff by depriving him of kickback-free settlement services, his broker's impartial evaluation of All Star's service and quality, and the consumer benefits of fair competition among independent title and settlement service providers.

43. As a direct and proximate result of its action, All Star harmed Plaintiff because Plaintiff paid higher settlement charges than he would have without the illegal kickbacks, First Choice performed no services in exchange for the kickbacks, and All Star paid kickbacks instead of lowering charges to Plaintiff for title and settlement services.

44. Plaintiff's transaction and the course of events thereafter exemplify the working of the Kickback Scheme, and are typical of the transactions involving all members of the proposed class.

9

## FACTS SUPPORTING EQUITABLE TOLLING

45. As an essential feature of the Kickback Scheme, All Star and Participating Lenders fraudulently concealed from borrowers, including Plaintiff and Class Members, their coordinated business relationship, the Kickback Scheme and the payment, receipt and acceptance of illegal kickbacks associated with any particular loan, refinance or reverse mortgage.

46. All Star fraudulently concealed its coordinated business relationships with Participating Lenders, the kickbacks, and the Kickback Scheme through misrepresentations on borrowers' loan documents, including borrowers HUD-1 statements and loan documents related to government programs insuring or guaranteeing a loan, refinance or reverse mortgage.

47 Under federal law, All Star is required to provide a borrower with HUD-1 settlement statement at closing. All Star adopted as a regular business practice the omission from the HUD-1 statement the payment of a kickback to a Participating Lender related to a borrower's loan. All Star followed this business practice in relation to Plaintiff's HUD-1s, and omitted from all lines of Plaintiff's HUD-1 statement the payment of a kickback to First Choice.

48. In addition, and in the alternative, All Star and Participating Lenders agreed to kickbacks to be paid in a form that All Star and the Participating Lenders believed would not be required to be disclosed on a borrower's HUD-1 or other loan documents.

49. In transactions involving FHA loans, loan originators are required to complete a Direct Endorsement Approval for HUD/FHA Insured Mortgage Form HUD-82900-A ("Direct Endorsement"). Plaintiff's loan was an FHA loan, and First Choice was required and, upon information and belief, completed a Direct Endorsement related to Plaintiff's loan.

10

50. First Choice directed All Star to present the Direct Endorsement to Plaintiff at closing for Plaintiff's review and signature. All Star did so present the Direct Endorsement to Plaintiff and obtained Plaintiff's signature thereon.

51. On Plaintiff's Direct Endorsement, First Choice was required to, and, upon information and belief, certified that "no charge has been made to or paid by the borrower except as permitted under HUD regulations". This representation was false in relation to Plaintiff's loan because All Star illegally split and kicked back to First Choice a portion of the title and settlement services charged Plaintiff in exchange for the assignment and referral of Plaintiff's loan to All Star. HUD regulations prohibit both kickbacks and illegal fee splits. 12 C.F.R. § 1024.14 (b) (prohibiting referral fees), (c) (prohibiting splitting of charges except for actual services performed).

52. On Plaintiff's Direct Endorsement, First Choice also was required to and certified "[i]t has not paid any kickbacks, fees, or consideration of any type, directly or indirectly, to any party in connection with this transaction except as permitted under HUD regulations and administrative instructions." This representation was false as to Plaintiff's loan because First Choice assigned and referred Plaintiff's loan to All Star pursuant to the kickback agreement with All Star and as consideration for the kickback All Star paid First Choice.  HUD regulations prohibit the payment of such consideration. 12 C.F.R. § 1024.14.

53 These false representations on Plaintiff's Direct Endorsement fraudulently concealed: (1) All Star's coordinated business relationship with Participating Lenders including First Choice, (2) the fact that any thing of value was paid by All Star to First Choice for the assignment and referral of Plaintiff's loan, and (3) the amount of the charges reflected on

the HUD-1 that All Star split and paid to First Choice as a kickback related to Plaintiff's loan

54. Additionally, the methods employed by All Star and the Participating Lenders, including First Choice, for transferring things of value were designed to further conceal the payment of illegal kickbacks. These methods included but are not limited to, the form in which the kickbacks were paid and the use of sham and/or seemingly unrelated companies for the payment and receipt of kickbacks.

55. These fraudulent concealments were caused solely by the actions and conduct of All Star and the Participating Lenders, including First Choice, and were outside Plaintiff's control.

56. Plaintiff exercised reasonable diligence before, during and after the closing of the Plaintiff's Refinance.

57. In advance of the closing of his loan, Plaintiff received loan documents prepared by All Star and First Choice and reviewed those loan documents.

58. Upon information and belief, based on All Star's continuing pattern of practice, Plaintiff's pre-closing loan documents did not include any description or statement of the coordinated business relationship between All Star and the Participating Lenders, including First Choice, or the fact that All Star would pay any thing of value for First Choice's assignment and referral of the Plaintiff's Refinance to All Star.

59. Upon information and belief, based on All Star's continuing pattern of practice, Plaintiff's pre-closing documents concealed and did not reflect any amount that would be paid or a thing of value would be given by All Star to First Choice related to the Plaintiff's Refinance.

12

60. The omissions in Plaintiff's pre-closing loan documents were made for the purposes of concealing All Star's coordinated business relationship with Participating Lenders, including First Choice, the Kickback Scheme and the kickbacks related to Plaintiff's refinance and did so conceal from Plaintiff.

61. As was reasonable under the circumstances, Plaintiff believed these documents and the representations made therein. A reasonable borrower would have no reason to believe, and Plaintiff did not believe that a coordinated business relationship existed between All Star and First Choice. A reasonable borrower would have no reason to believe, and Plaintiff did not believe there would be any payment or exchange of a thing of value between All Star and First Choice, or First Choice Broker McCotter, related to Plaintiff's Refinance.

62. Plaintiff acted diligently during the closing or settlement of Plaintiff's Refinance. As a condition of funding his refinance, First Choice required Plaintiff to participate in a closing, and Plaintiff attended and participated in the required closing and settlement.

63. All Star, and or its employees and/or agents, conducted the closing of Plaintiff's Refinance.

64. At the closing of his refinance, All Star provided Plaintiff multiple loan documents, including a HUD-1 statement Direct Endorsement.   Plaintiff reviewed and signed all of the documents All Star provided at the closing, including the HUD-1 statement and Direct Endorsement.   Plaintiff also asked questions and received answers related to questions generated by Plaintiff's review of the closing documents.

65. Upon information and belief, based on All Star's continuing pattern of practice, the documents Plaintiff received at closing did not contain a description or statement of the

13

coordinated relationship between All Star and Participating Lenders, including First Choice.

66. Upon information and belief, based on All Star's continuing pattern of practice, the documents Plaintiff received at closing did not reflect any amount that would be paid by All Star to First Choice related to the Plaintiff's Refinance.

67. Upon information and belief, based on All Star's continuing pattern of practice, the documents All Star chose to provide Plaintiff at closing did not contain a description or statement that a portion of the settlement service charges on the HUD-1 would be split with any third party, including First Choice or First Choice Broker McCotter.

68. The documents All Star chose to provide Plaintiff at closing contained the false statements described in ¶¶51-52 above.

69. The false representations in Plaintiff's closing loan documents were made for the purposes of concealing All Star's coordinated business relationship with Participating Lenders, including First Choice, the Kickback Scheme and the kickbacks related to Plaintiff's refinance and did so conceal from Plaintiff.

70. As was reasonable under the circumstances, Plaintiff believed these documents and the representations made therein. A reasonable borrower would have no reason to believe, and Plaintiff did not believe that a coordinated business relationship existed between All Star and First Choice. A reasonable borrower would not believe, and Plaintiff did not believe, there would be any payment or exchange of a thing of value between All Star and First Choice related to Plaintiff's Refinance.

71. Plaintiff acted diligently after his closing. On or about April 27, 2017, Plaintiff received a letter from undersigned counsel describing the Kickback Scheme and setting forth facts supporting a conclusion that All Star paid kickbacks related to his refinance. Upon

14

receiving a letter from undersigned counsel, Plaintiff's first indication of any potential wrongful, illegal, and/or actionable conduct by anyone, Plaintiff contacted and retained counsel within days and learning of the facts giving rise to the causes of action pled herein. Plaintiff filed this Complaint within one year of Plaintiff becoming aware of facts giving rise to his cause of action.

72. As a result of All Star's fraudulent concealment of its coordinated business relationship with Participating Lenders, including First Choice, and the payment, receipt and acceptance of kickbacks related to the Plaintiff's Refinance, and Plaintiff's diligence before, during and after the closing of his Refinance which was reasonable under the circumstances, the statute of limitations was tolled beginning on the date of his loan closing and continuing until Plaintiff's learning of facts giving rise to his causes of action, on or about April 28, 2017.

73. Plaintiff believes and therefore avers, that the fraudulent concealments described herein were an integral component of the Kickback Scheme, and typical of all Class Members' transactions such that all Class Members are entitled to equitable tolling of the applicable limitations period.

## CLASS ACTION ALLEGATIONS

74. The allegations in the above stated paragraphs are incorporated by reference as if fully restated herein.

75. Plaintiff brings this action on behalf of himself and all other similarly situated individuals pursuant to Fed. R. Civ. P. 23, and the alleged All Star Title Class is defined as follows:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) for which All Star Title, Inc., provided a settlement service, as identified in Section 1100 on the HUD-1, during the time period January 1, 2009

15

through present. Exempted from this class is any person who, during the period January 1, 2009, through present was an employee, officer, member and/or agent of All Star Title Inc.

76. There are questions of law and fact common to the claims of each and all members of the Class. These common questions include, but are not limited to:

a.    Whether Plaintiff and Class Members were deprived of kickback free title and settlement services related to their residential mortgage loans, refinances or reverse mortgages;

b.    Whether All Star paid unearned fees and illegal kickbacks to Participating Lenders for the referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services;

c.    Whether All Star's payments to Participating Lenders, and their employees and/or agents, violated RESPA;

d.    Whether All Star paid illegal kickbacks to Participating Lenders instead of lowering prices for title and settlement services to consumers, including Plaintiff and Class Members;

e.    Whether Plaintiff and Class Members were forced to pay more for title and settlement services because of All Star's payment of kickbacks and unearned fees to Participating Lenders;

f.    Whether All Star and Participating Lenders used a system of false and fraudulent statements and/or omissions on HUD-1s and/or other loan documents to fraudulently conceal the illegal kickbacks, unearned fees, and the Kickback Scheme from Plaintiff and Class Members;

16

g.   Whether Plaintiff's and Class Members' statute of limitations is equitably tolled because of All Star's fraudulent concealment of the illegal kickbacks, unearned fees and the Kickbacks Scheme; and

h.   Whether Plaintiff and the Class are entitled to treble damages and attorneys fees and expenses under RESPA;

77. These common issues of law and fact predominate over any question affecting only individual Class members.

78. Plaintiff's claims, including those for equitable tolling, are typical of the claims or defenses of the respective Class Members, and are subject to the same statutory measure of damages set forth in 12 U.S.C. § 2607(d)(2).

79. Plaintiff will fairly and adequately protect the interests of the Class. The interests of the named Plaintiff and all other members of the Class are identical.

80. Plaintiff's counsel has substantial experience in complex litigation and class action proceedings and will adequately represent the Class's interests.

81. Based upon examination of public records, the Class consists of more than 100 borrowers, and thus are so numerous that joinder of all members is impracticable.

82. Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for All Star.

83. This action entails questions of law and fact common to Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

17

84. The Class Members' causes of action arise from the same single course of conduct and scheme; therefore, a class action is superior to other available methods of fair and efficient of this litigation.

85. As each member of the Class is entitled to the same statutory measure of damages, no member of the Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Md. Rule 2-231.

## COUNT I
### Violation of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2607(a)

86. Plaintiff incorporates the above stated paragraphs as if restated herein.

87. All transactions at issue in the instant complaint are incident to or part of real estate settlement services involving federally related mortgage loans and thereby are subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

88. At all relevant times, All Star was subject to the provisions of RESPA, 12 U.S.C. § 2601, *et. seq.*

89. All Star had an agreement with Participating Lenders, including First Choice, to pay kickbacks and/or things of value in exchange for referrals of federally related loans to All Star in violation of RESPA, 12. U.S.C. § 2607(a).

90. Participating Lenders, including First Choice, in fact assigned and referred federally related loans to All Star and received and accepted things of value from All Star pursuant to the agreement.

91. All Star paid Participating Lenders, including First Choice, things of value as a result of the referral of loans for title and settlement services and pursuant to the agreement.

18

92. All loans assigned and referred to All Star as part of the Kickback Scheme were secured by first or subordinate liens on residential real property and were made in whole or in part by banks, credit unions and other financial institutions whose deposits or accounts are insured by the Federal Government and/or who are regulated by an agency of the Federal Government.

93. The payment and/or arranging of payment of kickbacks to Participating Lenders by All Star and Participating Lenders receipt thereof constitute a violation of § 8(a) of RESPA, which prohibits the payment of referral fees or kickbacks pursuant to an agreement in connection with the origination or brokering of federally related mortgage loans.

94. As a direct and proximate result of All Star's actions, Plaintiff and Class Members were harmed and deprived of kickback free settlement services, impartial and fair competition among independent settlement service agents, and paid more for settlement services than they would have without All Star's coordinated business relationship and the payment of illegal kickbacks.

**COUNT II**
**Violation of the Real Estate Settlement Procedures Act (RESPA),**
**12 U.S.C. § 2607 (b)**

95. Plaintiff incorporates the above stated paragraphs as if restated herein.

96. The borrowers on all loans referred to the All Star as part of the Kickback Scheme were charged for title and settlement services associated with their federally-related mortgage loan.

97 Pursuant to the referral agreement, All Star split and paid a portion of these charges to the Participating Lender.

98. Pursuant to the referral agreement, All Star split and paid a portion of Plaintiff's settlement charges to First Choice.

19

99. The fee splits paid by All Star to Participating Lenders, including First Choice, were made solely for the purpose of All Star receiving referrals and no services were actually performed by Participating Lenders, including First Choice, in connection with the receipt of these payments and/or things of value, in violation of 12 U.S.C. § 2607(b), which prohibits the splitting of fees in connection with federally related mortgage loans.

100. As a direct and proximate result of All Star's conduct, Plaintiff and Cass Members were harmed and deprived of kickback free settlement services, impartial and fair competition among independent settlement service agents, and paid more for settlement services than they would have without All Star's coordinated business relationship and payment of illegal fee splits.

WHEREFORE:

a. Plaintiff respectfully demands this Court certify this class action pursuant to Md. Rule 2-231 and set this matter for trial; and

b. Demands judgment for Plaintiff and Class Members against All Star, and

c. Demands an award to Plaintiff and Class Members in an amount equal to:

   1. Treble damages for settlement services charged by All Star, including, but not limited to, title insurance premiums, in an amount equal to three times the amount of any charge paid for such settlement services, pursuant to 12 U.S.C. § 2607(d)(2);

   2. Reasonable attorneys' fees, interest and costs pursuant to 12 U.S.C. § 2607(d)(5); and

   3. Such other and further relief as this Court deems proper.

Respectfully submitted,

_Timothy F. Maloney/mrs_

Timothy F. Maloney, Esq.
Veronica B. Nannis, Esq.
Megan A. Benevento, Esq.
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
(301) 220-2200 / (301) 220-1214 (fax)
Email: tmaloney@jgllaw.com
vnannis@jgllaw.com
mbenevento@jgllaw.com
*Co-Counsel for Plaintiff and Class Members*

Michael Paul Smith, Esq.
Melissa L. English, Esq.
Sarah A. Zadrozny, Esq.
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, MD 21204
(410) 821-0070 / (410) 821-0071 (fax)
Email: mpsmith@sgs-law.com
menglish@sgs-law.com
szadrozny@sgs-law.com
*Counsel for Plaintiff and Class Members*

## PRAYER FOR JURY TRIAL

Plaintiff and Class Members hereby request a trial by jury on the foregoing Class Action Complaint.

_Timothy F. Maloney/mrs_

Timothy F. Maloney, Esq.
Veronica B. Nannis, Esq.
Megan A. Benevento, Esq.
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
(301) 220-2200 / (301) 220-1214 (fax)
Email: tmaloney@jgllaw.com
vnannis@jgllaw.com
mbenevento@jgllaw.com
*Co-Counsel for Plaintiff and Class Members*

Michael Paul Smith, Esq.
Melissa L. English, Esq.
Sarah A. Zadrozny, Esq.
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, MD 21204
(410) 821-0070 / (410) 821-0071 (fax)
Email: mpsmith@sgs-law.com
menglish@sgs-law.com
szadrozny@sgs-law.com
*Counsel for Plaintiff and Class Members*

21

# EXHIBIT A

IN THE CONSUMER PROTECTION DIVISION
THE OFFICE OF THE ATTORNEY GENERAL OF MARYLAND

----------------------
                          :
IN RE:                    :
                          :
GENUINE TITLE, LLC        :
                          :

_____

                              Thursday, June 12, 2014

Deposition of

                    BRANDON GLICKSTEIN,

a witness called for examination by counsel for the

State of Maryland, pursuant to Notice, at the offices

of the Attorney General, 200 St. Paul Place, 20th

Floor, Baltimore, Maryland 21202, commencing at

10:15 a.m., there being present on behalf of the

respective parties:

ON BEHALF OF THE STATE OF MARYLAND:

        JEFFREY EVANS, ESQUIRE
        Office of the Attorney General
        200 St. Paul Place
        Baltimore, Maryland 21201

                HUNT REPORTING COMPANY
        Court Reporting and Litigation Support
        Serving Maryland, Washington, and Virginia
                410-766-HUNT (4868)
                1-800-950-DEPO (3376)

2

ON BEHALF OF THE RESPONDENT:

    ARI KAREN, ESQUIRE
    DANIELLA CASSERES, ESQUIRE
    Offit Kurman
    4800 Montgomery Lane
    Ninth Floor
    Bethesda, Maryland 20814

ON BEHALF OF MARYLAND INSURANCE ADMINISTRATION:

    PETER BRADY
    Enforcement Officer
    200 St. Paul Place
    Suite 2700
    Baltimore, Maryland 21202

ON BEHALF OF CONSUMER FINANCIAL PROTECTION BUREAU:

    GENESSA STOUT, ESQUIRE
    LAWRENCE D. BROWN, ESQUIRE
    1700 G Street, Northwest
    Washington, DC 20552

REPORTED BY:  KATHLEEN A. COYLE, Notary Public

- - -

HUNT REPORTING COMPANY
Court Reporting and Litigation Support
Serving Maryland, Washington, and Virginia
410-766-HUNT (4868)
1-800-950-DEPO (3376)

224

1    why we're sitting here today.

2        Q    Okay.

3        A    But, no.

4        Q    Okay.  And then there have been, you know,

5    comments made at various places off the record with

6    numerous people about this conduct -- and by conduct I

7    mean either directly paying people for referrals or

8    paying for marketing or some other service in order to

9    get referrals -- is common in the title industry.  Do

10   you know of or do you have personal knowledge of other

11   title companies that are engaging in similar conduct?

12       A    Yes.

13       Q    Okay.  And what's your knowledge and who are

14   they?

15       A    Can I talk to my counsel?

16            MR. KAREN:  Sure.  We can -- do you mind if

17   we step out?

18                 (Whereupon, there was a short recess.)

19            THE WITNESS:  Okay.  So, yes.  Other

20   companies that I know of, the most popular ones, or the

21   one would be All Star Title.  The company that's no

225

1    long around, but ELTG.  I know of you know, I know of

2    ELTG doing that.  There's another title company that

3    would do the same data service with their clients.  And

4    the name of that company at the moment is escaping me.

5    However, I will be able to recall it.  But they were --

6                BY MR. EVANS:

7        Q    If you don't -- before we finish, if you just

8    want to communicate it to your attorneys and they'll

9    let us know.

10       A    Okay.  And they were -- so this -- the data

11   process, it was just with Wells Fargo, just started,

12   probably started with Genuine Title.  But shortly after

13   there were, you know, it was no secret that, you know,

14   these, some other, some other title companies made

15   these connections and purchased data for --

16       Q    And provided it to other branches at Wells

17   Fargo?

18       A    Absolutely.

19       Q    Okay.  And then at some point Wells Fargo

20   said, we can't -- we've got to stop this practice?

21       A    Right.

HUNT REPORTING COMPANY
Court Reporting and Litigation Support
Serving Maryland, Washington, and Virginia
410-766-HUNT (4868)

232

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript and, with corrections made by me, the same is a true record of the testimony given by me.

_____
BRANDON GLICKSTEIN

Subscribed and sworn to before me this _____ day of _____, 2014.

_____
Notary Public in and for
the State of Maryland

My Commission Expires:

_____

HUNT REPORTING COMPANY
Court Reporting and Litigation Support
Serving Maryland, Washington, and Virginia
410-766-HUNT (4868)
1-800-950-DEPO (3376)

CERTIFICATE OF NOTARY

I, KATHLEEN A. COYLE, the officer before whom the foregoing testimony was taken, do hereby certify that the witness whose testimony appears in the foregoing transcript was duly sworn by me; that the testimony of said witness was taken by me by stenomask means and thereafter reduced to typewriting by me or under my direction; that said testimony is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this testimony is taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

This certification is expressly withdrawn and denied upon the disassembly or photocopying of the foregoing transcript of the proceedings or any part thereof, including exhibits, unless said disassembly or photocopying is done by the undersigned court reporter and/or under the auspices of Hunt Reporting Company, and the signature and original seal is attached thereto.

KATHLEEN A. COYLE
Notary Public in and for
the State of Maryland

My Commission Expires:

April 30, 2018

HUNT REPORTING COMPANY
Court Reporting and Litigation Support
Serving Maryland, Washington, and Virginia
410-766-HUNT (4868)
1-800-950-DEPO (3376)

# EXHIBIT B

REDACTED

Azevedo Solutions Group, Inc.
417 Kohler Ct
Santa Rosa CA 95404

# Invoice

Date 6/20/2013
Invoice # 2755

**Bill To**
All Star Title

**Ship To**

P.O. #
Terms

Ship Date 6/20/2013
Due Date 6/20/2013
Other

| Item | Description | Qty | Price | Amount |
|---|---|---|---|---|
| Marketing | marekting services | | 1,250.00 | 1,250.00 |
| Credit | | | -625.00 | -625.00 |
| | Pay your bills online at: | | | |
| | https://www.intuitbillpay.com/azevedosolutionsgroup | | | |

| | |
|---|---|
| Subtotal | $625.00 |
| Sales Tax (0.0%) | $0.00 |
| Total | $625.00 |
| Payments/Credits | $0.00 |
| Balance Due | $625.00 |

*Azevedo Solutions Group, Inc.*
mario@azevedo.com                707-568-5013

EXHIBIT C

```
------------------------------
                            :
                            :   IN THE CONSUMER
IN RE:                      :
                            :   PROTECTION DIVISION
    GENUINE TITLE, LLC      :
                            :   THE OFFICE OF
                            :
                            :   THE ATTORNEY GENERAL
                            :
                            :   OF MARYLAND
------------------------------
```

Thursday, April 24, 2014

Deposition of

                JAY ZUCKERBERG,

the Respondent, called for examination by counsel for

the Consumer Protection Division, pursuant to Notice,

at the Office of the Maryland Attorney General, 200 St.

Paul Place, 16th Floor, Baltimore, Maryland 21202,

commencing at 10:02 a.m., there being present on behalf

of the respective parties:

HUNT REPORTING COMPANY
Court Reporting and Litigation Support
Serving Maryland, Washington, and Virginia
410-766-HUNT (4868)
1-800-950-DEPO (3376)

2

ON BEHALF OF THE CONSUMER PROTECTION DIVISION:

    JEFFREY EVANS, ESQUIRE
    Assistant Attorney General
    Office of the Attorney General
    Consumer Protection Division
    200 St. Paul Place
    16th Floor
    Baltimore, Maryland 21202

ON BEHALF OF THE RESPONDENT:

    J. STEVEN LOVEJOY, ESQUIRE
    Shumaker Williams, P.C.
    Dulaney Center II
    901 Dulaney Valley Road
    Suite 610
    Towson, Maryland 21204

    AND

    MICHELLE N. LIPKOWITZ, ESQUIRE
    Saul Ewing
    Lockwood Place
    500 East Pratt Street
    Baltimore, Maryland 21202-3133

ALSO PRESENT:   GENESSA STOUT
               PETER BRADY
               CAROL A. FRYE
               LUCY CARDWELL

REPORTED BY:   GEOFFREY L. HUNT, CVR-CM, NOTARY PUBLIC

- - -

HUNT REPORTING COMPANY
Court Reporting and Litigation Support
Serving Maryland, Washington, and Virginia
410-766-HUNT (4868)
1-800-950-DEPO (3376)

69

1   obtain the payoff, but that definitely wasn't something

2   that we discussed that would be paid because of that.

3        Q    Right.  You weren't -- you weren't paying --

4        A    But --

5        Q    -- Angela for obtaining the payoff?

6        A    But she may have obtained the payoff --

7        Q    Right.

8        A    -- anyway.

9        Q    Okay.  But she -- she would have done that as

10  her role as the mortgage originator so that the deal

11  could close?

12       A    Correct.

13       Q    Not so that she could earn a $75.00 payment

14  from you?

15       A    Correct.

16       Q    Okay.  All right.  So -- and -- and

17  agreements that are basically identical to this

18  agreement were signed by the other entities that we've

19  just talked about?

20       A    Correct.

21       Q    All right.  And I think you referred earlier

1    to the fact that when you started making these referral

2    payments that there were other title companies that

3    were offering similar inducements to the mortgage

4    originators in order to refer settlement work to them?

5          A    Correct.

6          Q    And who were those?

7          A    I don't know specific names.  I know there's

8    an All Star Title is one of our competitors.  Again, I

9    don't -- I didn't work at All Star, so I don't know --

10   I can only speculate.

11         Q    Well, I mean, did you form some understanding

12   as a result of --

13         A    Formed an understanding that there was other

14   title companies willing to market or do other things.

15         Q    Okay.  And -- and you formed that because you

16   were talking to these mortgage originators who were

17   telling you that other title companies are offering

18   them inducements?

19         A    Correct.

20         Q    Okay.  I mean, is that how it happened?

21         A    On a few of them.  I'll give you an example.

1   Like not -- not Gary only because I've known Gary.

2   Gary was going to give me the business -- even if

3   another title company was offering him something, he

4   would have brought it in my direction.

5          So I don't really like know if Gary Klopp

6   actually got offered something from somebody else.  I

7   would assume he did.  That might be a question for

8   Gary.  But like I know Angela, I believe, was getting

9   marketing paid for by All Star Title.

10   Q   And -- and why do you say that?

11   A   Because she told me.

12   Q   Okay.  And do you know -- what was -- what

13   did she tell you about it?  What was the form of the

14   marketing that they were paying for?

15   A   They were paying for mail, for her to -- for

16   her to send -- them to send mail out for her.

17   Q   Okay.  And when you say paying for mail, what

18   does -- what does that mean?

19   A   Mail to homeowners to try to get closings.

20   Q   Okay.

21   A   Like a marketing piece.

)
                                                                72

1       Q    And how were they coming up with the list of

2   the homeowners in order to send the mailing to?

3       A    I don't know how they were doing it.  It's

4   not hard.

5       Q    Okay.

6       A    You can buy a list from -- there's a hundred

7   places to buy a list from.

8       Q    Okay.  And so it's your belief that they were

9   buying the lists for her?

10      A    Buying the list and mailing -- and doing the

11  actual mail for her as well.

12      Q    Okay.  So they would buy a list, prepare a

13  letter, stuff the letter in an envelope --

14      A    Correct.

15      Q    -- and pay for the postage?

16      A    Correct.

17      Q    Okay.  And when did she tell you that that

18  was happening?

19      A    I guess prior to us doing business.  So I'm

20  not sure when the first check to Mark, LLC was, but

21  prior to that, I believe she was using All Star before

73

1    us.

2        Q    Okay.  And do you know if she continued to

3    use All Star after you started making the payments?

4        A    I don't know.  I don't think so.

5        Q    You think she switched over and used you

6    exclusively?

7        A    Yes.

8        Q    Okay.  Anybody else?

9        A    I'm not sure.  I'm not sure offhand any other

10   title companies that I can think of.

11       Q    Okay.  So you don't remember having any

12   conversations with these mortgage originators --

13       A    A few --

14       Q    -- about other title companies offering them

15   inducements?

16       A    I do, but I don't remember the names of the

17   title companies.

18       Q    Okay.  Who -- do you remember who you had the

19   conversation with?

20       A    I do know Net Equity was dealing with -- I

21   know who, Casa Title, Mi Casa Title.

CERTIFICATE OF NOTARY

I, GEOFFREY L. HUNT, CVR-CM, the officer before whom the foregoing testimony was taken, do hereby certify that the witness whose testimony appears in the foregoing transcript was duly sworn by me; that the testimony of said witness was taken by me by stenomask means and thereafter reduced to typewriting by me or under my direction; that said testimony is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this testimony is taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

This certification is expressly withdrawn and denied upon the disassembly or photocopying of the foregoing transcript of the proceedings or any part thereof, including exhibits, unless said disassembly or photocopying is done by the undersigned court reporter and/or under the auspices of Hunt Reporting Company, and the signature and original seal is attached thereto.

GEOFFREY L. HUNT, CVR-CM
Notary Public in and for
the State of Maryland

My Commission Expires:

HUNT REPORTING COMPANY
Court Reporting and Litigation Support
Serving Maryland, Washington, and Virginia
410-766-HUNT (4868)
1-800-950-DEPO (3376)

IN THE CIRCUIT COURT FOR <u>Baltimore County</u>
                                                    (City or County)

## CIVIL - NON-DOMESTIC CASE INFORMATION REPORT

### DIRECTIONS

*Plaintiff*: This Information Report must be completed and attached to the complaint filed with the Clerk of Court unless your case is exempted from the requirement by the Chief Judge of the Court of Appeals pursuant to Rule 2-111(a).

*Defendant*: You must file an Information Report as required by Rule 2-323(h).

***THIS INFORMATION REPORT CANNOT BE ACCEPTED AS A PLEADING***

FORM FILED BY: ☒PLAINTIFF ☐DEFENDANT  CASE NUMBER _____
                                                                        (Clerk to insert)

CASE NAME: <u>Godswill Uche</u>                         vs.  <u>All Star Title, Inc.</u>
                          Plaintiff                                           Defendant

PARTY'S NAME: <u>Godswill Uche</u>                              PHONE: _____

PARTY'S ADDRESS: <u>2103 Lukewood Drive, Gwynn Oak, MD 21207</u>

PARTY'S E-MAIL: _____

If represented by an attorney:

PARTY'S ATTORNEY'S NAME: <u>Michael Paul Smith</u>         PHONE: <u>410-821-0070</u>

PARTY'S ATTORNEY'S ADDRESS: <u>600 Washington Avenue, Suite 200, Towson, MD 21204</u>

PARTY'S ATTORNEY'S E-MAIL: <u>mpsmith@sgs-law.com</u>

JURY DEMAND? ☒Yes ☐No

RELATED CASE PENDING? ☐Yes ☒No  If yes, Case #(s), if known: _____

ANTICIPATED LENGTH OF TRIAL?: ____ hours  <u>14</u> days

### PLEADING TYPE

New Case: ☒Original  ☐Administrative Appeal  ☐Appeal

Existing Case: ☐Post-Judgment  ☐Amendment

*If filing in an existing case, skip Case Category/Subcategory section - go to Relief section.*

### IF NEW CASE: CASE CATEGORY/SUBCATEGORY *(Check one box.)*

**TORTS**
- ☐ Asbestos
- ☐ Assault and Battery
- ☐ Business and Commercial
- ☐ Conspiracy
- ☐ Conversion
- ☐ Defamation
- ☐ False Arrest/Imprisonment
- ☐ Fraud
- ☐ Lead Paint - DOB of Youngest Plt: _____
- ☐ Loss of Consortium
- ☐ Malicious Prosecution
- ☐ Malpractice-Medical
- ☐ Malpractice-Professional
- ☐ Misrepresentation
- ☐ Motor Tort
- ☐ Negligence
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability
- ☐ Specific Performance
- ☐ Toxic Tort
- ☐ Trespass
- ☐ Wrongful Death

**CONTRACT**
- ☐ Asbestos
- ☐ Breach
- ☐ Business and Commercial
- ☐ Confessed Judgment (Cont'd)
- ☐ Construction
- ☐ Debt
- ☒ Fraud

- ☐ Government
- ☐ Insurance
- ☐ Product Liability

**PROPERTY**
- ☐ Adverse Possession
- ☐ Breach of Lease
- ☐ Detinue
- ☐ Distress/Distrain
- ☐ Ejectment
- ☐ Forcible Entry/Detainer
- ☐ Foreclosure
  - ☐ Commercial
  - ☐ Residential
  - ☐ Currency or Vehicle
  - ☐ Deed of Trust
  - ☐ Land Installments
  - ☐ Lien
  - ☐ Mortgage
  - ☐ Right of Redemption
  - ☐ Statement Condo
- ☐ Forfeiture of Property / Personal Item
- ☐ Fraudulent Conveyance
- ☐ Landlord-Tenant
- ☐ Lis Pendens
- ☐ Mechanic's Lien
- ☐ Ownership
- ☐ Partition/Sale in Lieu
- ☐ Quiet Title
- ☐ Rent Escrow
- ☐ Return of Seized Property
- ☐ Right of Redemption
- ☐ Tenant Holding Over

**PUBLIC LAW**
- ☐ Attorney Grievance
- ☐ Bond Forfeiture Remission
- ☐ Civil Rights
- ☐ County/Mncpl Code/Ord
- ☐ Election Law
- ☐ Eminent Domain/Condemn.
- ☐ Environment
- ☐ Error Coram Nobis
- ☐ Habeas Corpus
- ☐ Mandamus
- ☐ Prisoner Rights
- ☐ Public Info. Act Records
- ☐ Quarantine/Isolation
- ☐ Writ of Certiorari

**EMPLOYMENT**
- ☐ ADA
- ☐ Conspiracy
- ☐ EEO/HR
- ☐ FLSA
- ☐ FMLA
- ☐ Workers' Compensation
- ☐ Wrongful Termination

**INDEPENDENT PROCEEDINGS**
- ☐ Assumption of Jurisdiction
- ☐ Authorized Sale
- ☐ Attorney Appointment
- ☐ Body Attachment Issuance
- ☐ Commission Issuance

- ☐ Constructive Trust
- ☐ Contempt
- ☐ Deposition Notice
- ☐ Dist Ct Mtn Appeal
- ☐ Financial
- ☐ Grand Jury/Petit Jury
- ☐ Miscellaneous
- ☐ Perpetuate Testimony/Evidence
- ☐ Prod. of Documents Req.
- ☐ Receivership
- ☐ Sentence Transfer
- ☐ Set Aside Deed
- ☐ Special Adm. - Atty
- ☐ Subpoena Issue/Quash
- ☐ Trust Established
- ☐ Trustee Substitution/Removal
- ☐ Witness Appearance-Compel

**PEACE ORDER**
- ☐ Peace Order

**EQUITY**
- ☐ Declaratory Judgment
- ☐ Equitable Relief
- ☐ Injunctive Relief
- ☐ Mandamus

**OTHER**
- ☐ Accounting
- ☐ Friendly Suit
- ☐ Grantor in Possession
- ☐ Maryland Insurance Administration
- ☐ Miscellaneous
- ☐ Specific Transaction
- ☐ Structured Settlements

CC-DCM-002 (Rev. 04/2017)                    Page 1 of 3

| IF NEW OR EXISTING CASE: RELIEF (Check All that Apply) | | | |
|---|---|---|---|
| ☐ Abatement | ☐ Earnings Withholding | ☐ Judgment-Interest | ☐ Return of Property |
| ☐ Administrative Action | ☐ Enrollment | ☐ Judgment-Summary | ☐ Sale of Property |
| ☐ Appointment of Receiver | ☐ Expungement | ☒ Liability | ☐ Specific Performance |
| ☐ Arbitration | ☐ Findings of Fact | ☐ Oral Examination | ☐ Writ-Error Coram Nobis |
| ☐ Asset Determination | ☐ Foreclosure | ☐ Order | ☐ Writ-Execution |
| ☐ Attachment b/f Judgment | ☐ Injunction | ☐ Ownership of Property | ☐ Writ-Garnish Property |
| ☐ Cease & Desist Order | ☐ Judgment-Affidavit | ☐ Partition of Property | ☐ Writ-Garnish Wages |
| ☐ Condemn Bldg | ☐ Judgment-Attorney Fees | ☐ Peace Order | ☐ Writ-Habeas Corpus |
| ☐ Contempt | ☐ Judgment-Confessed | ☐ Possession | ☐ Writ-Mandamus |
| ☒ Court Costs/Fees | ☐ Judgment-Consent | ☐ Production of Records | ☐ Writ-Possession |
| ☒ Damages-Compensatory | ☐ Judgment-Declaratory | ☐ Quarantine/Isolation Order | |
| ☐ Damages-Punitive | ☐ Judgment-Default | ☐ Reinstatement of Employment | |

*If you indicated Liability above,* mark one of the following. This information is <u>not</u> an admission and may not be used for any purpose other than Track Assignment.

☐ Liability is conceded.   ☒ Liability is not conceded, but is not seriously in dispute.   ☐ Liability is seriously in dispute.

| MONETARY DAMAGES (Do not include Attorney's Fees, Interest, or Court Costs) |
|---|

☐ Under $10,000     ☐ $10,000 - $30,000     ☐ $30,000 - $100,000     ☒ Over $100,000

☐ Medical Bills $_____     ☐ Wage Loss $_____     ☐ Property Damages $_____

| ALTERNATIVE DISPUTE RESOLUTION INFORMATION |
|---|

Is this case appropriate for referral to an ADR process under Md. Rule 17-101? (Check all that apply)
A. Mediation      ☐ Yes   ☒ No          C. Settlement Conference   ☐ Yes   ☒ No
B. Arbitration    ☐ Yes   ☒ No          D. Neutral Evaluation       ☐ Yes   ☒ No

| SPECIAL REQUIREMENTS |
|---|

☐ If a Spoken Language Interpreter is needed, check here and attach form CC-DC-041

☐ If you require an accommodation for a disability under the Americans with Disabilities Act, check here and attach form CC-DC-049

| ESTIMATED LENGTH OF TRIAL |
|---|

*With the exception of Baltimore County and Baltimore City, please fill in the estimated LENGTH OF TRIAL.*          ***(Case will be tracked accordingly)***

☐ 1/2 day of trial or less          ☐ 3 days of trial time

☐ 1 day of trial time               ☐ More than 3 days of trial time

☐ 2 days of trial time

| BUSINESS AND TECHNOLOGY CASE MANAGEMENT PROGRAM |
|---|

*For all jurisdictions, if Business and Technology track designation under Md. Rule 16-308 is requested, attach a duplicate copy of complaint and check one of the tracks below.*

☐ Expedited- Trial within 7 months of          ☐ Standard - Trial within 18 months of
Defendant's response                              Defendant's response

| EMERGENCY RELIEF REQUESTED |
|---|

## COMPLEX SCIENCE AND/OR TECHNOLOGICAL CASE MANAGEMENT PROGRAM (ASTAR)

*FOR PURPOSES OF POSSIBLE SPECIAL ASSIGNMENT TO ASTAR RESOURCES JUDGES under Md. Rule 16-302, attach a duplicate copy of complaint and check whether assignment to an ASTAR is requested.*

☐ **Expedited** - Trial within 7 months of Defendant's response        ☐ **Standard** - Trial within 18 months of Defendant's response

*IF YOU ARE FILING YOUR COMPLAINT IN BALTIMORE CITY, OR BALTIMORE COUNTY, PLEASE FILL OUT THE APPROPRIATE BOX BELOW.*

### CIRCUIT COURT FOR BALTIMORE CITY (CHECK ONLY ONE)

☐ Expedited — Trial 60 to 120 days from notice. Non-jury matters.
☐ Civil-Short — Trial 210 days from first answer.
☐ Civil-Standard — Trial 360 days from first answer.
☐ Custom — Scheduling order entered by individual judge.
☐ Asbestos — Special scheduling order.
☐ Lead Paint — Fill in: Birth Date of youngest plaintiff_____.
☐ Tax Sale Foreclosures — Special scheduling order.
☐ Mortgage Foreclosures — No scheduling order

### CIRCUIT COURT FOR BALTIMORE COUNTY

☐ **Expedited** (Trial Date-90 days) — Attachment Before Judgment, Declaratory Judgment (Simple), Administrative Appeals, District Court Appeals and Jury Trial Prayers, Guardianship, Injunction, Mandamus.

☐ **Standard** (Trial Date-240 days) — Condemnation, Confessed Judgments (Vacated), Contract, Employment Related Cases, Fraud and Misrepresentation, International Tort, Motor Tort, Other Personal Injury, Workers' Compensation Cases.

☐ **Extended Standard** (Trial Date-345 days) — Asbestos, Lender Liability, Professional Malpractice, Serious Motor Tort or Personal Injury Cases (medical expenses and wage loss of $100,000, expert and out-of-state witnesses (parties), and trial of five or more days), State Insolvency.

☒ **Complex** (Trial Date-450 days) — Class Actions, Designated Toxic Tort, Major Construction Contracts, Major Product Liabilities, Other Complex Cases.

April 27, 2018
Date

600 Washington Avenue, Suite 200
Address

Towson          MD     21204
City            State   Zip Code

_____
Signature of Counsel / Party

Michael Paul Smith
Printed Name

CC-DCM-002 (Rev. 04/2017)          Page 3 of 3

# EXHIBIT 3

Case Header Information

CaseSearch        Circuit Court of Maryland

## Case Information

Court System: **Circuit Court For Baltimore County - Civil**
Location:       **Baltimore County Circuit Court**
Case Number: **03-C-18-004296**
Title:          **Uche vs All Star Title Inc**
Case Type:    **Tort - Other**
Filing Date:    **04/27/2018**
Case Status:   **Closed / Inactive**

## Involved Parties Information

### Defendant

Name: **All Star Title Inc**
Address: **1421 Clarkview Road**
        **Suite 108**
City:      **Baltimore**   State: **MD**   Zip Code: **21209**

*Attorney(s) for the Defendant*

Name:           **LEVY, HARRY**
Appearance Date: **09/13/2018**
Removal Date:     **02/15/2019**
Address Line 1:    **SHUMAKER WILLIAMS PC**
Address Line 2:    **901 DULANEY VALLEY RD**
Address Line 3:    **STE 610**
City:           **TOWSON**   State: **MD**   Zip Code: **21204**

### Plaintiff

Name: **Uche, Godswill**
Address: **2103 Lukewood Rive**
City:      **Gwynn Oak**   State: **MD**   Zip Code: **21207**

*Attorney(s) for the Plaintiff*

Name:           **Zadrozny, Sarah A**
Appearance Date: **04/30/2018**
Removal Date:     **02/15/2019**
Address Line 1:    **Smith, Gildea & Schmidt, LLC**
Address Line 2:    **600 Washington Ave**
Address Line 3:    **Suite 200**
City:           **Towson**   State: **MD**   Zip Code: **21204**

Name:           **SMITH, MICHAEL PAUL**
Appearance Date: **04/30/2018**
Removal Date:     **02/15/2019**

Case Header Information

| | |
|---|---|
| Address Line 1: | **Smith Gildea & Schmidt L L C** |
| Address Line 2: | **600 Washington Avenue** |
| Address Line 3: | **Suite 200** |
| City: | **Towson**   State: **MD**   Zip Code: **21204** |

| | |
|---|---|
| Name: | **MALONEY, TIMOTHY FRANCIS** |
| Appearance Date: | **04/30/2018** |
| Removal Date: | **02/15/2019** |
| Address Line 1: | **Joseph, Greenwald And Laake** |
| Address Line 2: | **6404 Ivy Lane** |
| Address Line 3: | **Suite 400** |
| City: | **Greenbelt**   State: **MD**   Zip Code: **20770** |

| | |
|---|---|
| Name: | **Nannis, Veronica Byam** |
| Appearance Date: | **04/30/2018** |
| Removal Date: | **02/15/2019** |
| Address Line 1: | **Joseph, Greenwald & Laake, PA** |
| Address Line 2: | **6404 Ivy Lane** |
| Address Line 3: | **Suite 400** |
| City: | **Greenbelt**   State: **MD**   Zip Code: **20770** |

| | |
|---|---|
| Name: | **Benevento, Megan A** |
| Appearance Date: | **04/30/2018** |
| Removal Date: | **02/15/2019** |
| Address Line 1: | **Joseph Greenwald & Laake P.A.** |
| Address Line 2: | **6404 Ivy Lane** |
| Address Line 3: | **Suite 400** |
| City: | **Greenbelt**   State: **MD**   Zip Code: **20770** |

| | |
|---|---|
| Name: | **English, Melissa L** |
| Appearance Date: | **04/30/2018** |
| Removal Date: | **02/15/2019** |
| Address Line 1: | **Stombaugh, Smith & Company** |
| Address Line 2: | **600 Washington Ave** |
| Address Line 3: | **Suite 204** |
| City: | **Towson**   State: **MD**   Zip Code: **21204** |

## Receiver

Name: **Gillis, David D**

## Converted Fee Party

Name: **FeeParty, Converted**

## Court Scheduling Information

| Event Type | Event Date | Event Time | Court Location | Court Room | Result |
|---|---|---|---|---|---|
| Conference - Scheduling | 11/02/2018 | 14:00:00 | Conversion - Baltimore Circuit Court | Courtroom 10 - 3rd Floor | POST |
| Conference - | 01/25/2019 | 09:00:00 | Conversion - Baltimore | Courtroom 14 - 4th | CAVA |

Case Header Information

| Scheduling | Circuit Court | Floor |
|---|---|---|

## Judgment Information

Judgment Event Type: **Case Disposition History**

## Document Information

File Date: **04/27/2018**
Filed By:
Document Name: **Complaint with Request for Jury Trial**
Comment: **Motion: 1 Sequence: 0 Create Initials: MEC Create Date: 04/30/2018 Update Initials: EMH Update Date: 01/24/2019 DIRT - Complaint with Request for Jury Trial With Exhibits Filed: 04/27/2018 Party: PLT PartyNum: 1 PartyName: Godswill Uche**

---

File Date: **04/27/2018**
Filed By:
Document Name: **Summons Issued (Service Event)**
Comment: **Motion: 2 Sequence: 0 Create Initials: MEC Create Date: 04/30/2018 NWSU - Writ of Summons - Civil Filed: 04/27/2018 Party: DEF PartyNum: 1 All Star Title Inc Routing: 04/30/2018**

---

File Date: **04/30/2018**
Filed By:
Document Name: **Service Issued**
Comment: **ServedDate: Jun 28 2018 12:00AM ServiceAgency: Pps FreeText: JMN 7/9/18 ResponseDate: Jul 28 2018 12:00AM Party Name: All Star Title Inc Response: Jul 28 2018 12:00AM**

---

File Date: **07/11/2018**
Filed By:
Document Name: **Affidavit of Service**
Comment: **Motion: 3 Sequence: 0 Create Initials: MEC Create Date: 07/12/2018 DAFS - Affidavit of Service Served Jason Horwitz, Resident Agent of and for All Star Title Inc. a Writ of Summons, Complaint, Prayer for Jury Trial, Non-Domestic Information Report and Exhibits on 06/28/18 Filed: 07/11/2018**

---

File Date: **09/04/2018**
Filed By:
Document Name: **Order**
Comment: **Motion: 4 Sequence: 0 Create Initials: EMH Create Date: 09/04/2018 DORD - Stipulated protective order for the protection of confidential non-public information Filed: 09/04/2018 Decision: Granted - 09/04/2018**

---

File Date: **09/04/2018**
Filed By:
Document Name: **Motion and Order**
Comment: **Motion: 5 Sequence: 0 Create Initials: EMH Create Date: 09/04/2018 Update Initials: EMH Update Date: 09/04/2018 MMOR - Joint petition to appoint receiver Filed by PLT001-Uche, DEF001-All Star Title Inc Filed: 09/04/2018 Party: PLT PartyNum: 1 PartyName: Godswill Uche Decision: Granted - 09/04/2018**

File Date: **09/10/2018**
Filed By:
Document Name: **Answer**

| | |
|---|---|
| Comment: | **Motion: 1 Sequence: 1 Create Initials: CNB Create Date: 09/13/2018 Update Initials: EMH Update Date: 01/24/2019 DANS - Answer to Complaint Filed: 09/10/2018 Party: DEF PartyNum: 1 All Star Title Inc** |

| | |
|---|---|
| File Date: | **09/21/2018** |
| Filed By: | |
| Document Name: | **Notice of Scheduling Conference Issued** |
| Comment: | **Motion: 6 Sequence: 0 Create Initials: AC Create Date: 09/21/2018 NSCI - Notice of Scheduling Conference Issued Filed: 09/21/2018 Routing: 09/21/2018** |

| | |
|---|---|
| File Date: | **09/26/2018** |
| Filed By: | |
| Document Name: | **Returned Mail** |
| Comment: | **Motion: 7 Sequence: 0 Create Initials: MEC Create Date: 09/28/2018 Update Initials: EMH Update Date: 01/24/2019 TRPO - Returned from Post Office Stipulated Protective Order for the Protection of Confidential Non-Public Information sent to All Star Title Inc. Filed: 09/26/2018** |

| | |
|---|---|
| File Date: | **11/02/2018** |
| Filed By: | |
| Document Name: | **Notice of Scheduling Conference Issued** |
| Comment: | **Motion: 8 Sequence: 0 Create Initials: AC Create Date: 11/02/2018 NSCI - Notice of Scheduling Conference Issued Filed: 11/02/2018 Routing: 11/02/2018** |

| | |
|---|---|
| File Date: | **11/02/2018** |
| Filed By: | |
| Document Name: | **Result Reason: Joint Request** |
| Comment: | |

| | |
|---|---|
| File Date: | **01/24/2019** |
| Filed By: | |
| Document Name: | **Complaint - Amended** |
| Comment: | **Motion: 9 Sequence: 0 Create Initials: EMH Create Date: 01/24/2019 Update Initials: EMH Update Date: 01/24/2019 DCAM - Amended Complaint Filed: 01/24/2019 Party: PLT PartyNum: 1 PartyName: Godswill Uche** |

| | |
|---|---|
| File Date: | **01/24/2019** |
| Filed By: | |
| Document Name: | **Dismissal - Voluntary** |
| Comment: | **Motion: 10 Sequence: 0 Create Initials: EMH Create Date: 01/24/2019 Update Initials: EMH Update Date: 01/24/2019 DVDE - Notice of voluntary dismissal Filed: 01/24/2019 Party: PLT PartyNum: 1 PartyName: Godswill Uche** |

| | |
|---|---|
| File Date: | **01/24/2019** |
| Filed By: | |
| Document Name: | **Result Reason: Scheduled in Error** |
| Comment: | |

## Service Information

| Service Type | Issued Date | Service Status |
|---|---|---|
| Writ of Summons | 04/30/2018 | |

*This is an electronic case record. Full case information cannot be made available either because of legal restrictions on access to case records found in Maryland Rules, or because of the practical difficulties inherent in reducing a case record into an electronic format.*

# EXHIBIT 4

**SMITH, GILDEA & SCHMIDT** LLC

MICHAEL PAUL SMITH
DAVID K. GILDEA
LAWRENCE E. SCHMIDT
MICHAEL G. DEHAVEN
JASON T. VETTORI

LAUREN D BENTA
MARIELA C D'ALES
MELISSA L ENGI
CARMELO D. MORA
SARAH A ZADRO
*of counsel*
EUGENE A. ARBAUGH
DAVID T LAMP
MARY G LO
STEPHEN J NO

December 19, 2018

**VIA Priority Mail**

████████████████

1203 Dairy Road
Parkton, MD 21120

**Re: All Star Title, Inc. –** ██████████████ **Kickback Investigation and Lawsuit**

Dear Mr. and Ms. ██████

    We are currently investigating and preparing to file a class action complaint related **All Star Title, Inc.** The allegations are that illegal kickbacks were paid by All Star Title, Inc., ██████████████ in exchange for the referral of people like you for mortgage lo settlement services. As a result, borrowers like you paid more for mortgage loan settlem services than you would have without the payment of illegal kickbacks. If true, this prac violates the federal law known as the Real Estate Settlement Procedures Act (RESPA).

    Our review of public records shows that you had a settlement on a loan brokere originated by ██████████████████████, on or around 4/2/2012. Encl please find a copy of your Deed of Trust. This is right in the timeframe that our investiga and evidence show the kickbacks were occurring. As part of our investigation, we would to talk with you about your situation.

    ... m today at 410-821-0070 to discuss your experience and our investig ... hether you have a legal claim.

    ... rtant that you act quickly. We look forward to hearing from you.

Sincerely,

Michael Paul Smith

Enclosure